FILED'08 SEP 30 16:21 usdc-orp

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEFFREY RAY WILLIAMS,                  )
                                       )       Civil No. 03-1678-JO
            Petitioner,                )
                                       )
      v.                               )       OPINION AND ORDER
                                       )
BRIAN BELLEQUE,                        )
Superintendent, Oregon                 )
State Penitentiary,                    )
                                       )
            Respondent.                )

      Steven T. Wax
      Federal Public Defender
      Patrick J. Ehlers
      Assistant Federal Public Defender
      Kristina Hellman
      Assistant Federal Public Defender
      101 S.W. Main Street, Suite 1700
      Portland, Oregon 97204

            Attorneys for Petitioner

      Hardy Myers
      Attorney General
      Timothy Sylwester

1 - OPINION AND ORDER

Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97301

      Attorneys for Respondent

JONES, District Judge.

      Petitioner, an inmate on death row, moves for summary judgment on Claims 1, 2, 3, 7, and 10(A) of the Petition for Writ of Habeas Corpus (#85). For the reasons set forth below, I conclude that petitioner has not demonstrated that he is entitled to habeas corpus relief on Grounds One through Five. Therefore, petitioner's motion for partial summary judgment (#95) is denied. Also before the court is respondent's motion for leave to respond to petitioner's reply and request for oral argument on petitioner's motion for summary judgment (#117), which is granted in part and denied in part.

## BACKGROUND

      The facts regarding the two aggravated murders of which petitioner was convicted are set forth in State v. Williams, 313 Or. 19, 828 P.2d 1006, cert. denied, 506 U.S. 858 (1992) (hereinafter "Williams I") and State v. Simonsen, 310 Or. 412, 798 P.2d 241 (1990) (affirming convictions for aggravated murder and remanding case for a new sentencing proceeding). Briefly, this case involves the murder of two young German women who were on vacation in the United States and hitchhiking from California to Oregon. Petitioner and David Simonsen were seen with the women on August 31, 1988, the day the women were murdered. Later that same day petitioner and Simonsen were seen without the women, but with their possessions.

Simonsen confessed to having shot the women. He pled guilty and was sentenced to death. See Simonsen, 310 Or. 412.

Petitioner was initially tried, convicted and sentenced to death in 1989. On direct review, the Oregon Supreme Court upheld petitioner's convictions but remanded the case for a new penalty-phase trial. See Williams I.

Petitioner's second penalty phase trial was held in August 1993 and he was again sentenced to death. On direct review, the Oregon Supreme Court upheld the death sentence. See State v. Williams, 323 Or. 498, 918 P.2d 364, cert. denied, 519 U.S. 854 (1996)(hereinafter "Williams II").

Petitioner next filed for post-conviction relief ("PCR") in state court. The PCR court held an evidentiary trial and denied relief. Respondent's Exhibits 168 & 169. On appeal, the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. Williams v. Palmateer, 184 Or. App. 761, 58 P.3d 244 (2002), rev. denied, 335 Or. 656, 75 P.3d 899 (2003).

On March 16, 2007, petitioner filed his Petition for Writ of Habeas Corpus raising Nineteen Claims and numerous sub-claims. At the last status hearing in this case, the court ordered petitioner to brief his five strongest and potentially dispositive claims to determine whether this case could be summarily resolved on the current record without further proceedings involving petitioner's remaining claims.

On June 26, 2007, petitioner filed his motion for partial summary judgment. Petitioner's grounds for relief are summarized as follows:

3 - OPINION AND ORDER

1.    Petitioner received ineffective assistance of counsel at the guilt phase of his trial
      (Petition Claim 1);

2.    Petitioner received ineffective assistance of counsel at his first penalty phase trial
      (Petition Claim 2);

3.    Petitioner received ineffective assistance of counsel at his re-sentencing trial
      (Petition Claim 3);

4.    During the guilt phase, the trial court improperly instructed the jury on the
      definition of reasonable doubt with its use of the words "moral certainty" (Petition
      Claim 7); and

5.    Witness testimony at petitioner's re-sentencing trial indicating that petitioner had
      been on death row violated his Eighth and Fourteenth Amendment rights.
      (Petition Claim 10A)

Memorandum in Support (#97), pp. 7, 10, 11 & 15; Petitioner's Reply (#115), p. 2.[1]

Respondent argues that petitioner is not entitled to relief because: (1) some of petitioner's

grounds for relief are procedurally defaulted, and the default is not excused; (2) the Oregon state

court decisions denying relief are neither contrary to nor unreasonable applications of Supreme

Court precedent; and (3) all of petitioner's claims are without merit.

**STANDARD**

Summary judgment should be granted if there are no genuine issues of material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). If the moving

party shows that there are no genuine issues of material fact, the non-moving party must go

beyond the pleadings and designate facts showing an issue for trial. Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986). A scintilla of evidence, or evidence that is merely colorable or not

---

[1] I note that petitioner concedes that his claim involving the re-sentencing court's failure to
give an instruction on life without parole is procedurally defaulted. I will consider the exceptions
to procedural default as they relate to this claim in a future round of briefing. Petitioner's Reply, pp.
1-2.

significantly probative, does not present a genuine issue of material fact. <u>United Steelworkers of America v. Phelps Dodge</u>, 865 F.2d 1539, 1542 (9th Cir. 1989).

The substantive law governing a claim determines whether a fact is material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>T.W. Elec. Service v. Pacific Elec. Contractors</u>, 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. <u>T.E. Elec. Service</u>, 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. <u>Id</u> at 630-31. Summary judgment is an appropriate vehicle for deciding habeas corpus cases. <u>See Blackledge v. Allison</u>, 431 U.S. 63, 80-81 (1997).

<strong><u>DISCUSSION</u></strong>

## I.   <u>Exhaustion and Procedural Default</u>

### A.   <u>Standard of Review</u>

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims. <u>Rose v. Lundy</u>, 455 U.S. 509, 519 (1982). "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'" <u>Casey v. Moore</u> 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, (1986)). If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were considered, the claims have not been fairly presented to the state courts

and are therefore not eligible for federal habeas corpus review.  Castille v. Peoples, 489 U.S. 346, 351 (1989).

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman v. Thompson, 501 U.S. 722, 750 (1991).  If a petitioner has procedurally defaulted a claim in state court, a federal court will not review the claim unless the petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the state court, or demonstrates that the failure to consider the claims will result in a fundamental miscarriage of justice.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman, 501 U.S. at 750.

**B.    Procedural Default Analysis**

Respondent contends that petitioner failed to fairly present his Ground Five claim to the Oregon Supreme Court in a procedural context in which its merit was considered.[2]  Petitioner concedes that the Oregon Supreme Court never addressed the merits of this claim because it determined that trial counsel's motion for a mistrial, made following the "death row" comment, was untimely.  Petitioner's Reply, p. 3.[3]  Nevertheless, petitioner argues that such ruling "is not an adequate state law ground to prevent this Court's review of the Eighth and Fourteenth

---

[2]  This claim is numbered as 10(A) in the Petition, and relates to the jury having heard during petitioner's re-sentencing trial that he had been on death row for five years.

[3]  Following the death row comment, made by a state witness during cross-examination, counsel asked four more questions on cross and waited for one question to be asked on redirect before telling the judge that he had a matter for the court. With the court's reassurance that his matter would not be prejudiced, counsel waited for four more questions to be asked on redirect before moving for a mistrial. Id. at 4; Transcript Designation ("TD") Part R Trial Transcript Vol. XIV at 1776-78.

Amendment claim because it was not clearly established or consistently applied." Id. at 4. I

disagree.

> Federal courts will not generally review a question of federal law decided by a
> state court if its decision rests on a state law ground that is independent of the
> federal question and adequate to support the judgment. See Coleman v.
> Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). . . . To be
> adequate, the state's legal grounds for its decision must be firmly established and
> consistently applied. Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003).
> To be firmly established or consistently applied, a rule must be clear and certain.
> See Melendez v. Pliler, 288 F.3d 1120, 1124 (9th Cir. 2002)(citing Morales v.
> Calderon, 85 F.3d 1387, 1390-92 (9th Cir. 1996)); see also Wells v. Maass, 28
> F.3d 1005, 1010 (1994)("a state rule must be clear, consistently applied, and well
> established").

King v. A. Lamarque, 464 F.3d 963, 965-66 (9th Cir. 2006).[4]

Federal courts utilize a burden-shifting process to determine whether a procedural rule is

adequate:

> Once the government has pleaded "the existence of an independent and adequate
> state procedural ground as an affirmative defense, the burden to place that defense
> in issue shifts to the petitioner. [Bennett, 322 F.3d at 586]. The petitioner "may
> satisfy this burden by asserting specific factual allegations that demonstrate the
> inadequacy of the state procedure, including citation to authority demonstrating
> inconsistent application of the rule." Id. The burden then shifts back to the
> government, and it bears "the ultimate burden of proving the adequacy" of the
> relied upon ground. Id. at 585-86.

King, 464 F.3d at 966-67.

Petitioner relies primarily on State v. Pratt, 316 Or. 561 (1993), to support his argument

that Oregon's rule governing the timeliness of motions for mistrial is not adequate to bar federal

review. A situation nearly identical to the one at issue here arose in Pratt: a state witness

---

[4] Inquiring as to the adequacy of a state procedural rule to foreclose review of a federal
question is itself a federal question. Melendez, 288 F.3d at 1124 (citing Douglas v. Alabama, 380
U.S. 415, 422 (1965)).

7 - OPINION AND ORDER

testified on cross-examination during the defendant's re-sentencing trial that "everybody knows that he's been on death row." Id. at 581.[5] Notably, even more time passed between the death row comment and counsel's motion for mistrial in Pratt than in petitioner's case. In both cases, the trial courts denied the motions on the merits. However, when those trial court rulings were challenged on appeal, the Oregon Supreme Court affirmed the trial court's ruling in Pratt on the merits, but declined to reach the merits in petitioner's case on the ground that trial counsel's motion for mistrial was untimely. Id. at 583; compare Williams II, 322 Or. at 635. Petitioner argues that "[t]he fact that the Oregon Supreme Court entered inconsistent rulings on the timeliness of the Motion for Mistrial in Pratt and Williams . . . demonstrates that this rule is neither clear, nor consistently applied by the Oregon courts." Petitioner's Reply, p. 5.

As a preliminary matter, I note that the Oregon Supreme Court made no express finding in Pratt that trial counsel's motion for mistrial was timely. It is not unreasonable to assume that the court chose to bypass the preservation issue and affirm on the merits. Nevertheless, by bypassing the timeliness issue in one case and reaching it in another, the court treated the two cases differently vis-a-vis Oregon's rule that a motion for mistrial must be timely. Accordingly, the question is whether such differential treatment demonstrates "inconsistent application of the rule" such that the Oregon law governing the timeliness of motions for mistrial is not adequate to bar federal habeas review. King, 464 F.3d at 967.

---

[5] Following the death row comment in Pratt, defense counsel continued to examine the witness for what amounted to five pages of transcript. Then, only after redirect and recross amounting to seven more pages of transcript and a ten-minute recess wherein the witness was briefly examined did counsel move for a mistrial. Id. at 582.

The Ninth Circuit has held that even if a state's highest court chose to disregard a procedural rule to reach the merits in a particular case, it does not demonstrate that the state's courts do not invoke the rule "[i]n the vast majority of cases," such that the rule is not adequate to bar federal habeas review. Shumway v. Payne, 223 F.3d 982, 989 (9th Cir. 2000) (quoting Dugger v. Adams, 489 U.S. 401, 410 n.6 (1989)).

Respondent correctly asserts that the Oregon Supreme Court regularly applies the state rule governing the timeliness of motions for mistrial. See, e.g., State v. Barone, 328 Or. 68, 90, 969 P.2d 1013 (1998); State v. Hayward, 327 Or. 397, 409, 963 P.2d 667 (1998); Williams II; State v. Montez, 309 Or. 564, 601, 789 P.2d 1352 (1990); State v. Larson, 325 Or. 15, 933 P.2d 958, 961 (1996); State v. Walton, 311 Or. 223, 248, 809 P.2d 81 (1991); State v. Shafer, 222 Or. 230, 235, 351 P.2d 941 (1960). Given this consistent invocation of the state's rule governing the timeliness of motions for mistrial, petitioner's citation to one case where the Oregon Supreme Court apparently bypassed the procedural rule is insufficient to show that the rule is inconsistently applied and therefore inadequate.

Petitioner argues further that rules requiring a fact-dependent inquiry, such as Oregon's rule governing the timeliness of motions for mistrial, are not the sort of regularly applied procedural rules that bar federal habeas review. Petitioner's Reply, p. 6. According to petitioner, Oregon's rule governing the timeliness of motions for mistrial "requires a fact-specific inquiry to determine whether the court would have the opportunity to correct the allegedly harmful error." Id. Petitioner cites no authority and I find none to support his assertion that rules requiring fact-specific inquiries cannot bar federal review. However, a comparable argument was raised in Wood v. Hall, 130 F.3d 373, 376 (9th Cir. 1997). In Wood, the petitioner argued that because

the rule at issue was discretionary (allowing, but not requiring, the Oregon courts to dismiss

cases in which appellants had absconded), it was not strictly or regularly applied. Id. The Ninth

Circuit rejected this "discretion equals inconsistency" argument. In so doing, it noted that rules

that had been found to be inconsistently or arbitrarily applied to bar federal habeas review tended

to fall into two categories: (1) rules that have been selectively applied to bar claims of certain

litigants; and (2) rules that are so unsettled due to ambiguous or changing state authority that

applying them to bar a litigant's claims is unfair. Id. at 377. Here, petitioner has failed to

demonstrate that Oregon's rule governing the timeliness of motions for mistrial falls into either of

these categories.

I conclude that Oregon's law governing the timeliness of motions for mistrial is an

independent and adequate state law ground sufficient to bar federal habeas review. Accordingly,

petitioner's claim was not properly exhausted in state court and is now procedurally defaulted.

Petitioner does not attempt to excuse his default by proving cause or prejudice, or by making a

colorable showing of actual innocence in his motion for partial summary judgment. However,

even assuming that petitioner could excuse his default, for the reasons that follow, I find that his

claim fails on the merits.

### C.    Merits Analysis of Ground Five

Petitioner contends that his rights under the Eighth and Fourteenth Amendments were

violated when the jury learned during his second penalty phase trial that he had previously been

sentenced to death. Petitioner's Reply, pp. 6-7 (citing Caldwell v. Mississippi, 472 U.S. 320,

328-30 (1985)).

The Supreme Court held in Romano v. Oklahoma that admission of evidence during the sentencing phase of a capital case indicating that a different jury had sentenced the defendant to death in an earlier case did not violate Eighth and Fourteenth Amendments by impermissibly undermining the sentencing jury's sense of responsibility for determining whether the death penalty should be imposed. 512 U.S. 1 (1994). In Romano, the Court determined that for the principle established in Caldwell to apply, the jury must have been "affirmatively misled regarding its role in the sentencing process," and ultimately concluded that the evidence of a prior death sentence was not misleading because it was neither false at the time it was admitted, nor did it pertain to the jury's role in the sentencing process. 512 U.S. at 9-10. The Court also noted that the trial court instructions emphasized the importance of the jury's role. Id. at 9. Finally, in considering whether the admission of evidence relating to the defendant's prior death sentence so infected the proceeding with unfairness as to render it a denial of due process, the Court held: (1) that if the jury followed the court's instructions, which they are presumed to do, the evidence would not significantly effect their deliberations; and (2) even if the jury disregarded the court's instructions,

> it is impossible to know how this evidence might have affected the jury. It seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so. Either conclusion necessarily rests upon one's intuition. To hold on the basis of this record that the admission of evidence relating to petitioner's sentence in [another case] rendered petitioner's sentencing proceeding for the [murder in this case] fundamentally unfair would thus be an exercise in speculation, rather than reasoned judgment.

Id. at 13-14.

11 - OPINION AND ORDER

Here, petitioner seeks to distinguish his case from <u>Romano</u> on the basis that his re-sentencing jury learned that he had been previously sentenced to death in the <u>same</u> case and "by the fact that the jury never heard instructions at the start of the case on the serious nature of the task or that they were the sole decisionmakers for the penalty." Petitioner's Reply, p. 7 (citing TD Part L Trial Transcript Vol. I at 26-27, 32 (court's pretrial instructions)). I am not persuaded by these distinctions.

Petitioner's re-sentencing jury was not affirmatively misled regarding its role in the sentencing process because the witness's remark that petitioner was on death row was neither inaccurate nor related to the jury's role in the sentencing process. Accordingly, petitioner has not established a <u>Caldwell</u> violation. <u>See</u> <u>Romano</u>, 512 U.S. at 9-10. In addition, my independent review of the record supports the conclusion that the trial court adequately instructed the jurors as to their role in the sentencing process. After closing arguments, the court instructed the jury as follows:

> The Defendant in this case was previously found guilt[y] of Aggravated Murders of Unna Tuxen and Kathrine Reith. Oregon law provides that the penalty for Aggravated Murder shall be either death or life imprisonment. You will be given four questions that you must answer yes or no. Before any question can be answered yes, all 12 jurors must agree. If all 12 jurors cannot agree that a particular question should be answered yes, then the question must be answered no. If you answer all four questions yes, the law requires that the penalty shall be death. If you answer one or more of the questions no, the law requires that the penalty shall be life imprisonment.

TD Part V, Trial Transcript, Vol. XXI at 2668. I found no indication in the trial transcript that either the court or the attorneys ever suggested to the jury that it was relieved from its responsibility to determine whether sentencing the petitioner to the death penalty was

12 - OPINION AND ORDER

appropriate.  TD Part L, Trial Transcript Vol. I at 5, 6 & 26-33; TD Part V, Trial Transcript, Vol. XXI at 2662-2674.

Finally, as was the case in <u>Romano</u>, it is impossible to know whether the re-sentencing jury's knowledge that petitioner had previously been sentenced to death in the same case made the jurors more or less inclined to impose a death sentence.  <u>See</u> 512 U.S. at 14.  Petitioner's argument that a witness's comment informing the re-sentencing jury that petitioner had previously been sentenced to death in the same case could make it feel less responsible for its decision, and therefore more likely to re-impose the death penalty, is a plausible one.  Equally plausible however, is the argument that the re-sentencing jury might be less inclined to impose the same sentence after learning that petitioner's first death sentence was somehow defective.  I found no evidence in the record to support petitioner's contention; therefore, his argument is an exercise in speculation.  Based on the evidence that the witness's "death row" comment was accurate at the time it was made, and that the trial judge accurately explained the jury's role during the penalty phase, petitioner cannot demonstrate that the witness's disclosure misled the jury.  <u>See</u> <u>id</u>. at 14-15 (O'Connor, concurring).  I conclude that petitioner's re-sentencing proceeding was not rendered fundamentally unfair by the witness's comment, and that petitioner has not established that the inadvertent introduction of this evidence violated the Constitution.  Accordingly, petitioner's Ground Five claim (Petition Claim 10A) fails on the merits.

## II.      Merits Analysis of Grounds One through Four

### A.      Standard of Review

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was:  (1) "contrary to, or involved an unreasonable

13 - OPINION AND ORDER

application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id</u>. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. <u>Id</u>. at 410. The state court's application of clearly established law must be objectively unreasonable. <u>Id</u>. at 409.

**B.    Analysis**

**1.    Ineffective Assistance of Trial Counsel - Guilt Phase (Ground One)**

In Petition Claim One, petitioner alleges that both of his trial attorneys were unconstitutionally ineffective during his guilt phase trial in that they failed to: (1) investigate; (2) prepare; (3) present an available defense and introduce reasonable doubt; and (4) confront evidence presented by the prosecution and subject it to adversarial testing. Memorandum in Support, p. 8. Petitioner contends that as a result of counsel's failure to investigate and prepare,

14 - OPINION AND ORDER

they pursued a defense based solely on forensics and a relationship among the parties that was unsupported by the evidence. Id. In addition, petitioner argues that counsel presented evidence that actually buttressed the prosecution's case and provided no alternative theory under which the jury could consider the evidence and reach a favorable verdict for petitioner. Id. Petitioner asserts that counsel rendered ineffective assistance by choosing not to develop and use information in their possession that could have undermined the prosecution's case because they did not explore the issue sufficiently before making a decision to present a particular defense. Id. at 9.

Petitioner contends that counsel's deficient performance described above prejudiced him by: (1) setting up a futile forensics defense that reinforced the prosecution's case; and (2) failing to provide a defense challenging petitioner's *mens rea* for the murders and aider and abettor liability through introduction of Simonsen's statements and background. Id. at 10. According to petitioner, counsel's failures eliminated all reasonable doubt and therefore any possibility of an effective defense for petitioner. Id.

The Supreme court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 686-687 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." Id. at 689.

Second, the petitioner must show that his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. Id. at 696.

The PCR trial court made the following pertinent findings of fact and conclusions of law:

## FINDINGS OF FACT

* * *

6.     During the first trial proceedings, petitioner was represented by court-appointed counsel, Robert Brasch and John Trew.

7.     Counsel obtained the services of an investigator, Gordon West, to assist with preparation of the defense.

* * *

24.    Counsel Brasch did not enjoy representing petitioner, but he handled petitioner's case zealously.

25.    Counsel Trew handled much of the trial preparation and had most of the direct contact with petitioner. At times, Counsel Brasch was best able to communicate with petitioner, and petitioner admired Counsel Brasch's style.

* * *

31.    The defense investigator, Gordon West, had worked as a police officer for nine years before going into private investigation, had received training in mitigation at the BPST, and had worked on murder cases before working on petitioner's case.

32.    Mr. West's billing records do not accurately reflect all the time he spent working on petitioner's case; he spent more hours working on the case than those records show.

33.    The state had thoroughly investigated the case, and the defense investigation confirmed what the state investigators had discovered.

* * *

37.    Petitioner's investigator in [his] post-conviction proceeding worked
       approximately 1,400 hours on the case.

38.    The only new evidence petitioner's post-conviction investigator obtained
       was two letters from law enforcement agencies that appear to contradict
       statements made by petitioner to various witnesses that petitioner had
       engaged in certain criminal activities.

39.    In light of the extensive evidence of petitioner's other criminal behavior
       that was presented at trial, the two letters submitted in this post-conviction
       proceeding would not have undermined the strength of the state's case if
       counsel had presented that evidence at trial.

46.    Counsel Trew observed most of co-defendant Simonsen's penalty phase
       trial and took extensive notes about those proceedings.  As a result,
       counsel were fully aware of witnesses from Simonsen's trial whose
       testimony might have been used as an attempt to rebut the state's argument
       that Simonsen was petitioner's robot and that Simonsen shot the victims on
       petitioner's instructions.

47.    Counsel chose not to call the Simonsen witnesses because counsel did not
       believe the state's "robot theory" was persuasive, but they believed that if
       all the drug-related evidence came in, the "robot theory" would be greatly
       enhanced.

48.    The unfavorable "drug-related evidence" included testimony that petitioner
       injected Simonsen with methamphetamine because Simonsen was unable
       to inject the drug himself, and petitioner used that situation to control
       Simonsen.

49.    Petitioner agreed with counsels' decision not to call the Simonsen
       witnesses in his trial.

50.    Petitioner presented no credible evidence that this strategic decision was
       an error of constitutional magnitude.  This court does not find persuasive
       Duane McCabe's testimony that no reasonable attorney would have chosen
       not to present the Simonsen witnesses.

51.    Counsel Brasch and Trew weighed the risks inherent in calling the
       Simonsen witnesses and concluded that the risk of presenting those
       witnesses was greater than the potential benefit.  That decision was not
       unreasonable.

17 - OPINION AND ORDER

52. Petitioner presented no credible evidence to prove that counsel were not prepared to examine the witnesses.

53. Petitioner presented no credible evidence that his case was prejudiced in any way by counsel's examination of witnesses about which he complains.

54. Counsel received all discovery from the prosecution. John Trew organized and managed the reports.

55. Both counsel reviewed the discovery before trial commenced. Both counsel were familiar with the evidence the state intended to present against petitioner and the evidence the defense intended to present.

56. Based on information available to counsel, counsel developed a defense strategy that David Simonsen shot the victims, and that petitioner did not aid and abet the killing.

57. Counsel's opening statement was based on information available to him from discovery provided by the prosecution and his own investigation and anticipated defense witness testimony.

58. Although the case against petitioner was very strong, petitioner refused to let counsel attempt to negotiate a plea bargain.

59. During opening statement, counsel tried to convince the jury that he had "something," and he hoped to create reasonable doubt by creating some "smoke" and "haze."

60. None of counsel's opening statements stretched the expected testimony beyond reasonable limits. Counsel rebutted the prosecutor's attacks on his opening statement by pointing out that any differences between opening and the actual testimony given during the trial were caused by the fact that counsel had to rely on reports but that testimony does not always match reports.

67. Petitioner presented no evidence or argument to prove that counsel did not properly cross-examine criminalist Michael Scanlon.

68. On cross-examination, counsel attacked Officer Scanlon's credentials; reiterated that many results of tests conducted on physical evidence were inconclusive; reiterated that no physical evidence of the type usually associated with a rape crime scene was found on the victims; and attacked the reliability of Officer Scanlon's analysis of the shotgun wadding.

18 - OPINION AND ORDER

71.    Counsel attacked Officer Scanlon's testimony about tire tracks and shotgun wadding through cross-examination and by presenting a defense expert whose testimony contradicted Officer Scanlon's findings.

72.    Petitioner presented no evidence to prove that counsel did not timely receive discovery on witnesses Daune Erickson, Michael Harp, and William Sarver.

73.    Counsel interviewed co-defendant David Simonsen as a potential defense witness, and Simonsen told them he would not testify because his attorneys had advised him not to testify.

74.    Counsel could not be sure what Simonsen would say if he were called; counsel were concerned that Simonsen would take the stand and testify that petitioner shot the victims.

75.    [The post-conviction court] did not find persuasive the affidavit of David Simonsen, which was prepared, for unknown reasons and under unknown conditions, some time after petitioner's first trial was concluded.

80.    The state investigators did not perform a full tire track ink print on petitioner's truck tires, and counsel used Mr. Van Ooetegham's testimony to criticize that failure by the state.

81.    The fact that Mr. Van Ooetegham did not have the state's test fire wads did not adversely impact his testimony. Mr. Van Ooetegham testified that he could not conclude from his own test fires that the shotgun wadding taken from the victim's head had been fired through petitioner's gun.

94.    Counsel presented a coherent defense theory in his closing arguments; that theory was supported by evidence in the record.

95.    The court does not find persuasive Duane McCabe's testimony that no reasonable attorney would have presented the defense used by petitioner's trial counsel.

96.    Petitioner presented no evidence or argument to support his claim that counsel was constitutionally inadequate when he was unable to blunt every possible argument the prosecutor might make during rebuttal closing argument.

98.   The mixture of evidence about whether Simonsen or petitioner actually
      shot the victims allowed the prosecution to argue the "robot theory" along
      with other theories for petitioner's culpability.

CONCLUSION OF LAW

1.   In the first criminal proceedings resulting in petitioner's conviction,
     petitioner was not denied the right to assistance of counsel, as guaranteed
     by . . . the United States Constitution.

Respondent's Exhibits Volume 10, Exhibit 168, pp. 3-14, 27.

As a preliminary matter, petitioner argues that the PCR trial court required him, contrary
to Strickland v. Washington, 466 U.S. 668 (1984), to prove his claims of ineffective assistance
by a preponderance of the evidence. Memorandum in Support, p. 19.[6] During the PCR
proceeding, both petitioner and the state expressly cited and relied on the correct legal standard
required by Strickland. Concise Statement of Material Facts (#96, #111 & #116), ¶30
(hereinafter "¶ 'x'").

The PCR court found that petitioner did not prove his ineffective assistance claims by a
preponderance of the evidence. However, given the absence of any discussion from the PCR
court indicating that when it considered the prejudice prong of petitioner's ineffective assistance
of counsel claims it applied a preponderance of the evidence standard--rather than a reasonable
probability standard as required by Strickland--such conclusion clearly refers to the PCR court's
finding that petitioner did not meet his burden of proving all the facts underlying his claims of
ineffective assistance of counsel by a preponderance of the evidence. See, e.g., Davis v.
Woodford, 333 F.3d 982, 991 (9th Cir. 2003) ("The petitioner carries the burden of proving by a

---

    [6]  This discussion applies to all of petitioner's ineffective assistance of counsel claims: guilt
phase, first penalty phase, and re-sentencing phase (Grounds One through Three).

preponderance of the evidence that he is entitled to habeas relief."); Alcala v. Woodford, 334

F.3d 862, 869 (9th Cir. 2003) (A habeas petitioner "must prove all facts underlying his claims of

ineffective assistance by a preponderance of the evidence."). Thus, petitioner's argument that the

PCR court applied the wrong standard to his ineffective assistance of counsel claims is without

merit.

Petitioner alternatively argues that no deference is due the PCR court's findings of fact

because such findings are unreasonable in light of the evidence presented at the hearing.

Petitioner's Reply, p. 8. Although petitioner indicates that none of the PCR court's factual

findings are entitled to deference and refers to "set[s] of findings" as being among the most

relevant of the PCR court's factual errors, he specifically challenges only a handful of the PCR

court's "unsupported" factual findings, as set forth below. See id. at 8-19.

### a.    PCR Court's Findings Regarding Counsel's Receipt, Management, and Review of Discovery Materials

Petitioner argues that there is no support in the record for the PCR court's findings that:

(1) counsel received all discovery from the prosecution and counsel Trew organized and

managed the reports; and (2) both counsel reviewed the discovery before trial commenced and

were familiar with the evidence the state and the defense intended to present. Petitioner's Reply,

pp. 8-9. Petitioner supports his argument with the fact that on the day  trial commenced, counsel

asked the court to direct the prosecution to provide him each evening with the list of witnesses

they planned to call the following day, stating:

> The reason for that is that there has been so much voluminous discovery in this
> case, quite frankly, I've lost track. The prosecutor has asked me if I have certain
> reports, and I can't find them. I'm not going to ask for any more, I know they've
> given them to me, but I've completely lost track of this case. I've lost physical

21 - OPINION AND ORDER

reports, I don't have reports of some witnesses.  If I can get a little lead time,
between Mr. Trew and I, we can get ready for trial the next day.  But I can
guarantee you that I'm just -- you know, I don't know what I've gotten, and
apparently I've thrown away some of the stuff, because I -- or lost it, that they say I
should have.  Mr. Trew has asked for it and I don't have it.  I don't even know
what I don't have.

Id. (quoting TD Part B Jury Trial Vol I at 105-06).  Brasch further admitted, "I've still got stuff I

haven't read.  I mean, they've just buried us in stuff."  Id.  In addition, Trew told the court that he

believed the state had provided the defense with all of their discovery, but that because there was

so much of it, he was not sure that without some lead time defense counsel could get it together.

Id.

        Brasch's and Trew's admissions are certainly troubling.  They are not the words of

attorneys who have a strong command of the evidence.  Nevertheless, the question before the

court is whether these statements, made pretrial and out of the presence of the jury, amount to

clear and convincing evidence sufficient to rebut the presumption of correctness given to the

PCR court's findings that counsel had received and reviewed the discovery materials, organized

and managed the reports, and were familiar with the evidence in the case.

        Examining this issue, I first note that counsel's statements and the PCR court's finding

that counsel received all discovery from the prosecution are consistent.  In fact, counsel's request

for a next-day witness list appears to have been a plea for the court to assist them in focusing

their trial preparation on the most relevant portions of the voluminous discovery the prosecution

provided.  Moreover, while petitioner may legitimately raise a question as to the adequacy of

Trew's report management given his candid statements to the trial court, these cannot be fairly

read as demonstrating by clear and convincing evidence that Trew failed, contrary to the PCR court's finding, to organize and manage the reports at all.

Petitioner further contends that given Brasch's statements regarding record review and organization of documents, coupled with his pretrial billing of 25.9 hours, the only reasonable conclusion to draw from his later requests for time to read reports prior to examining certain witnesses is that he was reading those reports for the first time at trial. Petitioner's Reply, p. 10. Consequently, petitioner argues, there is no support in the record for the PCR court's finding that Brasch reviewed the discovery before trial and was familiar with the evidence that the prosecution and defense intended to present. Id. I disagree. Even in the ordinary case, it is not uncommon for counsel to request time to review a report before questioning a witness. In this complicated capital case, even considering counsel's troubling statements and the limited number of hours he billed pre-trial, the assertion that he was reading those reports for the first time is speculative. There is no way to know, based on Brasch's comments, what discovery materials he may have misplaced, thrown away, or failed to read. Though petitioner relies on Rompilla v. Beard, 545 U.S. 374 (2005), I find that Rompilla actually underscores the reasons why petitioner is not able to meet his burden in this case.

Rompilla involves defense counsel's performance during the penalty phase of a case in which the prosecution sought to prove aggravating circumstances justifying a death sentence. Id. The prosecution notified counsel of its intent to introduce evidence of a prior rape and assault, including a transcript of the victim's testimony at trial, to prove that petitioner had a significant history of felony convictions involving crimes of violence. Id. at 383-84. Notwithstanding this notice, counsel did not review her client's readily available prior conviction file until the

23 - OPINION AND ORDER

prosecution notified her of its intent a second time.  Id.  Even then, counsel failed to review the entire file, and thus, failed to discover "a range of mitigation leads that no other source had opened up."  Id. at 385, 390.

Petitioner suggests that, as was the case in Rompilla, his trial counsel "did not review critical prosecution evidence, or his own experts' evidence, evidence that 'eviscerated' the attempted defense."  Petitioner's Reply, p. 12.  However, in stark contrast to the facts in Rompilla, in which it is uncontested that counsel failed to review all of the contents of a specific prior conviction file and that those contents contained significant mitigating material, there is no agreement here as to any specific discovery materials that counsel failed to review, and no way to reliably determine the potential impact of petitioner's counsel's lapse.  I will not speculate about whether there was potentially mitigating evidence in trial counsel's files.

Furthermore, I reject petitioner's assertion that there is no support in the record for the PCR court's findings.  In an affidavit submitted to the PCR court, Trew averred that he had shared copies of all witness and police reports with Brasch, that one of his responsibilities was to handle the paperwork and organize documents for Brasch's use, that he provided such documents on Brasch's request, and that "[a]ll of these had been reviewed before trial."  Respondent's Exhibit 156, Trew Affidavit.

Petitioner argues that the most critical evidence of what occurred at trial is the trial record itself and faults the PCR court for not reconciling its findings with counsel's troubling statements.  Petitioner's Reply, p. 10 (citing Schriro v. Landrigan __ U.S. __, 127 S.Ct. 1933 (2007); Taylor v. Maddox, 366 F.3d 992, 1007-08 (9th Cir. 2004)).  I agree that reference to the trial record itself is appropriate here, and I would expect that had counsel "completely lost track of this case,"

evidence of his ineptitude would be visible in the record.  However, counsel's statements aside, my independent review of the record supports the conclusion that petitioner's attorneys were prepared for trial and familiar with the evidence in the case.  Accordingly, given the nonspecific nature of counsel's comments about trial preparation, coupled with Trew's affidavit affirming that counsel had reviewed all of the discovery materials, I conclude that petitioner has not met his burden of rebutting the presumption of correctness due the PCR court's above-referenced findings by clear and convincing evidence.

b.    **<u>Findings regarding Counsel's Defense Strategy</u>**

Petitioner contends that there was no evidence presented to the PCR court to support its finding that counsel developed a defense strategy that Simonsen shot the victims and that petitioner did not aid and abet in the killings.  Petitioner's Reply, p. 12.  According to petitioner, any finding that counsel developed a strategy at all was effectively rebutted by Brasch's own testimony at the PCR trial that his defense was one of desperation; that he hoped the prosecution would not be able to place petitioner at the scene; that he just wanted to attack on all fronts and hope something would happen; that he believed the prosecution's case was ironclad; and that they could prove "'they'd been there, they'd done it.'"  Id.  Although when describing his approach to trials Brasch stated that he felt it was a mistake to become inflexibly tied to a theme, he also testified that he goes into cases with some ideas and a game plan.  Respondent's Exhibit 173, p. 121.

The PCR court had sufficient evidence of such a game plan in the record to support its finding regarding counsel's strategy.  That evidence included argument at trial over the issue as to whether the jury would be told that Simonsen shot the victims.  Brasch stated:

25 - OPINION AND ORDER

> I want to, number one, be able to tell the jury in opening statement that Mr.
> Simonsen is the confessed killer of these two girls and that the question for the
> jury to decide is whether Mr. Williams aided and abetted in the killing. That's
> what I want permission to say to the jury in opening statement.

Respondent's Exhibit 158, p. 19. Trew confirmed that this was their trial strategy. He stated that

their belief that some reports raised doubt as to the State's ability to put petitioner at the scene,

coupled with Simonsen's guilty plea to the actual murders, provided an opportunity to create

reasonable doubt as to petitioner's guilt. Respondent's Exhibit 156, p. 3. Based on this evidence,

I conclude that petitioner has not demonstrated that the PCR trial court's finding with regard to

counsel's defense strategy was unreasonable.

### c.   Findings regarding Simonsen Witnesses and Investigation of a Viable Defense Theory

Petitioner further challenges the PCR court's findings that: (1) counsel weighed the risk

of calling the Simonsen witnesses and concluded that the risk outweighed the potential benefit;

and (2) concluded that counsel's decision was not unreasonable. Petitioner's Reply, p. 14.

According to petitioner, counsel could have pursued two possible defenses: one based on

Simonsen as a violent independent actor and the other based on challenging petitioner's presence

at the crime. Id. Petitioner asserts that in light of Brasch's admission that he knew at the time of

the trial that the latter defense would fail, it was unreasonable for counsel not to at least

investigate the other option. Id. at 14-15. Petitioner contends that this is especially true given

the availability of the Simonsen-as-violent-independent-actor theory, which the prosecution had

just successfully utilized to obtain a death sentence in the Simonsen case. Id. at 13.

I reject this argument because it rests on the false premise that due to counsel's failure to

conduct an adequate investigation, they were unaware of the Simonsen-as-violent-independent-

actor strategy (hereinafter "Simonsen strategy") employed by the prosecution during Simonsen's penalty phase trial. The record supports the conclusion that petitioner's attorneys were well aware of this strategy. Trew attended most of the Simonsen penalty phase trial and his notes reveal that he was familiar with the independent actor theory the state used to convict Simonsen. Respondent's Exhibit 156, p. 3. In fact, Trew's exposure to the prosecution and defense strategies during that trial informed his and Brasch's choice of strategy in petitioner's case. Id. at 3-4. Moreover, counsel made a deliberate decision at trial, following an offer of proof, not to call certain witnesses that would have testified that Simonsen was violent and could act independently. TD Part F, Jury Trial Guilt Phase, Vol. VII at 1244. Counsel's decision was made after the trial court indicated that those witnesses' testimony would open the door to the prosecution bringing in drug activity evidence against petitioner. Id. Thus, while petitioner may argue that counsel should have presented the available evidence to support a Simonsen strategy defense, he cannot reasonably contend that, due to inadequate investigation, his attorneys were unaware of the defense at all.

Petitioner states that the PCR court's conclusion that counsel's decision not to introduce the Simonsen witnesses' testimony was reasonable is erroneous because counsel presented a defense they were sure would fail and that was inconsistent with the evidence. Petitioner's Reply, p. 14. However, in support of this assertion, petitioner returns to his argument that as a result of counsel's failure to adequately prepare and investigate, i.e., uncover the Simonsen strategy, their presentation did not test the state's case. Id. at 15 (citing Corell v. Ryan, 465 F.3d 1006, 1015-16 (9th Cir. 2006)). As noted above, I reject any notion that petitioner's attorneys were unaware of the Simonsen strategy. Therefore, petitioner has failed to demonstrate that the

PCR court's conclusion that it was reasonable for counsel to decide not to utilize the Simonsen witnesses was contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

### d.    Finding regarding Counsel's Failure to Challenge Officer Scanlon's Testimony

Further, petitioner challenges the PCR court's finding that "[c]ounsel attacked Officer Scanlon's testimony about tire tracks and shotgun wadding through cross-examination and by presenting a defense expert who contradicted Officer Scanlon's findings." Petitioner's Reply, p. 15. Petitioner contends that the fact that the two experts reached the same conclusions supports his position that petitioner's expert actually reinforced Scanlon's testimony. Id. I disagree. I have reviewed the experts' testimony. TD Jury Trial Guilt Phase, Vol. V, pp. 853, 882-95; TD Jury Trial Guilt Phase, Vol. VI, pp. 1112-13, 1149-51. Although both experts agreed that gross characteristics on the wadding found in one of the victims could be matched to the gun, they ultimately disagreed about whether the gun could be conclusively matched to the wadding. In addition, while both experts ultimately concluded that the tire track results were inconclusive, their respective testimony supporting their conclusions differed enough to support the PCR court's finding. Accordingly, petitioner has not demonstrated by clear and convincing evidence that the PCR court's finding on this matter is in error and not entitled to deference.

### e.    Finding regarding Introduction of Drug-Related Evidence

Petitioner challenges the PCR court's finding that "[c]ounsel chose not to call the Simonsen witnesses because counsel did not believe the state's 'robot theory' was persuasive, but they believed that if all the drug-related evidence came in, the 'robot theory' would be greatly

enhanced." Petitioner's Reply, p. 15. Petitioner first argues, without citation to any authority, that if counsel thought the robot theory was unpersuasive, they had a duty to present facts to the jury to that effect. Id. at 15-16. I note that petitioner's contention does not directly challenge the PCR court's finding.

Petitioner argues further that his post-conviction expert, McCabe, testified that while an approach that would bring in drug evidence was risky, it was the only viable strategy and that proper voir dire would mitigate that risk. Id. at 16. Again, this argument does not challenge the PCR court's factual finding and petitioner fails to acknowledge the PCR court's additional finding that it did not find McCabe's testimony persuasive.

Finally, petitioner asserts that counsel's decision to keep drug evidence out at the guilt phase was unreasonable because it was sure to come in during the penalty phase to support the state's future dangerousness assertion. Petitioner's Reply, pp. 16-18. Petitioner contends that since the jury was going to hear the evidence in the penalty phase, "there was no conceivable harm from previewing the evidence in the guilt phase." Id. This argument addresses the legal question as to whether counsels' strategy regarding the drug evidence was reasonable, not the PCR court's factual finding that counsel had determined that the robot theory was weak and that witness testimony discussing petitioner and Simonsen's drug use and drug dealing would have enhanced that theory.

Regardless, I disagree that no conceivable harm could come from introducing the drug evidence during the guilt phase. Although drug-related evidence was likely to (and did) come in during the penalty phase, during the guilt phase petitioner's attorneys were seeking a lesser conviction than aggravated murder, and therefore it was reasonable to pursue a strategy to limit

the amount of damning drug-related evidence presented to the jury during that phase. Based on the foregoing, petitioner has failed to rebut, by clear and convincing evidence, the presumption of correctness owed the PCR court's findings relating to introduction of drug-related evidence.

>    **f.**     **Finding regarding Counsel Failing to Obtain Jury Instruction**
>                **that Simonsen Shot the Victims**

Finally, petitioner challenges as unreasonable the PCR court's finding that he had presented no evidence supporting his claim that counsel should have persuaded the court to instruct the jury that they were required to accept as fact Simonsen's statement that he shot the victims. The court instructed the jury as follows: "[t]his is a fact that you can consider in this case. David Lynn Simonsen has admitted that he shot Unna Tuxen and Kathrin Reith, and you may consider that as a fact in this case." ¶28. Given that the court could not know what Simonsen might testify to if called, petitioner has not demonstrated that the PCR court's finding was unreasonable in light of the evidence.

>    **g.**     **Challenge to PCR Court's Legal Conclusion:**

In addition to challenging the PCR court's factual findings, petitioner argues that its conclusion that he was not denied effective assistance of counsel during his guilt phase trial was an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). He argues that counsel either did not read discovery and prepare for trial or counsel did read discovery and still pursued a defense they knew was doomed to fail. In either case, petitioner contends, counsel did not find the "strong" Simonsen strategy defense. Petitioner reasons that counsel failed to investigate, that without investigation they could make no strategic decisions, and consequently,

their decision not to introduce the Simonsen witnesses cannot be viewed as a strategy entitled to deference.

On the issue of prejudice due to counsels' alleged failure to investigate, petitioner contends that the fact that the post-conviction investigator found no new evidence in his investigation of the crime actually supports his claim that counsel were ineffective. Petitioner's Reply, pp. 21-22. Petitioner argues this is so because it confirms that counsel could not challenge the state's evidence that petitioner was at the scene, and underscores the importance of choosing a trial strategy that incorporates the facts that cannot be disputed; presumably the Simonsen strategy. Id. at 22. However, as noted above, petitioner has not overcome his burden of rebutting the presumption of correctness due the PCR court's factual findings regarding his attorneys' decision not to call the Simonsen witnesses, nor has he shown that the PCR court's conclusion that counsel's defense strategy was reasonable was contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

Based on the foregoing, petitioner has not demonstrated that the PCR court's conclusion that guilt phase counsel were not ineffective was contrary to or involved an unreasonable application of federal law as determined by the U.S. Supreme Court.

2.    **Ineffective Assistance of Trial Counsel - First Penalty Phase Trial (Ground Two)**

Notwithstanding the fact that he was granted a re-sentencing trial, petitioner contends that the deficient performance of counsel during his first penalty phase trial contributed to the ineffective assistance provided by counsel during his re-sentencing trial. Petitioner's Memo in

31 - OPINION AND ORDER

Support, p. 10.  Petitioner asserts that counsel at the first penalty phase (Brasch & Trew) played a major role in his re-sentencing due to the re-sentencing court's ruling limiting re-sentencing counsel's ability to reinterview guilt phase witnesses, and because the only evidence introduced about Simonsen at the re-sentencing trial came from reading into the record transcripts from Brasch's examination of witnesses during the first penalty phase.  Petitioner's Reply, pp. 23-24. Petitioner apparently argues that re-sentencing counsel inherited the first penalty phase counsel's irreparable mistakes in developing a full record from certain guilt phase witnesses.

Because the Oregon Supreme Court vacated petitioner's first death sentence and remanded his case for a full re-sentencing trial, that re-sentencing trial necessarily superceded his first penalty phase trial.  Moreover, petitioner's allegations that:  (1) the re-sentencing court impermissibly limited his ability to develop his mitigation case; and (2) re-sentencing counsel presented Simonsen evidence only through first penalty phase  transcripts, are due process and ineffective assistance of re-sentencing counsel claims respectively.  Any errors relating to petitioner's ability to procure relevant mitigating information from guilt phase witnesses during his re-sentencing trial necessarily rest with the re-sentencing trial court or resentencing counsel.

Accordingly, petitioner has failed to demonstrate that the PCR court's conclusion that "[p]etitioner's complaints about the manner in which counsel examined witnesses during the first sentencing phase are irrelevant because the first sentence was vacated by the Oregon Supreme Court on direct appeal," is contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

3.   **Ineffective Assistance of Trial Counsel -Re-sentencing Phase Trial (Ground Three)**

Petitioner contends that his re-sentencing counsel rendered ineffective assistance in: (1) failing to introduce critical evidence of Simonsen's greater culpability; (2) failing to investigate, discover and introduce evidence of petitioner's bipolar disorder; and (3) impermissibly limiting their mitigation case to proving that petitioner could be controlled in prison if given a life sentence. Memorandum in Support, p. 11. Petitioner asserts that he was prejudiced by counsel's deficient performance because the Simonsen evidence would have cast the penalty phase evidence against him in a new light and may have "rebalanced the scales against death for some jurors;" that counsel's failure to unearth all relevant mitigating evidence, including evidence of a mental disorder, is fundamentally prejudicial; and that counsel's sole focus on future dangerousness was prejudicial because the prosecution was able to present significant rebuttal evidence and because counsel affirmatively reinforced the prosecution's position on the issue of future dangerousness. Id. at 13-15.

Respondent contends that petitioner presented all of these arguments to the PCR trial court and that he has failed to demonstrate that the PCR court's decision rejecting his claims is not entitled to deference. Respondent's Opposition (#110), p. 26.

The PCR trial court made the following pertinent findings of fact and conclusion of law:

### FINDINGS OF FACT

\* \* \*

103.   Petitioner was represented during the 1993 re-sentencing proceedings by court appointed counsel, Mark Hendershott and John Kolego.

\* \* \*

148.  Petitioner's own expert diagnosed him as having an antisocial personality disorder.

\* \* \*

169.  Dr. Fred Wise was a strong witness for the defense, who testified that petitioner could be controlled in prison despite his diagnosis of antisocial personality disorder.

170.  Dr. Wise had sufficient information available to him to render a diagnosis and to form his expert opinion that petitioner could be controlled in a prison setting without endangering other people because petitioner was beginning to burn out.

171.  This court does not find persuasive the affidavit of Dr. Mark Cunningham; Dr. Cunningham's testimony in Randall Guzek's case did not prevent imposition of the death sentence, and petitioner did not present evidence that Dr. Cunningham's testimony on statistics would have been available at the time of petitioner's penalty-phase retrial through either Dr. Cunningham or some other witness.

\* \* \*

181.  Counsel presented evidence of petitioner's dysfunctional family through the family members, but focused his arguments on the fact that petitioner had been successfully controlled in the prison environment for approximately four years to argue that a sentence of life imprisonment would adequately protect society.

182.  Counsel's choice of arguments and emphasis was not unreasonable.

\* \* \*

188.  Counsel used some of the witnesses from David Simonsen's trial in an effort to show that Simonsen was a dangerous man who would act of his own volition.  Petitioner presented no persuasive evidence or argument to prove that his case was prejudiced by counsel's decisions in regard to these witnesses.

CONCLUSION OF LAW

\* \* \*

3.    In the re-sentencing proceedings that resulted in the imposition of the
death sentence, petitioner was not denied the right to assistance of counsel,
as guaranteed by . . . the United States Constitution.

Respondent's Exhibit 168, pp. 14, 20, & 23-27.

Petitioner argues that his attorneys were ineffective for failing to introduce the "most

critical evidence" about Simonsen through witnesses that had testified at Simonsen's sentencing

trial.  Petitioner insists counsel should have introduced evidence that he (Simonsen) gave

confessions of the crime to two friends, in a tape-recorded interview with Detective Dalton, in

multiple letters, and in a notarized statement; that he performed a videotaped reinactment of the

crime; that from an early age, he was emotionally disturbed and had severe difficulty forming

relationships with other people; that his biological mother wanted to sleep with him; that people

were afraid of him; that in the months before the crimes, he was increasingly suicidal and having

homicidal thoughts; that he lacked remorse; that he embraced his sole responsibility for the

shooting; that he had significant problems with women, including using violence; that he was

violent and explosive; that he was independent and had problems with authority; and that

Detective Dalton had testified that Simonsen talked petitioner out of forcing a man and his

girlfriend to do a line of crank at gunpoint.  Memorandum in Support, p. 13; ¶¶23, 24, 25, 26, 27,

29, 30, 31, 32, 33, 35, 36, 37, 38 & 39.

Petitioner contends that had the jury heard Simonsen's "full story" it might have

influenced its view of petitioner's moral culpability.  Id. (citing Williams v. Taylor, 529 U.S. 362,

398 (2000)).  Petitioner asserts that when comparing evidence counsel actually presented with

35 - OPINION AND ORDER

evidence they could have presented, this court can have no confidence in the death sentence. Id. at 15. Petitioner argues further that counsel's failings were compounded by the fact that the only Simonsen evidence they did introduce was presented via counsel reading into the record transcripts from Brasch's examination of certain witnesses--witnesses, petitioner contends, who could not testify to the most critical evidence about Simonsen. Petitioner's Reply, p. 24.[7]

Moreover, petitioner contends that the re-sentencing trial court's orders, first restricting counsel's ability to interview guilt phase witnesses and later permitting such interviews as necessary on the issue of petitioner's influence and control of Simonsen, contributed to counsel's deficient performance. Petitioner argues this is so because the second order was issued just four months before trial after counsel had pursued a strategy leaving out guilt phase witnesses and because the witnesses had other information about Simonsen as a person that would have been mitigating to petitioner. Id. Such evidence, argues petitioner, has "traditional sentencing value" as it goes both to whether petitioner is guilty of the crimes and how the crimes were committed, and thus, its admission is protected by the Eighth and Fourteenth Amendments. Id. at 26.

---

[7] During the re-sentencing trial, Hendershot and Kolego read from the first penalty phase transcripts the testimony of the Dean of Students and Vice Principal of Simonsen's highschool, as well as the testimony of a supervisor and co-worker from Simonsen's prior job. The Dean of Students testified about Simonsen's behavioral problems (particularly with women teachers), fighting in school, his recommendation that based on testing Simonsen receive counseling, his judgment that Simonsen was a violent person, and the fact that he had predicted that Simonsen would one day kill someone. The Vice Principal testified that he recalled Simonsen had problems in school involving outbursts in class (particularly with female teachers), but he did not recall problems with physical violence. Simonsen's supervisor testified that Simonsen had some behavioral problems, including problems taking orders, that he lost his temper easily and tried to intimidate people with his size. Simonsen's co-worker testified that Simonsen thought he was a hotshot, that he was cocky, and that while Simonsen had argued with their supervisor, he (the co-worker) had never had problems with him, perhaps because of the co-worker's large size. TD Part S Trial Transcript, Vol. XV at 1935-48; TD Part T Trial Transcript Vol. XVII at 2175-2188.

36 - OPINION AND ORDER

In response, respondent contends that the re-sentencing court's rulings regarding

investigation are not a basis for relief because any such claims are procedurally defaulted; and in

any event, that court's rulings were in accord with Oregon v. Guzek, 546 U.S. 517 (2006).

At issue is whether re-sentencing counsel rendered a deficient performance by choosing

not to introduce the "critical" Simonsen evidence at petitioner's re-sentencing trial.  The parties

dispute whether such evidence would be admissible mitigation evidence.  Respondent contends

that it tends to show whether petitioner committed the crimes.  Petitioner contends that it  tends

to show both whether he committed the crimes and how the crimes were committed.

> "The Eighth and Fourteenth Amendments require the sentencer . . . not be
> precluded from considering, as a mitigating factor, any aspect of a defendant's
> character or record *and any of the circumstances of the offense that the defendant*
> *proffers* as a basis for a sentence less than death."

Guzek, 546 U.S. at 524 (citing Lockett v. Ohio, 438 U.S. 586, 604 (1978)(emphasis in the

original)).  Traditional sentence-related evidence is evidence that tends to show how, not

whether, the defendant committed a crime.  Id.

As I read Guzek, it would be a stretch for me to conclude that evidence of Simonsen's

repeated and varied confessions of the crimes and his claim of sole responsibility for the shooting

would tend to show how, rather than whether petitioner committed the crimes for which he was

convicted.  Moreover, while petitioner's background is certainly admissible mitigation evidence,

it is less clear that the troubled personal history of his co-defendant is the kind of traditional

sentence-related evidence contemplated by Guzek.  Even if I agreed with petitioner that evidence

"that Simonsen was capable of acting on his own, capable of violence towards women, and

severely mentally ill would have given the jury a picture of any aiding or abetting or conspiracy

37 - OPINION AND ORDER

and [how] the crime took place," it is a close question. The PCR court reasonably could have determined that such evidence tended to show whether, not how the crime was committed. Therefore, I cannot conclude that the PCR court's conclusion that petitioner presented no persuasive evidence or argument to prove that his case was prejudiced by counsel's decisions regarding the use of Simonsen witnesses was contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

Moreover, though petitioner insists that the trial court's Order improperly limiting counsel's ability to reinterview guilt phase witnesses "explain[s]" why Hendershot and Kolego were ineffective, any fault with the limiting order is a due process trial court error claim. Petitioner's Reply, p. 24. Petitioner admits that he did not assign error to the trial court's order on direct review, nor did he assert that the trial court improperly limited the scope of investigation or the nature of the mitigating evidence that could be admitted at re-sentencing. ¶112. Accordingly, any such claim is procedurally defaulted.

Petitioner also contends that the performance of counsel was deficient in failing to investigate, discover, and introduce evidence of petitioner's bipolar disorder. According to petitioner, leads pointing to his disorder existed that would have led reasonable counsel to investigate further and that Hendershot and Kolego missed the red flags in their expert's (Dr. Wise) letter that should have resulted in a follow-up evaluation. Petitioner's Reply, pp. 27-28. Petitioner contends that failure to introduce evidence of a mental disorder is in itself prejudicial. Memorandum in Support, p. 15 (citing Lambright v. Schriro, 485 F.3d 512, 530 (9th Cir. 2007)).

Respondent argues that the record is devoid of any evidence that petitioner actually suffered from bipolar disorder during the re-sentencing proceedings, much less that he was

exhibiting signs of the disorder.  According to respondent, Hendershot and Kolego hired a

qualified mental-health expert to evaluate petitioner and provided this expert with relevant

records regarding petitioner's medical treatment and history.  Respondent's Opposition, pp. 29-

30.  Respondent contends that Dr. Wise did not diagnose petitioner with bipolar disorder and that

counsel cannot be faulted for relying on their qualified expert's opinion.  Id. at 30 (citing

Williams v. Woodford, 384 F.3d 567, 610-11 (9th Cir. 2002); Hendricks v. Calderon, 70 f.3d

1032, 1038 (9th Cir. 1995)).

"When it comes to the penalty phase of a capital trial, '[i]t is imperative that all relevant

mitigation information be unearthed for consideration.'  Only after a thorough investigation can a

less than complete presentation of mitigating evidence ever be deemed reasonable, and only to

the extent that a reasonable strategy supports such a presentation."  Lambright, 490 F.3d at 1120

(internal citations omitted).  In this case, counsel retained clinical neuropsychologist Dr. Fred

Wise to evaluate petitioner in preparation for the re-sentencing.  Dr. Wise examined petitioner

over the course of three days and reviewed petitioner's past psychological and psychiatric

records, medical records, Children's Services records (Maclaren School records and Jackson

County Juvenile records), and records from previous incarcerations.  TD Part U Trial Transcript,

Vol. XIX, pp. 2405-06, 2442-44.  Dr. Wise did not diagnose petitioner with bipolar disorder and

counsel did not argue that petitioner had a mental defect during the re-sentencing trial.[8]  After his

re-sentencing trial, petitioner was diagnosed with bipolar disorder.  Dr. Cunningham, who

---

[8]  Although petitioner faults counsel with failing to obtain and review his juvenile files, it
is apparent that Dr. Wise had access to such records and considered them in his assessment of
petitioner.  Memorandum in Support, p. 12; TD Part U Trial Transcript, Volume XIX, pp. 2405-06,
2442-64.

39 - OPINION AND ORDER

averred at petitioner's PCR trial that petitioner suffered from bipolar disorder, noted that symptoms of the disorder were apparent in petitioner's medical and psychiatric records from early adolescence. ¶119.

Petitioner argues that given the "tantalizing indications" of mental illness contained in Dr. Wise's report, counsel should have had petitioner evaluated further and suggests that such follow-up evaluation would have yielded a diagnosis of petitioner's bipolar disorder.[9] Petitioner's Reply, p. 29. Petitioner contends that "it appears that the timing and scope of Dr. Wise's evaluation resulted in a truncated defense investigation into mitigation evidence." Id. at 30.

Petitioner argues that Dr. Wise's evaluation of petitioner was done hastily and that "the reason that the formal diagnosis of bipolar disorder was not made until the post-conviction proceeding is because it was not until then that an attorney hired a psychologist to properly evaluate [petitioner]." Id. at pp. 27-28. I note, however, that petitioner does not challenge Dr. Wise's qualifications. Nor does petitioner support his assertion that the doctor's examination of him on portions of three consecutive days shortly before trial compromised the doctor's ability to reliably assess petitioner's condition.

During the re-sentencing trial, Dr. Wise testified for what amounts to more than one hundred pages of transcript. My review of that testimony supports the conclusion that Dr. Wise made a thorough review of petitioner's relevant treatment records and background, and that his examination of petitioner was sufficient for him to form a reliable opinion. Accordingly,

---

[9] According to petitioner, the signs of mental illness in Dr. Wise report included a history of epilepsy and prescription drugs for epilepsy; diagnosis of Attention Deficit Disorder; childhood history of psychiatric problems; and an apparent family history (father and grandmother) of diagnosable mental disorders. Id.

counsel's reliance on Dr. Wise was appropriate. See Harris v. Vasquez, 949 F.2d 1497, 1525 (9th Cir. 1990) (" It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts.").

Finally, petitioner argues that his attorneys' performance was deficient because they limited their mitigation case to the issue of future dangerousness, and that their decision prejudiced petitioner because the prosecution was able to present significant evidence to rebut the assertion that petitioner could be controlled in prison. Petitioner also contends counsel reinforced the prosecutions's future dangerousness argument by stating that they did not dispute that petitioner ordered Simonsen to shoot the victims and by having their medical expert testify that petitioner suffered from antisocial personality disorder. Petitioner contends that these actions "collapsed rather than expanded" the difference in moral culpability between petitioner and Simonsen. Petitioner's Reply, p. 26.

In response, respondent asserts that while counsel focused their efforts on trying to show that petitioner was controllable in prison, they also presented the jury with evidence on a number of fronts, including evidence regarding Simonsen's involvement in the shootings and Simonsen's background, as well as evidence of petitioner's abusive childhood, in an effort to persuade the jury to impose a life sentence. Respondent's Opposition, p. 26.

Although petitioner concedes that counsel introduced evidence of abuse during his re-sentencing trial, he inexplicably suggests that such evidence went only to the issue of future dangerousness. Id. at 30. I disagree. Numerous family members testified that petitioner endured severe abuse as a child, primarily at the hands of his father. TD Part S Trial Transcript, Vol. XVI at 1996-2065; TD Part T Trial Transcript, Vol. XVII at 2080-2123, 2168-2174 and TD Part T

Trial Transcript, Vol. XVIII at 2220-2265. I have reviewed this evidence of abuse and find no reason to conclude that the jury would confine its consideration of it to the issue of petitioner's future dangerousness.

With regard to petitioner's argument that counsel reinforced the prosecution's case as to future dangerousness, I note that "[a]n attorney's decision to concede guilt in the sentencing phase of a trial is not necessarily an unreasonable tactical decision," and that a jury may react favorably to such a decision because it shows respect for the jury's finding. Stenson v. Lambert, 504 F.3d 873, 890-91 (9th Cir. 2007) (citing Florida v. Nixon, 543 U.S. 175, 176-77 (2004)).

In comparison, Hendershott's statements that the defense did not dispute the prosecution's assertion that petitioner ordered the shooting and that he would not be arguing that petitioner had a mental defect, while not affirmative concessions of guilt, could be counsel's reasonable attempt to gain credibility with the jury. Moreover, both statements tracked with counsel's primary mitigation strategy of arguing that petitioner was beginning to "burn out" and could be adequately controlled in prison.

Based on the foregoing, I conclude that petitioner has failed to demonstrate that the PCR court's decision denying his ineffective assistance of re-sentencing counsel claim was contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

### 4.   Erroneous Jury Instruction Based on Use of Phrase "Moral Certainty" to Define Reasonable Doubt (Ground Four)

Petitioner contends that the trial court's instruction on reasonable doubt was constitutionally infirm. Memorandum in Support, p. 15. According to petitioner, given the

court's use of the phrase "moral certainty," the absence of an instruction on the presumption of innocence, and the deficient performance of guilt phase counsel, "'there is a reasonable likelihood that the jury understood the instruction to allow conviction based on proof insufficient to meet the *Winship* [beyond a reasonable doubt] standard.'" Id. (quoting Victor v. Nebraska, 511 U.S. 1,6 (1994)).

The Oregon Supreme Court addressed this due process issue on direct appeal and determined that the instruction was not constitutionally infirm. See Williams I. Petitioner argues that the Oregon Supreme Court's decision is contrary to Cage v. Louisiana as "guided" by Victor. 498 U.S. 39, 41 (1990) (overruled on other grounds by Estelle v. McGuire, 502 U.S. 62 (1991)). I note that the parties disagree as to whether Victor, decided after the Oregon Supreme Court issued its decision, bears on the discussion here.[10] Even assuming that Victor applies, petitioner has not demonstrated that the Oregon Supreme Court's decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

In Victor, the court examined an instruction very similar to the one at issue here. One of the petitioner's in that case primarily objected to use of the phrases "moral evidence" and "moral certainty" in the instruction defining reasonable doubt. Victor, 511 U.S. at 10. In affirming the constitutionality of the instruction there, the Court noted that the phrase moral evidence was defined so as to equate it with empirical evidence and that such conclusion was reinforced by

---

[10]    Respondent contends that petitioner's reliance on Victor is misplaced insofar as he contends that it supplies a clearly established rule for purposes of § 2254(d)(1) because it was not decided until after the Oregon Supreme Court issued its decision. Respondent's Opposition, p. 38. Petitioner argues that Victor did not establish new law, but merely provided additional guidance to courts considering "moral certainty" issues. Petitioner's Reply, p. 34.

43 - OPINION AND ORDER

other instructions given in the case. Id. at 13. Moreover, the court held that reference to moral

certainty in conjunction with "abiding conviction" language was sufficient to impress upon the

jury the need to reach a subjective state of near certitude of petitioner's guilt. Id. at 15 (citing

Jackson v. Virginia, 443 U.S. 307, 315 (1979)). Finally, as contrasted with Cage wherein the

jurors were told that they had to be morally certain of defendant's guilt with nothing more in the

instruction to lend meaning to that phrase, the Victor court held that given the instructions

directing the jury to base its conclusion on the evidence in the case, there was no reasonable

likelihood that it would have understood moral certainty to be unrelated from the evidence in the

case. Id. at 17.

In Williams I, the court discussed the context of the trial court's moral certainty

instruction at length. 313 Or. at 38-39 & 41. It held that, given the numerous references to

"evidence" and "facts," reasonable jurors would not base their decision on anything other than the

evidence in the case. Id. at 38. Moreover, in contrast to Cage, the moral certainty instruction

here was given in conjunction with "feel convinced" language. Id. at 34. The parties here

dispute whether "feel convinced" equates with the compensating "abiding conviction" language

found to be significant in Victor. Petitioner insists that "abiding" elevates the degree of

conviction to the highest level and that "feel convinced" is clearly a lower standard. This

argument is weakened by the fact that the language used in the Victor instruction was "feel an

abiding conviction." In any event, it is not clear to me that use of "feel convinced" language in

conjunction with the phrase moral certainty does not lend similarly helpful context as use of

"abiding conviction" language. Accordingly, I cannot conclude that the Oregon Supreme Court's

decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court.

Petitioner also relies on Estelle to argue that the Oregon Supreme Court's decision is contrary to federal law because the court did not adequately account for either the instructions as a whole or the trial record, including the failings of guilt phase counsel.

> It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.

Estelle, 502 U.S. at 72 (citations omitted).  However, as noted above, the Oregon Supreme Court did thoroughly consider the context of the trial court's jury instructions, and I do not read Estelle as requiring that a court specifically consider and reference every other conceivable error in resolving a claim challenging the constitutionality of a specific jury instruction.

In summary, following a careful examination of all of the evidence in the record, I conclude that the state court decisions at issue here are appropriately entitled to deference, and that petitioner's arguments that he received ineffective assistance of counsel during the state court proceedings fail as a matter of law.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

45 - OPINION AND ORDER

## CONCLUSION

For the reasons set forth above, petitioner has failed to demonstrate that he is entitled to habeas relief on Grounds One through Five (numbered in the Petition as Claims 1-3, 7 & 10(A)). Accordingly, petitioner's Motion for Partial Summary Judgment (#95) is DENIED, and petitioner is directed to show cause within 30 days from the date of this opinion why Petition Claims 1-3, 7 and 10(A) should not be dismissed with prejudice.[11]

IT IS FURTHER ORDERED that respondent's Motion (#117) is granted in part and denied in part as follows:  respondent's request to file a Response (#119) is GRANTED and respondent's request for oral argument is DENIED AS MOOT.  I note that petitioner's agreement not to oppose respondent's motion was contingent on the court permitting him to reply to respondent's latest response.  Because I find that additional briefing would not be helpful to the court in resolving petitioner's motion for partial summary judgment, I decline, in an exercise of my discretion, to consider further briefing at this time.  Petitioner may include additional arguments in his response to the court's Order to Show Cause.

IT IS SO ORDERED.

DATED this 30th day of September, 2008.

Robert E. Jones
Senior United States District Judge

---

[11]  I note that petitioner indicates he limited his challenge to the state court's fact finding to the evidence in the state court record ("intrinsic review") in this motion; and that in his Petition, he preserved his right to present additional evidence in support of the above claims in an evidentiary hearing following discovery and further investigation.  Memorandum in Support Motion for Summary Judgment, p. 20; Petition for Writ of Habeas Corpus, pp. 23, 30 & 61.