# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

JEFFERY RAY WILLIAMS,                )
                                     )      3: 03-cv-01678-JO
            Petitioner,              )
                                     )
      v.                             )
                                     )      OPINION AND ORDER
BRIAN E. BELLEQUE, Superintendent,   )
Oregon State Penitentiary,           )
                                     )
            Respondent.              )

        Michael R. Snedeker
        Lisa R. Short
        Snedeker, Smith & Short
        PMB 422, 4110 S.E. Hawthorne Blvd.
        Portland, Oregon 97214

            Attorneys for Petitioner

        Ellen F. Rosenblum
        Attorney General
        Timothy A. Sylwester
        Michael S. Shin
        Assistant Attorneys General
        Department of Justice
        1162 Court Street NE
        Salem, Oregon 97301

            Attorneys for Respondent

JONES, District Judge.


1 - OPINION AND ORDER

Petitioner brings this capital habeas corpus action pursuant to 28 U.S.C. § 2254 in which he challenges his convictions and death sentence for aggravated murder. In this Opinion and Order, I resolve on the merits: (1) claims the parties agree were fairly presented to the Oregon courts; (2) claims for which the State waives its procedural default defense; and (3) certain claims I deem can be denied on the merits regardless of whether they are defaulted. *See Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997)(federal habeas court may bypass question of procedural default to deny claim on the merits); 28 U.S.C. § 2254(b)(2)("An application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). I reserve my examination of the remaining claims, including whether *Martinez v. Ryan,* 566 U.S. 1 (2012) excuses the default of certain claims or subclaims, pending final briefing from the parties.[1]

## I.     PROCEDURAL BACKGROUND

### A.     State Proceedings

Petitioner was initially tried, convicted and sentenced to death in 1989. On direct review, the Oregon Supreme Court upheld petitioner's convictions but remanded the case for a new penalty-phase trial. *See State v. Williams*, 313 Or. 19, 828 P.2d 1006 (*Williams I*), *cert. denied*, 506 U.S. 858 (1992).

---

[1]     Claims and subclaims reserved for disposition pending final briefing on the issues of exhaustion, procedural default and exceptions to procedural default include: Claims 1(A)(2)(a)-(d), 1(A)(5)(a)-(d), 1(B)(2)(a)-(e), 1(C)(1), 1(C)(3)(a)-(d), 1(C)(4), 1(D)(1)(a)-(d), 1(D)(2), 1(E)(1)(a)-(k), 1(E)(2)(a) & (b), 1(E)(3), 1(E)(4), 1(E)(6), 1(F)(1)(a)-(c); Claims 3(A)(3)(a)-(r), 3(B)(1)(a)-(z), 3(C)(1)(a)-(m), 3(D)(2), 3(D)(3)(a)-(c), 3(D)(6); Claim 5; Claims 6(B)-(E); Claim 10(E); Claim 11(B); Claims 13(1)-(3); Claim 16(7)(f); and Claim 17.

In August 1993, the second penalty-phase jury again sentenced petitioner to death. On direct review, the Oregon Supreme Court upheld the death sentence. *See State v. Williams*, 322 Or. 620, 912 P.2d 364 (*Williams II*), *cert. denied*, 519 U.S. 854 (1996).

Petitioner next filed for post-conviction relief ("PCR") in state court. The PCR court held an evidentiary trial and denied relief. Respondent's Exhibits 168 & 169. On appeal, the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *Williams v. Palmateer*, 184 Or. App. 761, 58 P.3d 244 (2002), *rev. denied*, 335 Or. 656, 75 P.3d 899 (2003).

## B.    Federal Proceedings

On March 16, 2007, petitioner filed a Petition for Writ of Habeas Corpus [85]. At my request, the parties briefed several of petitioner's strongest claims in an effort to determine whether I could summarily resolve one or more of those claims in petitioner's favor on the current record and without further extensive proceedings. I denied petitioner's partial summary judgment motion on September 8, 2008. Thereafter, on September 13, 2010, I granted in part and denied in part the State's Motion for Partial Summary Judgment on procedural default grounds and directed further briefing from the parties on exceptions to procedural default. *See* Opinion and Order [199]. Due to a conflict bearing on the Oregon Federal Public Defender's ability to continue to represent petitioner, I appointed current counsel.

On February 18, 2014, I granted petitioner's unopposed motion for leave to file an amended petition. The Amended Petition [314] raises twenty-one (21) claims and numerous sub-claims. The parties have briefed the merits of these claims.

///

///

## II.    **Standard of Review**

An application for writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable. *Williams*, 529 U.S. at 409-10. A federal habeas court reviews the state court's "last reasoned decision." *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

For petitioner's claims of ineffective assistance, discussed in sections A, B, C and H of this opinion, the Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show that his lawyer's

4 - OPINION AND ORDER

performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.

Second, the petitioner must show that his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.

When considering ineffective assistance of counsel claims under 28 U.S.C. § 2254(d), "it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)(per curium). Moreover, where a state court has adjudicated an ineffective assistance of counsel claim on the merits, a habeas court's review of a claim under the *Strickland* standard is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 88-89 (2011); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

**III.  Discussion**

As noted above, the Amended Petition raises 21 claims, along with numerous sub-claims.

**A.  First Claim For Relief - Ineffective Assistance of Guilt-Phase Counsel**

1.  Claim 1(A)(1) - Guilt-phase counsel failed to fully investigate both the guilt and sentencing phases of the case in order to prepare an adequate defense for petitioner's capital trial. No capital defense team can make a reasonable tactical decision about how to pursue a defense at either phase without first conducting an adequate investigation

The parties agree that petitioner fairly presented this claim to the Oregon courts. However, for the reasons set forth in my prior Opinion and Order [120], pp. 14-31, I conclude that he cannot prevail on this claim which *generally* alleges that guilt-phase counsel failed to fully investigate both phases of the case in order to prepare an adequate defense for petitioner's capital trial because he cannot demonstrate as a general matter that the PCR court's denial of this claim involved an objectively unreasonable application of *Strickland*. I note that in several of petitioner's discreet guilt-phase ineffective assistance of counsel ("IAC") subclaims set forth below he alleges specific investigative failings on counsel's part and challenges specific factual findings by the PCR court related to these alleged investigative failures. I will address those subclaims individually.

Similarly, I have considered petitioner's arguments that no deference is due *any* of the PCR court's findings of fact or conclusions of law because that court improperly minimized its role in the post-conviction process and placed arbitrary limitations on petitioner's PCR counsel which created a wholly defective process. Having reviewed petitioner's extensive arguments, I decline to find that the entire post-conviction process was constitutionally defective. However, in the context of particular claims, where petitioner specifically challenges certain of the PCR court's findings of fact or conclusions of law on the basis that the process afforded him during his PCR proceedings denied him a constitutionally adequate avenue for presentation of particular claims, I will examine whether deference to the PCR court is warranted as to those individual claims.

Based on the foregoing, I conclude that petitioner has failed to demonstrate that the PCR court's denial of this subclaim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Court, or that it was based on an unreasonable

determination of the facts in light of the evidence presented in State court. Accordingly, I deny it on the merits.[2]

2. Claim 1(A)(2)(e) - Guilt-phase counsel failed to move to ensure that all bench conferences were recorded and failed to object when they were not. Counsel also failed to make a record of topics and results of the unrecorded bench conferences

Relevant to this claim is the following PCR court finding of fact: "[t]he trial court did not discuss substantive issues in bench conferences." Petitioner does not challenge this factual finding.

When a state chooses to provide for appellate review, it must provide a defendant with "a record of sufficient completeness to permit proper consideration of [his] claims" in order to satisfy the constitutional guarantees of due process and equal protection. *Mayer v. City of Chicago*, 404 U.S. 189, 193-94 (1971); *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)("there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal"). However, a record of sufficient completeness "does not translate automatically into a complete verbatim transcript." *Mayer*, 404 U.S. at 194. Moreover, the Ninth Circuit adopted *Britt*'s two criteria for determining whether the unavailability of a transcript violates due process: "'(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought; and (2) the availability of alternative

---

[2] As noted above, I am resolving the claims addressed in this Opinion and Order on the merits. To the extent petitioner fairly presented a particular claim to the Oregon courts and those courts denied it on the merits, any denial by me is based on my conclusion that petitioner failed to demonstrate that such denial was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Court, or that it was based on an unreasonable determination of the facts in light of the evidence presented in State court. Alternatively, to the extent there is a question as to whether a claim is procedurally defaulted, I have reviewed the claim *de novo* and any denial is on the merits.

devices that would fulfill the same functions as a transcript.'" *Madera v. Risley*, 885 F.2d 646, 648 (9th Cir. 1989).

Here, petitioner fails to contradict the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance. On this record, I cannot conclude that counsel acted unreasonably in failing to move to have all bench conferences recorded. Moreover, I owe deference to the PCR court's factual finding that nothing substantive took place during the unrecorded bench conferences that would have been material to petitioner's appeal and that was not mentioned elsewhere in the record.[3] For these same reasons, petitioner cannot demonstrate that counsel was ineffective in failing to make a record of topics and results of all bench conferences. Finally, petitioner fails to demonstrate that counsel's alleged failures prejudiced him by identifying an issue or claim that he could have successfully pursued had counsel moved to have bench conferences recorded and/or made a record of topics and results covered. Therefore, I conclude that any denial of relief by the PCR court on this ineffective assistance claim was neither contrary to nor did it involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of evidence presented in the PCR proceeding. Alternatively, on *de novo* review I would conclude that this subclaim is without merit.

---

[3] Even when a *claim* has not been fairly presented to the State courts, I must defer to the PCR court's relevant findings of fact absent clear and convincing evidence to the contrary. *See Sharpe v. Bell*, 593 F.3d 372, 378-79 (4th Cir. 2010)(citations omitted)("While Section 2254(d) thus has no application in the context of a *Schulp* claim because it pertains only to a 'claim that was adjudicated' in state court, Section 2254(e)(1) does come into play because it refers to the 'determination of a factual issue'-that is, to a state court's finding of fact, rather than its conclusions of federal law.").

3.    Claim 1(A)(2)(f) - Guilt-phase counsel failed to move for change of venue from Coos County where he could not get a fair trial before an impartial jury

The PCR court made the following relevant Findings of Fact:

27.    Counsel did not move to change venue because the case had not created any amount of undue local publicity.

28.    The trial court commented on how few of the potential jurors said during *voir dire* that they had heard anything about the case.

29.    Petitioner presented no evidence to support his claim that the case had generated so much publicity that a change of venue would have been warranted.

Respondent's Exhibit 168, p. 5.

In *Hayes v. Ayers*, 632 F.3d 500, 507-11 (9th Cir. 2011), the court outlined the law governing

due process violations arising out of a denial for change of venue:

The Sixth and Fourteenth Amendments "guarantee[] to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). When a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere[,] ... due process requires that the trial court grant defendant's motion for a change of venue." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988)(citing *Rideau v. Lousiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)).

In this circuit, we have identified "two different types of prejudice in support of a motion to transfer venue: presumed or actual." *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996). Interference with a defendant's fair-trial right "is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Actual prejudice, on the other hand, exists when voir dire reveals that the jury harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside." *Id*. at 1363. The Supreme Court applied this two-pronged analytical approach in [] *Skilling v. United States*, 561 U.S. ___, 130 S.Ct. 2896, 2907, 177 L.Ed.2d 619 (2010)(considering, first, whether pretrial publicity and community hostility established a presumption of juror prejudice, and then whether actual bias infected the jury).

* * *

"A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling*, 130 S.Ct. at 2915; *see also Harris*, 885 F.2d at 1361 ("The presumed prejudice principle is rarely applicable and is reserved for an extreme situation." (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)(citation and internal quotation marks omitted)).

* * *

Where circumstances are not so extreme as to warrant a presumption of prejudice, we must still consider whether publicity and community outrage resulted in a jury that was actually prejudiced against the defendant. This inquiry focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it. *See Skilling*, 130 S.Ct at 2917-23. Our task is to "determine if the jurors demonstrated actual partiality or hostility [toward the defendant] that could not be laid aside." *Harris*, 885 F.2d at 1363.

In his briefs, petitioner does not challenge the PCR court's findings of fact relative to this claim. As such, I presume that these findings are correct and conclude that petitioner failed to demonstrate that counsel were ineffective in failing to move for a change of venue. Moreover, in light of the PCR court's findings, petitioner cannot demonstrate that there was a reasonable chance that the trial court would have granted a motion for change of venue such that there is a reasonable probability that the outcome of the proceedings would have been different had counsel moved for change of venue. Consequently, petitioner cannot demonstrate that the PCR court's denial of this claim was contrary to or involved an unreasonable application of *Strickland*. Even on *de novo* review I would deny this subclaim on the merits.

4.   Claim 1(A)(2)(g) - Guilt-phase counsel rendered ineffective assistance when they made a request to go to trial within 60 days from date of arraignment

The PCR court made the following relevant Findings of Fact:

13.   On two occasions, Counsel Brasch requested early trial dates. On both occasions, the prosecution objected, reporting that they needed more time to prepare. On both occasions, the court denied the defense requests.

14.     Both defense requests for early trial dates were made with petitioner's consent. Both requests were attempts to get the case to trial before the prosecution was fully prepared to present its case against petitioner.

15.     The defense requests for early trial dates do not demonstrate that counsel was not prepared to take the case to trial.

Respondent's Exhibit 168, pp. 4-5.

Petitioner contends that counsel's requests for an early trial date illustrate their inexperience in litigating capital cases, and, that despite being given more time, counsel did "nothing" to prepare for the case. However, given the PCR court's above findings coupled with petitioner's failure to show that counsel's requests for an early trial date, *which the court denied*, prejudiced his case, petitioner cannot demonstrate that the PCR court's denial of this claim was contrary to or involved an unreasonable application of *Strickland*. Even on *de novo* review I would deny relief on this subclaim.

5.      Claim 1(A)(3) - Guilt-phase counsel failed to conduct an independent investigation and relied solely on information provided by law enforcement and the prosecution to defend petitioner

Relevant to this claim are the following PCR court findings of fact:

33.     The state thoroughly investigated the case, and the defense investigation confirmed what the state investigators had discovered.

38.     The only new evidence petitioner's post-conviction investigator obtained was two letters from law enforcement agencies that appear to contradict statements made by petitioner to various witnesses that petitioner had engaged in certain criminal activities.

39.     In light of the extensive evidence of petitioner's other criminal behavior that was presented at trial, the two letters submitted in this post-conviction proceeding would not have undermined the strength of the state's case if counsel had presented that evidence at trial.

46.     Counsel Trew observed most of co-defendant Simonsen's penalty phase trial
        and took extensive notes about those proceedings. As a result, counsel were
        fully aware of witnesses from Simonsen's trial whose testimony might have
        been used in an attempt to rebut the state's argument that Simonsen was
        petitioner's 'robot' and that Simonsen shot the victims on petitioner's
        instructions.

Respondent's Exhibit 168, pp. 6-7.

Petitioner argues that I should not defer to the PCR court's Findings of Fact 33 and 46

because they are contradicted and/or not supported by the record. However, with regard to this

general claim alleging that counsel failed to conduct an independent investigation into petitioner's

guilt or innocence of the capital charges, petitioner fails to show how the PCR court's findings are

contradicted and/or unsupported by the record. I will consider petitioner's challenges to these

particular factual findings where petitioner makes specific arguments in the context of discreet

claims. On this record and in light of the PCR court's above findings, petitioner fails to demonstrate

that counsel rendered ineffective assistance for failing to independently investigate petitioner's case.

Therefore, petitioner cannot show that any denial of this claim by the PCR court was contrary to or

involved an unreasonable application of *Strickland*. Even on *de novo* review the court would deny

relief on this subclaim.

6.      Claim 1(A)(4) - Guilt-phase counsel failed to review discovery provided by law
        enforcement

For the reasons set forth in my prior Order [120] at 23-25, I deny this subclaim.

7.      Claim 1(B)(1) - Guilt-phase counsel's representation undermined petitioner's
        presumption of innocence and lowered the burden of proof

This claim's allegations are conclusory and I deny it on the merits. I will address petitioner's

additional discreet allegations of ineffective assistance of guilt-phase counsel in the subclaims below.

8.    Claims 1(C)(2)(a)-(d) - Guilt-phase counsel failed to prepare Van Ootengham to testify regarding: footprints, shotgun evidence, tire tracks and red fibers

For the reasons set forth in my prior Order [120] at 16-19 & 28, I deny these subclaims. Even on *de novo* review I would deny relief on these subclaims.

9.    Claim 1(D)(3)(a)-(e) - Guilt-phase counsel failed to introduce testimony via Nicholas, Mobley, Mier, Griffen and House about Simonsen's independence, explosive temper, and problems with women

Respondent notes that I, in my consideration of these subclaims on summary judgment, rejected any argument that petitioner's counsel were unaware of the Simonsen-as-violent-independent-actor strategy. I concluded that the PCR court's determination that counsel's decision not to use the Simonsen witnesses was reasonable, is entitled to deference. *See* Order [120], pp. 27-28.

Relevant to this claim are the following PCR court findings of fact:

46.    Counsel Trew observed most of co-defendant Simonsen's penalty phase trial and took extensive notes about those proceedings. As a result, counsel were fully aware of witnesses from Simonsen's trial whose testimony might have been used in an attempt to rebut the state's argument that Simonsen was petitioner's "robot" and that Simonsen shot the victims on petitioner's instructions.

47.    Counsel chose not to call the Simonsen witnesses because counsel did not believe the state's "robot theory" was persuasive, but they believed that if all the drug-related evidence came in, the "robot theory" would be greatly enhanced.

48.    The unfavorable 'drug-related evidence' included testimony that Mr. Williams injected Simonsen with methamphetamine because Simonsen was unable to inject the drug himself, and Mr. Williams used that situation to control Simonsen.

49.    Petitioner agreed with counsel's decision not to call the Simonsen witnesses at trial.

50.    Petitioner presented no credible evidence that this strategic decision was an error of constitutional magnitude. This court does not find persuasive Duane

McCabe's testimony that no reasonable defense attorney would have chosen not to present the Simonsen witnesses.

51. Counsel Brasch and Trew weighed the risks inherent in calling the Simonsen witnesses and concluded that the risk of presenting those witnesses was greater than the potential benefit. That decision was not unreasonable.

Respondent's Exhibit 168, pp. 7-8.

As an initial matter, petitioner maintains that the above findings of fact, with the exception of FOF 49, are contradicted and/or unsupported by the record and deserve no deference from this court. Specifically, with regard to FOF 46, petitioner argues that Harold Wagy testified at Simonsen's trial that Simonsen used hard drugs in the Spring of 1988 during the period when Wagy, Simonsen and Brian Clevenger were roommates and prior to Simonsen ever meeting petitioner. Petitioner argues counsel's failure to interview Wagy and Clevenger supports his contention that FOF 46 is erroneous and unsupported by the record. I disagree. In addition to counsel's offer of proof from witnesses that could attest to Simonsen as an independent actor, Trew had observed Wagy's testimony and even noted that it might be helpful to petitioner. Accordingly, I reject petitioner's assertion here that counsel's failure to interview Wagy and Clevenger amounts to clear and convincing evidence contradicting the PCR court's finding that counsel were fully aware of how witnesses from Simonsen's trial could be used to rebut the state's theory that petitioner controlled Simonsen such that this court should not defer to FOF 46.

With regard to FOF 47 and its reference to "all drug-related evidence," petitioner argues that evidence of petitioner's drug use and drug dealing would not have been relevant to refute statements that Simonsen was independent and uncontrollable and that the only relevant evidence referenced by the PCR court in this FOF pertained to an assertion that petitioner used the fact that Simonsen

could not inject himself with methamphetamine to control him. In response, respondent asserts that the State had numerous witnesses available to testify that petitioner's control over Simonsen centered on drug use, including statements that petitioner shot Simonsen up with methamphetamine. While petitioner insists that the referenced testimony from Simonsen's trial was either hearsay, irrelevant to the issue of Simonsen's independence or involved testimony from witnesses that actually testified at petitioner's trial, my independent review of the record reveals there was sufficient evidence in the record before the PCR court to support FOF 47.

In addition, while petitioner seeks to minimize the testimony of Michael Shonk, a longtime friend of Simonsen's who testified at both petitioner's guilt-phase trial and Simonsen's penalty- phase trial, examination of the difference in Shonk's testimony at those two trials on the issue of petitioner's control over Simonsen reveals the significant nature of the drug-related evidence counsel sought to keep out of petitioner's trial.

First, at petitioner's guilt-phase trial, Shonk testified that he noticed a difference in Simonsen when he was with petitioner. He indicated that petitioner had to be the center of attention and that, "Dave [Simonsen] would do pretty much anything he asked, kind of like his gopher." TD, Part D, Vol. III, p. 573. In contrast, at Simonsen's penalty-phase trial, Shonk testified that he noticed a change in Simonsen around the summer of 1988 triggered by his hanging around petitioner. He testified that he had not known Simonsen to use drugs before, but that he believed that he began using methamphetamine around July 1988. Shonk testified that he counseled Simonsen against using hard drugs. Shonk also testified that petitioner, a known drug dealer in the area, supplied Simonsen with drugs and Shonk noticed Simonsen was taking them at an accelerated pace. He further testified to what he characterized as an "emerging dominance" that petitioner had over

Simonsen and that the combination of petitioner and drugs could make Simonsen a dangerous person. Finally, Shonk testified that he did not think Simonsen would have committed the crimes without petitioner and drugs. Accordingly, even setting aside the potential hearsay testimony of witnesses like Detective Dalton and Ronald Thurner, I conclude Shonk's testimony supports the PCR court's FOF 47.

With regard to FOF 48, however, I agree with petitioner that this FOF is not supported by the record at least as it refers to what information Brasch and Trew[4] had when they made their decision about the Simonsen witnesses. There was testimony that petitioner injected Simonsen with drugs. However, the court can find no mention in Simonsen's first penalty-phase trial, petitioner's guilt-phase trial or petitioner's first penalty-phase trial, and the State points to none, *other than in Simonsen's counsel's opening statement*, indicating that Simonsen could not inject himself and petitioner used this fact to control him.[5] During petitioner's second penalty-phase trial, Theresa Villa testified that petitioner injected Simonsen with drugs because he could not do it himself: "[h]e couldn't maneuver it right to be able to do it himself, so Jeff had to do it for him," but she did not specifically testify that petitioner used this fact to control Simonsen. TD, Part N, pp. 709-10.[6] Accordingly, in resolving this claim, I do not defer to FOF 48.

---

[4]    Court-appointed counsel, Robert Brasch and John Trew, represented petitioner during the first trial.

[5]    The court agrees with petitioner that comments in opening statements do not constitute evidence in the record sufficient to support the PCR court's FOF.

[6]    Ms. Villa testified in the earlier trials as well. While she confirmed that petitioner was the leader and that he exercised significant control over Simonsen, she did not testify in those earlier proceedings that Simonsen needed petitioner to inject him with drugs because he could not do it himself. TD, Part Y, p. 975; TD, Part D, p. 699.

Petitioner argues FOF 50 involves a legal conclusion not a factual finding and that no evidence was presented to refute McCabe's testimony. In response, respondent maintains that the PCR court made an express credibility finding regarding McCabe's testimony after hearing live testimony and that it concluded petitioner had failed present credible evidence that his counsel's decision not to call the Simonsen witnesses violated petitioner's constitutional rights. There is support in the record for the PCR court's FOF. Moreover, even assuming FOF 50 is a legal conclusion holding that counsel did not render ineffective assistance of counsel when they declined to call the Simonsen witnesses to testify, based on my analysis regarding counsel's decision whether to call these witnesses, I conclude that petitioner cannot demonstrate that the PCR court's determination was contrary to or involved an unreasonable application of *Strickland*.

With regard to FOF 51, petitioner insists counsel did not know what the risks of calling the Simonsen witnesses were because they never asked for a specific offer of proof to explore what any rebuttal witnesses may have testified to and never made their own efforts to find out. He further contends that the only relevant evidence mentioned by the PCR court, *i.e.,* that Simonsen needed petitioner to inject him and petitioner used that fact to control him, is unsupported by evidence in the record. These arguments notwithstanding, I conclude that even without evidence that petitioner used the fact that Simonsen allegedly could not inject himself to control him, there was sufficient support in the record, including Shonk's testimony, supporting FOF 51.

In summary, petitioner argues that I should not defer to the PCR court's factual findings bearing on this claim because they are based on the unsupported findings that: (1) Simonsen relied on petitioner to inject him with drugs because he could not inject himself; and (2) petitioner used this fact to control him. Similarly, petitioner insists that the PCR court erred in deferring to counsel's

purported tactical choices because counsel's failure to conduct an adequate investigation left them unaware of the actual risks of calling the Simonsen witnesses and caused them to gravely overestimate the downside of calling these witnesses compared with the benefit of introducing critically important evidence of Simonsen's independence that could have resulted in a different and more favorable outcome for petitioner.

As a preliminary matter, I reject petitioner's suggestion that the specific finding that Simonsen needed petitioner to inject him with drugs because he could not do it himself and that petitioner used this fact to control Simonsen is the only relevant drug-related rebuttal evidence at issue. My review of the record reveals counsel were aware of and reasonably concerned with a much wider breadth of drug-related evidence. In fact, Trew averred during petitioner's PCR proceeding that they were worried about *any* mention of drugs and drug dealing. In addition, Trew testified at the PCR hearing that they were concerned about testimony that they had heard about petitioner injecting Simonsen and evidence that the two committed the murders because they were high on drugs. These concerns prompted counsel to make the strategic decision to scrub the evidence before the guilt-phase jury, as much as possible, of any drug-related references.

While petitioner insists that such testimony was either inadmissible hearsay, irrelevant to issue of control, or ended up being introduced in large part at trial anyway, my review of the record reveals otherwise. Petitioner argues counsel should have introduced the ample evidence demonstrating Simonsen's independence even if it meant the trial court would allow in the drug-related evidence. On this record, however, I cannot conclude that no reasonable lawyer would have

acted as petitioner's counsel did.[7]  Rather, "some reasonable lawyer" could have determined, as

counsel did here, that keeping as much of the drug-related evidence out, even at the expense of not

being able to introduce evidence of Simonsen's independence, was a sound trial strategy.  *See*

*Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141

(1998)("The test has nothing to do with what the best lawyers would have done.  Nor is the test even

what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial

could have acted, in the circumstances, as defense counsel acted at trial.").

Accordingly, in light of the PCR court's above findings, petitioner fails to demonstrate that

counsel rendered ineffective assistance in failing to introduce certain evidence of Simonsen's

independence.  As such, he cannot show that any denials of these subclaims by the PCR court were

contrary to or involved an unreasonable application of *Strickland*.  Even on *de novo* review I would

deny relief on these subclaims.

10.  Claim 1(D)(3)(f) & (h) - By mistakenly believing the rebuttal evidence involving
drug use would be too prejudicial, guilt-phase counsel guaranteed petitioner would
be convicted of aggravated murder because counsel introduced no evidence that
Simonsen was capable of acting independently and violently without petitioner's
influence.  In addition, because the prosecution introduced rebuttal drug use and drug
dealing evidence during the penalty phase, counsel denied petitioner the benefit of
the Simonsen witnesses and subjected petitioner to the drug evidence anyway

This is a new claim.  Nevertheless, I bypass the issue of procedural default and on *de novo*

review deny it on the merits.

---

[7]  As respondent argues, counsel could have reasonably determined that such evidence
carried a risk of actually working against their client by portraying Simonsen as a ticking time bomb
who became a killer when petitioner provided him with drugs.

As a preliminary matter, petitioner suggests that absent affirmative evidence that Simonsen was capable of acting independently, the jury would *necessarily* credit evidence suggesting that petitioner influenced and controlled Simonsen's actions. Even if this suggestion is plausible, I disagree that counsel's calculus vis-a-vis the referenced evidence "guaranteed" an aggravated murder conviction. Counsel's proffered alternative theory that a jury would not easily determine that an individual would kill at another's direction and would not easily transfer responsibility from the admitted shooter to petitioner is also plausible. Indeed, petitioner's counsel explicitly stated that they did not find the state's "robot theory" terribly convincing. I cannot say that such view was an unreasonable one. Moreover, while counsel, in an effort to avoid introduction of drug evidence, declined to introduce available evidence of Simonsen's independence at trial, in closing arguments he tried to convince the jury that the case they had heard was the one against Simonsen: "the admitted personal, intentional killer of those two girls." He maintained that the evidence showed that Simonsen killed the girls so quickly that nobody, including petitioner, could have predicted it was going to happen. Specifically, counsel argued:

> Now, what kind of guy is Simonsen? Simonsen is a confessed murderer. Simonsen is a guy who, just a few hours before all of this started happening, Burt Tirey said the man got out of control. He said "out of control. He was like a caged animal, not in control, and he said 'I need to kill something.'" And he is 6'4". He's a big boy. He is a pretty intimidating character. "I need to kill something."

TD, Part F, p. 1427.

Based on the foregoing, I deny these subclaims alleging counsel's failure to utilize evidence of Simonsen's independence guaranteed an aggravated murder conviction. With regard to petitioner's assertion that counsel was ineffective in his tactics because the drug-related evidence

came in during the penalty phase anyway, I deny relief for the reasons set out in my prior Opinion and Order [120], pp. 28-30.

11. <u>Claim 1(D)(3)(g) - Guilt-phase counsel failed to introduce evidence of Simonsen's intense misogyny because counsel mistakenly believed it would open the door to damaging rebuttal evidence</u>

This too is a new claim. Nevertheless, I bypass the issue of procedural default and on *de novo* review deny it on the merits.

Notwithstanding the state's representation on direct appeal[8], my review of the relevant portions of the transcript reveals that the trial court and the parties understood that petitioner's counsel hoped to introduce evidence of both Simonsen's independence and his hatred of women, but that counsel would opt not to do so if it meant opening the door to the prosecution's presentation of drug-related evidence. Based on my review of the record, it is not apparent that the trial court confined its ruling to the evidence that Simonsen was an independent and violent actor. To the contrary, that court indicated that it would have to make a determination as the evidence came in at trial. Moreover, despite knowing what petitioner's counsel sought to accomplish through their offer of proof, the court offered no assurances that only the testimony concerning Simonsen's independence and violence, *and not testimony concerning Simonsen's hatred of women*, would open the door to possible introduction of drug-related evidence. One would expect more clarity from the

---

[8] On his first direct appeal, petitioner raised a claim alleging that the trial court erred when it ruled that petitioner could present evidence on the issue of lack of control other people asserted over Simonsen, and that rebuttal evidence, presumably evidence of petitioner supplying Simonsen with drugs, might be admissible. In the context of this trial court error claim, respondent stated that petitioner had "clearly split his offer of proof into two parts" and that "[n]othing the trial court said indicated that it believed that evidence of Simonsen's misogynic attitude would open any door." Respondent's Exhibit 106, pp. 188-89, n.57.

court if indeed it had determined that testimony related to Simonsen's misogyny was in a different category and would not open the door to the drug-related evidence.

In any event, even if it is possible to infer that the trial court distinguished between the evidence as petitioner suggests, I would still conclude that counsel's interpretation, that the trial court's ruling applied equally to both kinds of testimony, was a reasonable one and did not constitute ineffective assistance of counsel. The interpretation was reasonable because counsel's purpose in introducing evidence of misogyny would be to show Simonsen shot the victims on a misogynistic impulse and not at petitioner's direction. As such, the reason for opening the door to the drug-related evidence, *i.e.*, to show petitioner controlled Simonsen, is the same, regardless of whether the testimony involved evidence of Simonsen's independence and violence or evidence of his hatred of women. Indeed, my review of petitioner's brief on the first direct appeal reveals that his appellate counsel, in summarizing the testimony of the witnesses in the offer of proof, did not suggest that the evidence fell into separate categories impacting whether the court would allow rebuttal evidence on the issue of control. Respondent's Exhibit 105, pp. 162-63. Accordingly, I deny this subclaim.

12. Claim 1(D)(4) - Guilt-phase counsel thought the physical evidence would convict petitioner and counsel failed to develop a theory on the case; instead taking the "hope" approach that the prosecution could not prove petitioner was at the scene

Were "hope" counsel's only tactic, I might agree with petitioner. But as noted in my prior Order [120], this argument is belied by the record. Counsel argued at trial that: (1) Simonsen was the admitted shooter; (2) the prosecution failed to meet its burden of showing petitioner "got into" the killing; and (3) the prosecution failed to present evidence proving beyond a reasonable doubt that petitioner was present at the scene when the victims were killed. As evidenced by his pre-trial letter to petitioner, Brasch did believe that the physical evidence against petitioner would place him at the

scene of the murders and that the circumstantial evidence would lead the jury to find that both he and Simonsen personally killed the victims. Nevertheless, a fair review of the record reveals that counsel he developed a theory of the case wherein he attempted to capitalize on the fact that Simonsen admitted to being the shooter. Accordingly, I deny this subclaim.

13. Claim 1(E)(5) - Guilt-phase counsel failed to request a jury instruction that correctly defined "reasonable doubt"

I deny this claim for the reasons set forth in my prior Order [120], pp. 42-25.

## B. Second Claim For Relief - Ineffective Assistance of First Penalty-Phase Counsel

First penalty-phase counsel rendered constitutionally deficient representation when they failed to adequately investigate, prepare, and present readily available and powerful mitigating evidence at petitioner's initial penalty-phase trial

According to petitioner, "*[b]ecause of a ruling in the penalty retrial*, the errors of Brasch and Trew carried over into that proceeding." Amended Petition [314], p. 28 (emphasis added). Specifically, petitioner argues that the second penalty-phase court limited his counsel's investigation and made other rulings concerning introduction of testimony that allowed the ineffective assistance of Brasch and Trew to carry over into the penalty-phase retrial. In addressing these same or similar arguments, I previously held:

> Because the Oregon Supreme Court vacated petitioner's first death sentence and remanded his case for a full re-sentencing trial, that re-sentencing trial necessarily superceded his first penalty phase trial. Moreover, petitioner's allegations that: (1) the re-sentencing court impermissibly limited his ability to develop his mitigation case; and (2) re-sentencing counsel presented Simonsen evidence only through first penalty phase transcripts, constitute due process and ineffective assistance of re-sentencing counsel claims respectively. Any errors relating to petitioner's ability to procure relevant mitigating information from guilt phase witnesses during his re-sentencing trial necessarily rest with the re-sentencing trial court or re-sentencing counsel.

Opinion and Order [120], p. 32.

Moreover, the Ninth Circuit affirmed the proposition that a re-sentencing court is independently obligated to assure that a petitioner receives a constitutionally fair re-sentencing. *See Clabourne v. Ryan*, 745 F.3d 362, 380 (9th Cir. 2014), overruled on other grounds by *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015)("The proper admission of evidence based on the law as it stood at the time of trial does not mean that that the admission of that evidence is invulnerable to any future challenge. It has been held for centuries, for example, that even if the law changed following a trial, '[t]he general rule ... is that an appellate court must apply the law in effect at the time it renders its decision.' ")(citations omitted).

Petitioner argues that had counsel represented him competently in the initial penalty-phase trial, a retrial would have been unnecessary. Presumably he is suggesting that constitutionally effective counsel in the first penalty-phase trial would have secured a non-death sentence. Nevertheless, petitioner concedes, as he must, that "[n]o remedy is available should this claim be granted, since the [first] penalty-phase verdict was set aside." Referencing arguments raised in Claim One, petitioner renews his plea for this court to consider these arguments in its assessment of the overall circumstances surrounding guilt-phase counsel's representation.

In light of petitioner's concession and for the reasons set out in this court's prior Order and Opinion [120], pp. 31-32, I deny this claim.

**C.**   **Third Claim For Relief - Ineffective Assistance of Re-sentencing Counsel**

   1.   Claim 3(A)(1) - Re-sentencing counsel rendered constitutionally ineffective assistance when they failed to file proper pretrial motions to prevent the prosecution from introducing evidence of uncharged and/or unadjudicated prior bad acts

Respondent argues that petitioner's allegations are conclusory in that they fail to specify the motions he believes counsel should have made or to identify the uncharged and/or unadjudicated prior bad acts at issue. In addition, respondent argues that evidence of uncharged and unadjudicated prior bad acts is admissible in Oregon during a penalty-phase proceeding to show future dangerousness. Finally, he notes that the Oregon Supreme Court specifically held in petitioner's case that the statute governing what evidence may be considered in the penalty phase "is to be interpreted broadly, to include even unadjudicated bad acts." *See Williams II*, 322 Or. at 632 (1996)(citations omitted). Based on the foregoing and given counsel is not required to file futile motions, respondent maintains that petitioner cannot demonstrate either that counsel rendered ineffective assistance when they did not file pretrial motions as alleged herein or that he was prejudiced by counsel's failure to file such motions.

Petitioner does not argue the merits of this subclaim in his briefs. I find that respondent's arguments are well taken. Accordingly, on *de novo* review, I deny this subclaim.

   2.   Claim 3(A)(2) - Re-sentencing counsel rendered constitutionally ineffective assistance when they failed to file proper pretrial motions to prohibit the prosecution from conducting a prejudicial *voir dire*

The PCR court made the following relevant findings: (1) the prosecutor did not ask the jurors during *voir dire* whether they would be able to return a verdict of death if the law required death; and (2) petitioner presented no evidence or argument to support his claim that the prosecutor asked improper questions during *voir dire* to which counsel should have objected.

Respondent argues that this court should defer to these findings which preclude a finding that the prosecutor conducted a prejudicial *voir dire* at all -- let alone one that counsel could and should have anticipated and preempted via proper pretrial motions. In addition, respondent denies that the record supports petitioner's contention that the prosecutor misstated Oregon's sentencing-scheme law during *voir dire* and notes that petitioner fails to identify what errors he thinks the prosecutor made in that regard. Finally, respondent contends that petitioner cannot demonstrate on this record either that reasonable counsel would have filed these pretrial motions or that there is a reasonable probability that the re-sentencing court would have granted them.

As with the prior claim, petitioner does not argue the merits of this claim in his briefs. I find that respondent's arguments are well taken. Accordingly, on *de novo* review, I deny this subclaim.

3.  Claim 3(D)(1) - Re-sentencing counsel rendered constitutionally ineffective assistance when they failed to propose and ensure the trial court gave the jury constitutionally sufficient preliminary instructions. Trial court did not instruct the jury before taking evidence, and, therefore, they sat through the entire proceeding without direction and information as to how to evaluate evidence

As a preliminary matter, I note:

A trial judge is required to explain the law correctly to the jury so that it may "apply the law to the facts," *United States v. Gaudin*, 515 U.S. 506, 514, 115 S.Ct. 2310, 1132 L.Ed.2d 444 (1995), and determine the defendant's guilt as to every element of the crime with which he is charged, *id.* at 510, 115 S.Ct. 2310. *See also Guam v. Marquez*, 963 F.2d 1311, 1314-15 (9th Cir. 1992)(holding "that all jury instructions must be read aloud to the jury in the presence of counsel and the defendant").

*Ho v. Carey*, 332 F.3d 587, 593 (9th Cir. 2003)(additional citations omitted).

Petitioner did not address this claim in his briefs. In his amended petition, however, he suggests that his counsel rendered ineffective assistance as a matter of law when they failed to propose or request preliminary jury instructions. Petitioner cites to no authority, and I am aware of

none, supporting the proposition that a trial court must give the jury instructions before the parties present any evidence. Without such authority, petitioner cannot show counsel's performance was ineffective nor can he demonstrate that he was prejudiced by any failure on counsel's part to request preliminary jury instructions. Accordingly, on *de novo* review, I deny this claim.

    4.    <u>Claim 3(D)(4)(a)-(f) - Re-sentencing counsel rendered constitutionally ineffective assistance when they failed to ensure the jury received a true life instruction and the trial court's resultant failure to instruct on this potential sentence constituted reversible error and unfairly restricted mitigating evidence that could be put before the jury</u>

As a preliminary matter, the parties agree that petitioner was entitled to have his re-sentencing jury instructed on three sentencing alternatives: death, life with the possibility of parole (hereinafter "life"), and, provided petitioner waived his *ex post facto* objection, life without the possibility of parole (hereinafter "true life"). The record establishes: (1) that petitioner's counsel submitted proposed jury instructions to the court which included an instruction on the true life alternative; and (2) the court did not give a true life instruction. However, prior to instructing the jury, the court recapped its brief off-the-record conference with counsel held before the proceedings. This on-the-record recap was held outside the presence of the jury but with petitioner present. The court noted that petitioner would be permitted to make a statement to the jury and discussed the instructions. With regard to the instructions, the court indicated that the only questions that came up during the conference involved instructions pertaining to allocution, "witness false in part," aiding and abetting, and the burden of proof on the Fourth Question. At no point in this recap did the court, counsel or petitioner raise the issue of sentencing options, including the true life alternative. TD, Part V, pp. 2600-05. Later, and again outside the presence of the jury, the court discussed the life alternative and how it would present that option to the jury. Again, neither counsel nor petitioner

objected to the omission of or otherwise mentioned the true life option. *Id.* at 2637. Accordingly, this record establishes that petitioner's counsel did not preserve an objection or make a statement on the record regarding a true life jury instruction.

At the time petitioner committed his crimes, Oregon law provided only two possible sentences for an aggravated murder conviction: death and life. The legislature added a true life option in 1989, but the Oregon Supreme Court in *Willie* determined that because the true life default sentence under the new scheme, when the jury has not made findings requiring that a defendant be sentenced to death, was harsher than the ordinary life default sentence under the old scheme, retroactive application of the new scheme violated the *ex post facto* provisions of the Oregon and United States Constitutions. *State v. Willie*, 317 Or. 487, 503-05 (1993). Accordingly, in those circumstances, a court could only give the jury a true life option if a petitioner waived his or her *ex post facto* objection to its inclusion as a sentencing option.

In *Gable v. State*, 203 Or.App. 710 (2006), the court examined Gable's counsel's actions in a 1991 sentencing proceeding which resulted in a true life sentence.[9] As with petitioner, Gable committed his crimes prior to the enactment of the 1989 statute allowing for a true life sentence such that his *ex post facto* rights were at issue. Nevertheless, the court gave a true life instruction to the jury in that case. On appeal, the court determined that Gable's counsel rendered ineffective assistance when they failed to advise him of his *ex post facto* rights and it remanded the case to decide whether Gable was prejudiced by his counsel's action. As is pertinent to petitioner's claim

---

[9]    I reject petitioner's argument that *Gable* is inapplicable here because it was decided after his re-sentencing proceeding. The sentencing proceeding examined in *Gable* occurred in 1991, prior to petitioner's re-sentencing trial, and involved a petitioner in the same circumstances, *i.e.*, Gable committed his crimes before the 1989 enactment providing for a true life option.

here, that court also determined that Gable never waived his *ex post facto* objection to the submission of the true life sentencing option.[10]  In *Gable*, evidence of waiver included:  (1) defense counsel's reference to the true life option during the initial stages of potential juror *voir dire*; (2) the trial judge's recollection that the matter had been discussed and that it was his impression that there was a defense strategy to go with the true life option; (3) defense counsel requested the true life option in a written requested jury instruction; and (4) the court prepared proposed jury instructions which included a true life option and these instructions were given in the preliminary instructions to the jury.  *Id*. at 724-25.  Nevertheless, the *Gable* court, in addressing the question of whether the right to be free from *ex post facto* laws requires that a defendant personally make an informed waiver or if it may be waived by counsel, concluded that "to determine whether [a] petitioner waived the *ex post facto* objection to the submission of the 'true life' option, we must look to his own words and conduct--and not just to the court's and counsel's statements at trial."  It held that counsel alone cannot validly waive a petitioner's *ex post facto* protections, but rather "the criminal defendant must personally make an informed waiver of his or her *ex post facto* rights."  *Id*. at 733.

Accordingly, *Gable* resolves the question of waiver here and petitioner's argument that his re-sentencing counsel's inclusion of a true life option in the proposed jury instructions constituted a valid waiver of his *ex post facto* rights is without merit.  Accordingly, given that there is no evidence in the record that petitioner personally waived his *ex post facto* rights, I deny this claim.

In addition, even if the waiver question did not resolve this claim, I reject petitioner's argument that, in the absence of an adequate record, respondent's position that petitioner did not want

---

[10]  The PCR court in *Gable* had determined that "'a waiver of the *ex post facto* protections * * * can be [inferred] from the totality of the circumstances reflected in the record in this case.'"  *Gable*, 203 Or.App. at 725.

his jury instructed on the true life option is supported only by speculation. Beyond his counsel's proposed instructions, nothing in the record indicates that petitioner chose or wanted to submit the true life alternative to the jury or that he otherwise demonstrated through his conduct any intention of waiving his *ex post facto* objection to this alternative.

Apparently petitioner would have me credit a scenario wherein, even though he wanted the court to give his jury a true life instruction and re-sentencing counsel affirmatively requested such an instruction via the aforementioned proposed jury instructions, counsel failed to preserve an objection when the court allegedly refused, even as the trial court memorialized an off-the-record meeting with counsel in chambers which included discussion of jury instructions. Furthermore, despite the fact that the trial court did not give a true life instruction, petitioner failed to raise either a trial court error claim on direct appeal, faulting the court with not allowing the instruction; or an ineffective assistance of re-sentencing counsel claim during his PCR proceedings, faulting counsel for failing to have the instruction given and/or failing to preserve the claim by lodging an objection on the record when the trial court refused to give it.[11]

Far from speculation, I am satisfied that the explanation best supported by the record here for the omission of a true life instruction during petitioner's second penalty-phase trial is that petitioner decided against seeking the instruction.[12] Based on the foregoing, I conclude on *de novo*

---

[11] The record was complete enough for petitioner, his direct appellate counsel and his PCR counsel to discern that no true life instruction had been given to the jury such that they could raise claims, either on direct appeal or during petitioner's PCR proceedings, related to the omission of this sentencing option.

[12] Such decision is not inconsistent with evidence in the record indicating that petitioner refused to authorize his guilt-phase attorney to attempt to negotiate with prosecutors to secure a non-death sentence. *See* Respondent's Exhibit 173, p. 123.

review that petitioner has not shown that his counsel rendered ineffective assistance and I deny this subclaim.

     5.     <u>Claim 3(D)(5) - Re-sentencing counsel rendered constitutionally ineffective assistance when they questioned a witness in a way that allowed him to respond that he assumed five years on death row would change your attitude somewhat and by this comment impermissibly reduced the jury's sense of responsibility. Re-sentencing counsel then failed to timely move for a mistrial</u>

For the reasons set out in my prior Order concluding that petitioner's "re-sentencing proceeding was not rendered fundamentally unfair by the witness's comment, and that petitioner has not established that the inadvertent introduction of this evidence violated the Constitution," petitioner cannot demonstrate that he was prejudiced by any action on re-sentencing counsel's part that allegedly prompted the comment. *See* Opinion and Order [120], pp. 10-13. Accordingly, I deny this subclaim.

**D.**    <u>**Fourth Claim For Relief - Petitioner's 1993 Re-sentencing Violated His Constitutional Rights**</u>

     1.     <u>Claim 4(A) - Petitioner was sentenced to death in 1988 under a facially unconstitutional statute</u>

Petitioner challenges the constitutionality of Oregon's 1987 version of the death penalty statute and argues that the Oregon Supreme Court's re-interpretation of the statute in *State v. Wagner,* 309 Or. 5 (1990)(" *Wagner II*") to allow a fourth question to "save" the statute cannot be squared with its earlier interpretation in *State v. Wagner*, 305 Or. 115 (1988)("*Wagner I*").

<u>Discussion</u>

State courts are the ultimate expositors of state law and federal courts are bound by their constructions except in extreme circumstances. *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). A

writ of habeas corpus is unavailable for alleged error in interpretation or application of state law. *Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1994)(citation omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)("[I]t is not within the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Moreover, the Second Circuit has persuasively reasoned that "it would be perverse for a federal court to discourage a state court from searching for 'every reasonable construction' of a state statute to 'save [the] statute from unconstitutionality.'" *Portalatin v. Graham*, 624 F.3d 69, 90 (2d Cir. 2010)(quoting *Skilling v. United States*, 561 U.S. 358 & n. 41 (2010)(additional citations omitted)). Nevertheless, rejection of a state-court interpretation of state law may be warranted if the interpretation is an "obvious subterfuge to evade consideration of a federal issue." *Peltier*, 15 F.3d at 862 (quoting *Mullaney*, 421 U.S. at 691).

Here, my review of relevant statutory history and case law reveals that the Oregon Supreme Court's interpretation and reinterpretation of Oregon's 1987 version of the death penalty statute in *Wagner I* and *Wagner II* are not necessarily inconsistent as petitioner insists.

*Wagner I*

In concluding that the statute provides that "the sentencer must be allowed to consider any relevant mitigating evidence" the court in *Wagner I* noted:

> Having identified one who may be subjected to the death penalty, ORS 163.150 requires the jury to address the same three issues as did the Texas statute and even adopts the Texas court's interpretation of its statute that the jury, in considering the three issues, *may hear all relevant mitigating evidence.*
>
> * * *
>
> "*In the [sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence*; * * *." ORS 163.150(1)(a). Even if the statute were silent, obviously, either defendant or the state would have the right to introduce any evidence relevant to the resolution of all or any of the three questions which

frame the jury's resolution of the three issues. We construe the statute to mean that a defendant shall be permitted to introduce any competent evidence related to mitigation on any of the three issues.

* * *

Under ORS 163.150(1), *the jury may consider all mitigating factors or circumstances that are shown by the evidence.*

*Wagner I*, 305 Or. at 144, 156-57 & 160 (emphasis added).

*Wagner II*

In *Wagner II*, the court first examined whether the 1987 statute precluded a fourth question. It carefully analyzed both the language of the statute and its own prior interpretations of the statute. It found that on its face, the statute neither precluded nor permitted a general mitigation question. While it noted that the statute did not state that the three statutory questions set out at ORS 163.150(1)(b) were the only issues to be submitted to the jury, the majority conceded that one could argue that ORS 163.150(1)(e) (providing that if the jury said yes to the three statutory questions the trial judge shall sentence the defendant to death, otherwise defendant shall be sentenced to life) precludes a fourth question. After thorough examination, however, the court determined that ORS 163.150(1)(e) intended a broader reference by its use of "this section" to ORS 163.150 as a whole, rather than being confined to the three statutory questions. In addition, the court recalled that in *Wagner I* it stated that "ORS 163.150(1) must permit jury consideration of 'any aspect of the defendant's character and record or any circumstances of his offense as an *independently* mitigating factor.' *See State v. Wagner*, 305 Or. at 160, 752 P.2d 1136. (Emphasis added.)." *Wagner II,* 309 Or. 5, 10 (1990). The court also relied on the fact that the statute contemplates that a jury will decide the appropriate sentence, including the possibility of a capital sentence, in a separate proceeding.

It reasoned that the fourth question would further the intended purposes of these separate proceedings, *i.e.*, to preserve the possibility of a death sentence for convicted aggravated murderers and to permit a jury to decide between life and death.

Turning next to the question of whether the statute permitted the addition of the fourth question, the court referenced its earlier finding that the statute permits introduction of "all constitutionally relevant mitigation evidence." Importantly, in *Wagner II*, the court noted that in *Wagner I* it had not wrestled with the question of whether a fourth question was precluded or permitted, but rather had held that mitigation shall be admissible on all three statutory issues, not just the second future dangerousness question. Ultimately, the court held in *Wagner II* that:

> In view of what we have learned in *Penry*, it is now clear that mitigating evidence beyond the scope of the statutory issues is indeed constitutionally "relevant to sentence" and, accordingly, statutorily admissible."

*Id.* at 14. Moreover, in determining that the statute permitted a general mitigation question, the court cited a trial court's statutory authority and responsibility to charge the jury on necessary matters of law and the defendant's right in a death penalty case to an instruction that, notwithstanding affirmative answers to the statutory questions set out at ORS 163.150(1)(b), the jury may conclude that mitigating evidence justifies imposition of a life sentence.

Based on the foregoing, I conclude that petitioner has failed to show that the Oregon Supreme Court's interpretation of the 1987 statute involves an "extreme circumstance" wherein it has engaged in subterfuge to evade federal consideration of the constitutionality of this death penalty statute. To the contrary, the majority rigorously analyzed the issues to reach its well supported conclusions and did not avoid the arguments raised by dissenting judges, many of which are echoed by petitioner in these proceedings. Accordingly, I must defer to the Oregon Supreme Court's interpretation of its

own state laws and its conclusions set out in detail in *Wagner II*. As such, on *de novo* review, I deny this subclaim.

2. Claim 4(B)(1)(a) - Application of the 1993 version of the statute violated the *ex post facto* clause because it provided for capital punishment and in 1988 there was no constitutional capital punishment statute

Petitioner acknowledges, as he must, that *Dobbert v. Florida*, 432 U.S. 282, 293 (1977), precludes relief on this claim. He nevertheless presents it as a good faith on-the-record challenge to *Dobbert*. The *Ex Post Facto* Clause provides that "no State shall ... pass any ... *ex post facto* Law." U.S. Const. art I, § 10, cl. 1. The Clause prohibits the legislative enactment of any law that "changes the punishment, and inflicts greater punishment, than the law annexed to the crime, when committed." *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001)(quoting *Calder v. Bull*, 3 Dall. 386, 1 L.Ed 648 (1798)). Here, the addition of a fourth question to ensure that the jury could fully consider mitigation evidence was ameliorative in nature. *See Dobbert*, 432 U.S. at 294 ("It is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law."). Accordingly, while I acknowledge petitioner's effort to preserve this subclaim for review, I deny it.

3. Claim 4(B)(1)(b) - Application of the 1993 version of the statute violated the *ex post facto* clause because the new statute was more burdensome in that under the new version he needed ten (10) votes for a life sentence, but under the prior version, he only needed one (1) vote for the same sentence

Respondent concedes that because the presumptive sentence under the 1993 version of the statute is more onerous, there was an *ex post facto* problem for defendants who, like petitioner, committed their crimes before the amendment. However, because no true life instruction was given here, the issue is irrelevant to petitioner's case. Moreover, given that there is no *ex post facto* problem for defendants who either validly waived their *ex post facto* objections or who committed

their crimes after the amendment, petitioner cannot demonstrate facial infirmity. Accordingly, I deny this subclaim.

4. <u>Claim 4(B)(1)(c)(I-iii) - Application of the 1993 version of the statute violated the *ex post facto* clause because: there was no mechanism for a penalty-phase only jury in the original statute and the new statute violates a defendant's Sixth Amendment right to trial by jury; use of transcripts in the re-sentencing violates a defendant's right to confrontation as the jury cannot assess the credibility of the witnesses; and it eliminated vitally important mitigation evidence in the way of lingering doubt</u>

On the issue of penalty-phase only juries, the *Wagner II* court noted:

There is no statutory or constitutional requirement or persuasive jurisprudential rationale * * * to require a new guilt trial or default sentencing to something less than death simply because the original guilt-phase jury has been discharged.

309 Or. at 18.

I am persuaded by this reasoning. Moreover, petitioner does not cite to any authority establishing that under the 1987 version of the statute all cases with penalty-phase only errors were remanded for a whole new guilt and penalty-phase trial. Accordingly, he cannot prevail on this *ex post facto* claim because he cannot demonstrate that his circumstances under the prior statute would have been different, let alone better, than under the 1993 version of the law.

Citing *Ring v. Arizona*, 536 U.S. 584 (2002), respondent argues that penalty-phase only juries are constitutional. Presumably then, that case contemplates the possibilities both that a penalty-phase only jury would preside over re-sentencing without exposure to "residual doubt" evidence raised during the guilt-phase trial and a party could opt to present witness testimony via transcript rather than live testimony. Respondent further maintains that given petitioner had the opportunity and motivation to vigorously cross examine witnesses during the guilt phase, introduction of their testimony via transcript does not raise confrontation clause issues. Finally, on

the issue of lingering doubt, he argues that petitioner cannot show circumstances were any different than they would have been under the 1987 version of the statute, and regardless, there is no right to introduce evidence of residual doubt at a re-sentencing trial. *See Oregon v. Guzek*, 546 U.S. 517, 526 (2006).

Ultimately, without support for his assertion that he was in a worse position vis-a-vis a change to the 1987 statute, petitioner does not have an *ex post facto* objection that flows from not receiving a whole new trial and the opportunity to defend his guilt again. Accordingly, whatever the merits of his objections concerning a penalty-phase only retrial, he has not demonstrated that they are any different than those he would have had under the 1987 version of the statute. Therefore, he has no *ex post facto* complaint. Based on the foregoing, I conclude that respondent's arguments are well taken and on *de novo* review deny this subclaim.

5.  Claim 4(c) - Petitioner argues that as *applied to him*: (1) he was not on notice of the future amendment to the statute and therefore could not prepare for a penalty-phase only retrial; and (2) he made decisions during the guilt phase based on an understanding that any reversal would result in a whole new trial

Respondent asserts that petitioner had the same notice regarding the need to prepare for a penalty-phase retrial as he would have had under the 1987 version. In addition, he argues that the record does not support petitioner's contention that he actually made guilt-phase decisions based on an assumption that he would get a whole new trial in the event of a remand on sentencing only and/or that he would have made different decisions had he known he could get a penalty-phase retrial only. Respondent maintains that under either version of the statute an error in the penalty phase did not entitle petitioner to the windfall of another opportunity to dispute guilt via a whole new guilt-phase trial.

37 - OPINION AND ORDER

These arguments are well taken. As discussed above, petitioner cannot show that the 1987 version of the statute would have entitled him to a whole new trial in the event of a sentencing error. Nor can he show that he made decisions during his guilt-phase trial based on that belief. Accordingly, his underlying premiss, that he would have had different or better notice under the 1987 version of the statute and that he made decisions based on his understanding that he would be entitled to a whole new trial in the event of a sentencing error, is neither credible nor is it supported by the record here or relevant history pertaining to how the Oregon courts handled sentencing errors prior to the statutory amendments specifically calling for penalty-phase only retrials. Accordingly, on *de novo* review, I deny this subclaim.

**E.    Sixth Claim For Relief - Prosecutorial Misconduct at Re-sentencing Trial**

1.    Claim 6(A)(1) - The prosecutor repeatedly misstated the law in a way that led the jury to believe there was a presumption of death when during *voir dire* he asked jurors if they could impose a death sentence "if the law required death"

Clearly established federal law holds that prosecutorial misconduct, such as inappropriate comments during arguments, warrants habeas relief when the conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned.'" *Id.* (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Alleged instances of misconduct must be reviewed "in the context of the entire trial." *Donnelly*, 416 U.S. at 639. Habeas relief is

available only if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)(citation omitted).

Petitioner argues that given Oregon law never requires imposition of the death penalty and the presumed sentence was life imprisonment, the prosecutor misstated the law during *voir dire* when he asked prospective jurors if they could impose the death penalty if the law required death.

Petitioner's arguments notwithstanding, my review of the record reveals that the prosecutor's use of the phrase "if the law required death" referred to the circumstance provided for under Oregon law whereby the jury had answered all four penalty-phase questions "yes." As the re-sentencing trial court correctly advised the jury, "[i]f all questions are answered yes, I am required by law -- I don't have any choice, I have no discretion -- to impose the death penalty. If any question or all of them are answered no, any one of them is answered no, I am required by law -- again I have no discretion and no choice in the matter -- I am required to impose life imprisonment." TD, Part L, pp. 592-93. A fair review of the record reveals that this is the "requirement" the prosecutor was alluding to in his *voir dire* questioning. Seen in that light the comment was not a misstatement of the law.

Petitioner further faults the prosecutor with posing questions along the following lines to the prospective jury panel and individual jurors:

> Let me ask the jurors as a whole, dealing with that particular question. Question number 4, whether the death sentence should be imposed, you should answer that question no if based upon the Defendant's character, his background or the circumstances of the crime justifies something less than death. We don't have a burden of proof in that particular question. We don't have to prove anything.

Petitioner's Reply [330], p. 262 (TD, Part J, p. 144).

Petitioner asserts these questions left the jury with the impression that relevant Oregon law carries a presumption of death. Again, I do not find that the prosecutor's questions here misstated

the law or that they would tend to mislead the jury into believing there was a presumption of death--particularly in the context of *voir dire* as a whole and the trial court's instructions on the four questions in particular. Accordingly, on *de novo* review I deny this subclaim.

      2.     <u>Claim 6(A)(2) - The prosecutor repeatedly misstated the law in a way that led the jury to believe there was a presumption of death when during closing and rebuttal arguments he argued there was no evidence in the record that would justify imposing a sentence less than death and none of the evidence rose to the level of justifying a sentence less than death, thus placing the burden on petitioner to prove death was not the appropriate sentence. The prosecutor's misconduct was compounded by the fact that instructions were not given at the end to defuse the prosecutor's misstatement of the law</u>

At the outset of his closing arguments, the prosecutor told the jurors that they were going to have to decide petitioner's punishment, death or life, based on the four questions. TD, Part V, p. 2608. He also advised them that "[t]he Court will give you the law dealing with that and those four questions and as it relates to those girls and the Defendant's conduct." *Id.* at 2609. He then correctly stated that the prosecution had to prove the first three questions by a standard of beyond a reasonable doubt, but that there was no burden of proof on the fourth question. *Id.* Then he argued as follows:

> And if you look at question number one, two and three, and we proved those to you, ladies and gentlemen, that becomes the death penalty, unless you can find evidence, evidence in this case that justifies a sentence of less than death. You can consider all the evidence, you can consider the Defendant's character, his background, to see whether you find evidence that justifies a sentence other than death.

*Id.* at 2609-10.[13]

---

[13]    Similarly, in closing rebuttal, the prosecutor stated:

> This Defendant committed Aggravated Murder. And you look at question number four and you go down through all the evidence and you look at that and you say, does this justify a sentence less than death for his conduct? Because that's what he's being penalized for. That's the consequence for his conduct. His behavior for killing those girls. And you look at those things and you say, oh, is that the evidence that I think justifies a sentence less than death for what he did? Ladies and gentlemen, you're not

40 - OPINION AND ORDER

Petitioner insists this line of argument improperly suggested that the law carries with it a presumption of death that petitioner had to overcome, *i.e.*, that petitioner had some burden of proof on the Fourth Question to avoid the death penalty. According to petitioner, the prosecutor repeatedly and improperly informed the jury that if they found petitioner *eligible* for the death penalty, death was the mandatory punishment unless petitioner affirmatively presented evidence that outweighed his criminal conduct. I understand petitioner's argument. However, taken in the context of the prosecution's entire closing argument and given the qualifying statements offered by the prosecution in discussing the Fourth Question, I disagree that he misstated the law or that he led the jury to believe that there was a presumption of death in petitioner's case. I cannot conclude that the prosecutor's actions here so infected the trial with unfairness as to make petitioner's conviction a denial of due process. Moreover, following closing arguments, the re-sentencing court issued instructions which included the following:

> Mitigating circumstances are those circumstances which do not justify or excuse the offense, but which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability and the appropriate punishment.
>
> **You may consider any aspect of Defendant's life in your determination on the fourth question** and any aspect of the Defendant's life that may be relevant in your determination of the first three questions. Defendant need not prove the existence of a mitigating circumstance beyond a reasonable doubt. If you reasonably believe that [a] mitigating circumstance exists, you may consider it as established.
>
> The burden of proof is on the State to prove beyond a reasonable doubt the yes answer to the first three questions submitted to you on each of the Aggravated Murders. * * * **There is no burden of proof as to the fourth question**.

---

going to find it. It doesn't rise to that level. The Defendant in this case has to suffer the consequences of his behavior.

TD, Part V, p. 2661.

TD, Part V, pp. 2671-72 (emphasis added).

Petitioner also suggests that the prosecutor improperly advised the jury that their consideration of mitigating evidence was limited to evidence that mitigates the crime, rather than all evidence that may justify a sentence of less than death regardless of the facts of the crime. The record does not support this assertion. To the contrary, the prosecutor specifically drew a contrast between the questions that dealt with the crime and the broader nature of question number four:

> Those questions, ladies and gentlemen, questions number one and three, really deal with the crime itself. Question number two deals with the Defendant and his criminal acts of violence and whether he's going to be a continuing threat to society. And question number four really deals with **both** the Defendant and the crime.

TD, Part V, p. 2610 (emphasis added).

Based on the foregoing, I conclude that the prosecutor's arguments fairly advised the jury that they could broadly consider all aspects of petitioner's background and character in determining whether there was a reason to spare his life. Moreover, to the extent that there was any ambiguity on this point, the trial court instructions accurately advised the jury on burdens of proof and the fact that it could broadly consider mitigating evidence. Accordingly, on *de novo* review, I deny this subclaim.

**F.    Seventh Claim For Relief - Petitioner was Convicted on a Burden of Proof less than the Constitutionally Required Beyond a Reasonable Doubt**

1.    Claim 7(A)(1)- (6) - The trial court diluted the State's burden of proof at six distinct places in petitioner's trial: (1) when it instructed the jury that petitioner "is presumed by the law to be not guilty ....": (2) when it stated, "Reasonable doubt exists when ... you do not feel convinced to a moral certainty that the defendant is guilty.": (3) when it stated, "Proof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your affairs.": (4) when it included "moral certainty" language into its instructions at the first penalty phase; (5) when it followed the moral

certainty language in the first penalty-phase instruction with, "Proof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your affairs."; and (6) when in it's re-sentencing instructions the court stated, "Proof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your own affairs."

2.    Claim 7(B) - The trial court's "moral certainty" instruction improperly directed the jury to use their feelings and personal morality, not the evidence, to determine whether the prosecution had met its burden of proof. Moreover, the trial court's directing the jury to weigh evidence in the context of "the most important of your affairs" allowed for a decision based on impermissible uncertainty and risk-taking

Petitioner acknowledges that I denied his motion for summary judgment on this claim, but continues to maintain that he is entitled to relief because, taken as a whole, the reasonable doubt instructions violated his right to due process. He argues that the facts in his case are distinguishable from those set out in *Rhoades v. Henry*, 638 F.3d 1027, 1043 (9th Cir. 2011) where the trial court gave a valid instruction on the presumption of innocence and the jury instructions included the critical "abiding conviction" language approved in *Victor v. Nebraska*, 511 U.S. 1, 16-17 (1994).

Discussion

A jury instruction that has the effect of lowering the state's burden of proving every element of the offense beyond a reasonable doubt violates the Due Process Clause and creates a *Winship* and *Cage* error. *Rhoades*, 638 F.3d at 1042 (citing *In re Winship*, 397 U.S. 358, 364 (1970); *Cage v. Louisiana*, 498 U.S. 39 (1990)).

We must decide whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents consideration of constitutionally relevant evidence." *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001). The question is not whether the jury *could have* done so, but whether there is a reasonable likelihood it *did*. *Victor v. Nebraska*, 511 U.S. 1, 6, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). And we are not to engage in a "technical parsing" of the language; instead, we should think of the instructions as the jury would--"with a commonsense understanding of the instructions in the light of all that has taken place at trial."

*Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)(internal quotations omitted).

*Rhoades*, 638 F.3d at 1042-43.

I addressed most of these subclaims in my prior Order. *See* Order [120], pp. 42-45. I primarily focused on the use of the phrase "moral certainty" in the instruction. My analysis remains sound and is consistent with *Rhoades*. With regard to petitioner's subclaim that the trial-court instructions were constitutionally infirm because they failed to instruct on the presumption of innocence (Claim 7(A)(1)) and his subclaims concerning the wording that "[p]roof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your affairs," (Claims 7(A)(3), (5) & (6) and part of Claim 7(B)), I find respondent's arguments are well taken. I note that during its preliminary instructions, the trial court advised the jury panel as follows:

> The fact that a criminal charge has been filed against the defendant is not evidence. The defendant is presumed not guilty *and innocent* of any crime and wrongdoing until and unless such time the State proves his guilt beyond a reasonable doubt.

TD, Part B, pp. 70 (emphasis added).[14] I conclude that the instruction was sufficient to advise the jury that petitioner was entitled to a presumption of innocence.

Futhermore, taken in context, I reject petitioner's claim that the trial court's use of "[p]roof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your affairs," language rendered the instructions constitutionally infirm. The trial court defined reasonable doubt as:

> [A]n honest uncertainty as to the guilt of the defendant. **It is based on common sense and reason.** Reasonable doubt exists when, **after careful and impartial consideration of all the evidence in the case**, you do not feel convinced to a moral

---

[14]    The trial court also later instructed the jury that "[t]he defendant is innocent unless and until the defendant is proven guilty beyond a reasonable doubt." TD, Part F, p. 1474.

certainty that the defendant is guilty. Proof beyond a reasonable doubt is such as you would be willing to act upon in the most important of your own affairs. Reasonable doubt, though, is not every doubt, because everything depending upon moral evidence is open to some possible imaginary doubt.

TD, Part F, pp. 1474-75 (emphasis added). In *State v. Pratt*, 316 Or. 561, 576-77 (1993), the trial court gave an instruction using the "most important of your own affairs" language. The Oregon Supreme Court determined that it did not mislead the jury regarding the burden of proof and did not prejudice defendant. *Pratt*, 316 Or. at 576-77. I adopt this reasoning and conclude that there was sufficient context surrounding the instructions here directing the jury to use reason and evidence to determine whether the prosecution met its burden of proof beyond a reasonable doubt. Taken in context, therefore, petitioner cannot demonstrate that the jury applied the challenged "the most important of your affairs" instruction in a way that prevented their consideration of constitutionally relevant evidence. Accordingly, on *de novo* review, I deny these subclaims.


**G.    Eighth Claim For Relief - The Prosecutor's Use of Inconsistent Theories to Convict Petitioner and to Sentence both Him and Simonsen to Death Violated Petitioner's Rights Under the Fifth, Eighth and Fourteenth Amendments**

Petitioner argues that the prosecution pursued fundamentally inconsistent theories when it argued, first, that Simonsen acted independently when he shot the victims and that he was *not* a follower in Simonsen's penalty-phase trial; and later, that Simonsen was petitioner's robot who petitioner directed to shoot the victims in petitioner's guilt and penalty-phase trials. Specifically, petitioner asserts that the prosecution argued during Simonsen's trial that Simonsen was a rebellious, independent actor and that he liked to fight authority. Painting Simonsen as an autonomous cold-blooded killer, the prosecution attacked Simonsen's defense that he was under petitioner's control.

The prosecution highlighted Simonsen's initial statements wherein he took credit for killing the girls and made no mention of drug use and did not suggest that petitioner made him commit the crime. Moreover, in that case, petitioner contends that the prosecution characterized petitioner as a coward in the background, unable to commit the murder. The prosecution also introduced evidence that Simonsen saw himself as a bomb that could go off and introduced "themes of killing," including a statement Simonsen made before the murders that "[he needed] to kill something." Finally, the prosecution: (1) dismissed as a "pattern of excuses" the suggestion that petitioner controlled Simonsen with drugs and even questioned whether they actually used drugs around the time of the crime; (2) sought to collapse the distinction in ownership of the murder weapon; and (3) did not have any witnesses testify about the control petitioner exercised over Simonsen. According to petitioner, the only role the prosecution conceded petitioner played in the murder was that Simonsen viewed him as a hero and that Simonsen wanted petitioner to think he was a tough guy.

In stark contrast, petitioner argues the prosecution's theory in his case centered on its assertion that Simonsen committed the murders *only* because he was under petitioner's control. The prosecutor argued that Simonsen was petitioner's robot and that petitioner told Simonsen to kill the victims, *i.e.*, to act as petitioner's "trigger." During the penalty phase, the prosecutor further argued that providing Simonsen with drugs was a way for petitioner to control him and even suggested this control supported a sentence of death because it showed petitioner would be dangerous to other inmates in prison. The prosecution omitted from their case: Simonsen's confession, his statements to police, and letters with his admissions and discussions of how easy it was to shoot the victims. In addition, the prosecutor emphasized the fact that petitioner, not Simonsen, owned the murder weapon. The prosecution introduced no evidence tending to show that Simonsen acted

independently or that he was a bad actor in general. Finally, when it came to sentencing, the prosecutor urged the jury to sentence petitioner to death for the very reasons he had opposed in Simonsen's trial.[15] Petitioner maintains that these inconsistent theories rendered both phases of his trial fundamentally unfair in violation of the Constitution.

## Discussion

The Ninth Circuit has held that "a prosecutor's pursuit of fundamentally inconsistent theories in separate trials against separate defendants charged with the same murder can violate due process if the prosecutor knowingly uses false evidence or acts in bad faith." *Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir. 2000). However, inconsistent theories may be permissible when the "arguments were consistent with the evidence actually adduced at each trial." *Id.* As the Ninth Circuit stated in *Nguyen*:

> It is not shocking or even unusual that the evidence came in somewhat differently at each trial. Any lawyer who has ever tried a case knows that the trial preparation is not a static process. As a case evolves, new witnesses come forward; others become unavailable. As new evidence is uncovered, other evidence loses significance. What is received in evidence by stipulation in one trial might draw vigorous objection in another . . . it is true that certain details came into evidence differently at the two trials, but the prosecution's theory was not inconsistent in any fundamental way.

*Nguyen*, 232 F.3d at 1241-42.

In *United States v. Presbitero*, the Seventh Circuit discussed conflicting authority touching on the issue of the government taking inconsistent positions against separate defendants in separate trials:

---

[15] During pretrial proceedings the prosecution even sought to prove that petitioner shot the victims despite Simonsen's guilty plea and admission that he had done the actual killing. The prosecution argued that some evidence was ambiguous as to the identity of the actual shooter and that because Simonsen was in such an altered state at the time of the crime he was a poor narrator of facts. The trial court refused to allow the prosecution to pursue this theory.

As support for his argument, Presbitero directs us to decisions from other circuits that found due process violations where the government took fundamentally opposite positions in different trials involving the same crime. *See Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000)(finding due process violation where state used "inconsistent, irreconcilable" theories to secure convictions against two defendants in different trials for the same offenses and stating, "[t]o violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime"); *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997)(en banc), rev'd on other grounds, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), (stating "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime"); see also *Abbate v. United States*, 359 U.S. 187, 197-200, 79 S.Ct. 666, 3 L.E.2d 729 (1959)(Brennan, J., specially concurring). Not everyone agrees that the due process clause prevents the government from arguing inconsistent theories. *See United States v. Frye*, 489 F.3d 201, 214 (5th Cir. 2007)(stating "a prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause" but finding inconsistencies not material to the conviction)(citation omitted); *see also Bradshaw v. Stumpf*, 545 U.S. 175, 190, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005)(Thomas, J., concurring)(stating that the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories").

569 F.3d 691, 702 (7th Cir. 2009).

Here, whether the prosecution did more than merely emphasize petitioner's domination over Simonsen differently in the separate cases, it remains that the State's version of their relationship during Simonsen's penalty-phase trial was never, as petitioner suggests, a "fact" established at trial such that it could not be relitigated. Moreover, it bears noting that the prosecutor introduced such evidence to counter Simonsen's defense in that trial that petitioner controlled him and that he shot the victims on petitioner's orders. In the end, the prosecution and Simonsen each introduced evidence supporting their respective positions as to how much control petitioner had over Simonsen and whether Simonsen was likely to act independently. Apart from its assertion that petitioner did not direct Simonsen to shoot the girls, but rather that Simonsen did so without any meaningful

influence from petitioner, the State never suggested that petitioner was not involved or responsible for the crime. To the contrary, it sought to introduce evidence at Simonsen's trial supporting its theory that petitioner was wholly involved in the plan to rape, rob and kill the victims from the beginning. This evidence included testimony that petitioner talked to Simonsen about having sex with, robbing and killing girls on their drive to California; that petitioner drove the victims to a remote location; that he was involved in stripping and raping the victims; that he had access to the murder weapon; that he was pulled over and ticketed by police in his truck shortly after the murder; and that he stole the victims' belongings. In addition, during closing arguments in Simonsen's case, the prosecutor stated:

> The defense is making something of "Well, it was Jeff's idea." Does it matter to the victims whose idea it was Simonsen's idea or Jeff Williams'? Does that matter? A killer is a killer. They are both responsible. Both equally dangerous. There are fellows like Williams all over the place, especially in the penitentiary.

> \* \* \*

> Is Mr. Williams worse? Who knows? He didn't have the "balls" to murder these two girls. Excuse my language. I am just quoting. He's a bad person, no question about it, and the State is going to be seeking the death penalty against him, too.

> The defendant in this case and Mr. Williams are both responsible for these girls' deaths, and they should both be receiving the death penalty.

TD part AA, pp. 1408 7 1426.

Similarly, in petitioner's trial, the prosecution continued to argue that there were two killers involved in the crime. He never suggested that Simonsen should be absolved of responsibility because petitioner was the leader. As noted, relevant evidence presented by the State in both trials included allegations that petitioner drove his pickup to the remote location, participated in tying the victims up and stripping them, robbed them of their stuff, was stopped and ticketed by police a few

miles from the murder scene with the victims' property in the back of his truck. This evidence, if credited by the jury, could tend to show that petitioner was involved in killing the victims. Plus, as was clearly relevant in its case against petitioner, the State introduced evidence from witnesses who testified that petitioner told them: "I told Simonsen to do it, boom, boom"; "Dusted a couple of dudes"; "We robbed a couple of dead Niggers." Witnesses also testified that in talking about Simonsen, petitioner said, "He blew two chicks away just cooler than shit, boom, boom" and "I had him take care of them, boom, boom."

Moreover, in the State's closing argument in petitioner's guilt-phase trial, the prosecutor stated:

> Aid and abet, ladies and gentlemen. By aiding and abetting, the defendant is just as responsible as Simonsen for pulling that trigger. In fact, ladies and gentlemen, by him telling Simonsen -- by telling him, "Hey, I had him take care of it. Boom, boom," he is actually participating right in that murder. Simonsen was the trigger, and he can try to separate himself from Simonsen as much as he wants, but he can't do it.

> He tried. he tried to be down in California. He tried to catch a ride over here, statements of Urich, and what's the relationship between the two of them? I'll tell you what it is. That's why I went through with all those witnesses about that relationship, so you would understand that. We are talking about the defendant being a leader and Simonsen being the follower, master-puppy dog. You remember those characterizations. The robot. Simonsen did the defendant's dirty work. A snap of the fingers. Remember that testimony? Harp testified about that. And what else? The defendant's own statements to these people. Simonsen was his robot. he even told people that. "Dave would do anything for me." Simonsen did what he wanted him to do. Simonsen was his stooge, his gofer, his partner.

> Ladies and gentlemen, I can go on about that relationship. You've heard the testimony about it and you've heard testimony about the defendant's own statements. Even the defendant's own statements were that Simonsen would do anything that he told him to do. He would do it without blinking. People described that. And the defendant's own statements about the killing of those two girls. We have brought to you evidence about the defendant's statements. We have shown you the

circumstances about what occurred. That, ladies and gentlemen, is Aggravated Murder.

TD, Part F, pp. 1403-04.

In addition, in rebuttal closing the State argued that there were two killers. "There were two men that did the dirty work out there, and [petitioner] was one of them." *Id*. at 1443.

> I would suggest to you ladies and gentlemen, there are two killers here, and you have a duty and a responsibility, and when we talk about Simonsen said that he shot them, what else do you have? You have the defendant also saying to a witness, "I had him take care of it, boom, boom." The same statement of participation.

*Id*. at 1445.

My review of the record reveals there is evidence supporting an assertion that Simonsen possessed an independent, violent side *and* evidence supporting an assertion that petitioner exercised significant control over him. Accordingly, petitioner cannot demonstrate here that the prosecution knowingly relied on false evidence or acted in bad faith in its pursuit of fundamentally inconsistent theories. Moreover, taken in the context of the respective trials as a whole, I cannot conclude that the prosecutor adopted fundamentally inconsistent, irreconcilable theories in these trials. To the contrary, the prosecutor's themes were consistent with the evidence adduced during the respective trials and reflected the State's goal of securing aggravated murder convictions for both defendants for the parts the prosecutor believed each played in the victims' murders. The prosecutor highlighted the evidence regarding Simonsen's independent violent nature and/or his dependence on petitioner and the control petitioner exercised over Simonsen in a way that the prosecutor felt left his case against each defendant in the strongest position. This does not equate with presenting inconsistent theories in violation of petitioner's constitutional rights. When there was available evidence supporting these competing views of Simonsen and his relationship with petitioner, the prosecution

acted within bounds making its best case with the available evidence. As previously discussed, petitioner's counsel had a strategic reason for not introducing available evidence challenging the prosecution's suggestion that petitioner controlled Simonsen and ordered him to kill the victims. The prosecution was not obligated to make petitioner's case for him and counsel's decision not to introduce this evidence does not establish that the prosecution took fundamentally inconsistent positions in the two cases.

For these same reasons, petitioner's Eighth Amendment argument pertaining to his penalty phase also fails. Citing the Eighth Amendment's demand for heightened reliability in capital sentencing, petitioner argues that the prosecution's use of inconsistent theories and its presentation of contradictory evidence portraying petitioner as two different people in his and Simonsen's cases denied his penalty-phase jury the opportunity to fairly consider his relative culpability in the crime. Petitioner's Reply [330], pp. 237-38, 242-44 (citing *Bradshaw v. Stumpf*, 545 U.S. 175, 189-90 (2005); *Turner v. Murray*, 476 U.S. 28, 33-34 (1983)(citations omitted)). However, for the reasons discussed above, I conclude that the prosecution did not take fundamentally inconsistent positions in these cases such that petitioner's constitutional rights were violated by its approach. *Stumpf* actually underscores the reason petitioner cannot prevail on this claim.

In *Stumpf*, the Supreme Court held that the prosecutorial inconsistencies surrounding whether Stumpf or his co-defendant shot the murder victim did not warrant relief because the precise identity of the triggerman was immaterial to Stumpf's aggravated murder conviction, given he, like petitioner here, was subject to an aggravated murder conviction as an aider and abettor. The court remanded Stumpf's case for consideration of whether the prosecution's inconsistent theories as to the identity of the shooter impacted the sentencing. *Stumpf*, 545 U.S. at 187-88. Unlike the circumstances in

*Stumpf* where prosecutor took inconsistent positions as to the identity of the shooter, this was never an issue for the jury to wrestle with in petitioner's case. The juries in Simonsen and petitioner's trials heard that Simonsen was the confessed killer of the victims. Similarly, the prosecutor alleged petitioner was involved in the crime from the beginning and was responsible for the victims' deaths in both trials. Any inconsistency centered on the question of whether and to what degree Simonsen shot the victims at petitioner's direction or he did it on his own. There was evidence supporting both theories. The parties presented, or could have presented, this evidence to persuade the jury as to how much culpability to assign petitioner. I conclude that any inconsistency in the theories adopted by the prosecutor in petitioner and Simonsen's trials did not violate petitioner's constitutional rights. Accordingly, on *de novo* review, I deny this subclaim.

**H.** **Ninth Claim For Relief - Ineffective Assistance of Appellate Counsel on the First Direct Appeal When Counsel Failed to Include the Oregon Supreme Court's Denials of Counsel's Motions for a Transcript of the Jury *Voir Dire* as an Assignment of Error in the Direct Appeal**

Petitioner's direct appellate counsel, David Groom, twice moved the Oregon Supreme Court for an order authorizing transcription of *voir dire* from the first trial in accordance with the relevant statute: "[i]f either the state or the defendant desires that the report of the jury selection proceedings be transcribed, that party must apply to the Supreme Court for an appropriate order, which will be made only upon a showing of good cause for preparation of that transcript." Or. R. App. P. 18.05(4)).[16] Respondent insists that since the Oregon Supreme Court twice denied Groom's motions

---

[16] On January 30, 1990, Groom moved the Oregon Supreme Court for a transcript of jury selection. That court denied the motion on February 28, 1990, with leave to renew, "on the ground that the motion is not sufficiently specific." Groom filed a second motion in March 1990, but the Oregon Supreme Court denied it on April 18, 1990, again with leave to renew if a specific showing

it would have been futile for him to assign these denials as error in a brief to that same court and notes that "assignments of error must be based on rulings of the trial court, not the appellate court." Response [321], p. 89 (citing *Buel v. Mathes*, 186 Or. 160, 164 (1948); *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982)). Moreover, respondent maintains that petitioner cannot demonstrate that Groom's alleged ineffectiveness prejudiced him because he cannot overcome the presumption of correctness due the PCR court's specific finding that he "presented no evidence of prejudice stemming from jury selection."

According to petitioner, Groom's failure to raise a claim challenging the Oregon Supreme Court's denial of his motions prevented him from determining whether he received a trial before an impartial and representative jury or whether the death-qualification process resulted in a jury biased toward conviction. He further maintains that the PCR court improperly granted summary judgment in favor of the State on this claim. He asserts that to the extent the PCR court found Groom could not have raised a claim on direct appeal to the Oregon Supreme Court, it's decision was objectively unreasonable and is not entitled to deference by this court.[17]

Petitioner argues that the Oregon Supreme Court should have granted Groom's motions because his affidavit was sufficient to satisfy *State v. Bonner*, 66 Or.App. 1 (1983)(non-capital case discussing the materiality and necessity showing needed to support a motion for a transcript on

---

is made. Respondent's Exhibits 210-13.

[17]    Petitioner's assertion notwithstanding, I disagree that respondent has abandoned any argument based on either ORS 138.040 and 138.053 or *State v. Montgomery*, 294 Or. 417, 425-26 (1983). In addition to maintaining that Groom could not have raised the Oregon Supreme Court's denials of his motions for the reasons argued in the PCR proceedings, *Buel* and *Bauman* buttress respondent's argument that Groom could not have raised the claim on direct appeal because assignments of error must be based on trial court rulings.

appeal). On the procedural question of whether Groom could raise a claim challenging the Oregon Supreme Court's denials on direct appeal, petitioner points to Groom's admission during the PCR proceedings that he knew he could raise such a claim and his testimony indicating that Justice Gillette had confirmed the denials could have been raised as an assignment of error.

With regard to *Strickland*'s ineffective assistance prong, petitioner insists that the fact that Groom twice requested the transcript does not end the inquiry. For example, in *State v. Acremant*, 338 Or. 302 (2005), a petitioner raised a claim on appeal challenging the Oregon Supreme Court's denial of a motion for supplementation. Guided by Acremant, petitioner asserts Groom's efforts to get the transcript were objectively unreasonable because he failed to follow up on the Oregon Supreme Court's denials with a motion to that court to reconsider its previous denials. Finally, petitioner cites ORS 19.420(3) for the proposition that Groom could have raised the Oregon Supreme Court's denials as an assignment of error on the basis that without the transcript the appellate record was insufficient for the prosecution of an appeal of petitioner's death sentence.

With regard to *Strickland*'s prejudice prong, petitioner argues that prejudice is presumed here where counsel's ineffectiveness resulted in the lack of a key portion of the trial transcript. In addition, he contends that without the *voir dire* transcript he was denied the opportunity to demonstrate that he was prejudiced by the erroneous natural and probable consequences jury

instruction allowing the jury to find petitioner guilty of intentional murder simply by finding him guilty of underlying felonies.[18] [19]

Claims of ineffective assistance of appellate counsel are reviewed according to the standard announced in *Strickland* requiring counsel's performance to be both deficient and prejudicial. To be constitutionally effective, "'[c]ounsel need not appeal every possible question of law....'" *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980). However, where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the *Strickland* standard does not apply and prejudice is presumed; the implication is that *Strickland* does apply where counsel is present but ineffective. *Penson v. Ohio*, 488 U.S. 75 (1988).

Given the overall efforts made by Groom here, including his efforts to obtain the *voir dire* transcript, petitioner cannot demonstrate that he was actually or constructively denied the assistance of direct appellate counsel. Accordingly, he must show that Groom's failure to raise the Oregon Supreme Court's denials as an assignment of error fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional error, petitioner would have prevailed on appeal. *See Strickland*, at 688 & 694.

---

[18]  The prosecutor reminded jurors during closing arguments to remember the discussions of the aiding and abetting issue had during *voir dire*. Petitioner argues that he is prejudiced by the lack of *voir dire* transcript because he cannot know the substance of these discussions and cannot prove that appellate counsel failed to present this meritorious issue and others to the Oregon Supreme Court on direct review.

[19]  Petitioner's reliance on *Acremant* notwithstanding, respondent notes that in *Acremant* the Oregon Supreme Court actually opted to construe the defendant's assignment of error pertaining to its denial of defendant's motion related to supplementation of a transcript as a request for reconsideration. Accordingly, respondent maintains that *Acremant* supports his position that Groom could not have raised the Oregon Supreme Court's denials of his motions for *voir dire* transcript as an assignment of error before the same court.

The parties dispute whether Oregon law permitted Groom to raise as an assignment of error the Oregon Supreme Court's denials of his requests for transcription of *voir dire*. Relying largely on *Montgomery*, it appears that respondent persuaded the PCR court that, procedurally, Groom could not have done so.[20] In that non-capital case, the Oregon Supreme Court concluded that ORS 138.040 does not authorize review of the trial court denial of a transcript. It concluded that any recourse from a trial court denial of a transcript rests with the Oregon Court of Appeals via a motion to supplement the record pursuant to ORAP 6.15. Given the governing statutes in petitioner's death case provided: (1) for automatic transcription of "all portions of the criminal proceeding reported by that reporter, other than selection of the jury"; (2) that any party wanting jury selection to be transcribed should apply to the Oregon Supreme court for an order, "which will be made only upon a showing of good cause for preparation of that transcript"; and (3) for a direct appeal bypassing the Oregon Court of Appeals and moving straight to the Oregon Supreme Court, *Montgomery* is not directly applicable to petitioner's case. Nevertheless, by analogy, it offers fair support for respondent's argument that the Oregon Supreme Court's denials of Groom's request for *voir dire* transcripts could not be raised as assignments of error under Oregon law.

Petitioner relies on *Mayer* to argue that the Oregon Supreme Court's refusal to provide him with the *voir dire* transcript and Groom's failure to secure it or to at least raise the issue on appeal denied him the "record of sufficient completeness" to which he was constitutionally entitled.

---

[20] There was a question during the PCR proceedings as to whether the subject claim alleged that Groom failed to raise a claim on appeal pertaining to his efforts to get the *voir dire* transcript from the *trial court* or from the *Oregon Supreme Court* in accordance with the relevant statute (as noted above, Groom twice moved the Oregon Supreme Court for the transcript). The PCR claim itself did not specify. However, the parties brought this discrepancy to the PCR court's attention during the hearing on respondent's motion to strike and it was a settled issue on appeal.

However, *Mayer* does not bear on the procedural question of whether Oregon law permitted Groom to raise the proposed issue on appeal such that his failure to do so could constitute ineffective assistance of appellate counsel. Accordingly, the PCR court's denial of this ineffective assistance of appellate counsel claim is entitled to deference and petitioner cannot demonstrate that it is contrary to or an unreasonable application of *Strickland*. Petitioner also insists that I should not defer to the PCR court's denial of this claim because that court denied him a sufficient process for briefing the issues raised in the claim. I reject this argument. Petitioner had the opportunity to counter, as he does here, respondent's procedural argument that Oregon law did not permit Groom to raise as an assignment of error on direct appeal the Oregon Supreme Court's denials of Groom's request for the *voir dire* transcript. Instead, petitioner, both in his brief to the PCR court and his appellate briefs to follow, offered only a cursory response that there were issues of material fact to be resolved.

I am cognizant that Oregon now has a heightened appreciation of the potential importance of *voir dire* transcripts, particularly in death penalty cases, and has revised its statute to provide for automatic transcription of this portion of the transcript. Nevertheless, on this claim of ineffective assistance of appellate counsel, respondent's arguments are well taken. I conclude that Groom did not render ineffective assistance of counsel when, after conferring with trial counsel and twice moving the Oregon Supreme for transcription of *voir dire* in accordance with the relevant statute, he declined to raise that court's denials as an assignment of error on appeal to that very court. I am persuaded that Groom made his best effort to glean information from trial counsel and present an affidavit to convince the state's high court that he had good cause for the transcription and that when that failed he cannot be faulted for failing to seek relief from that same court.

Even if I agreed with petitioner that Groom made an adequate showing for the transcript under the necessity and materiality standard discussed *Bonner*, it appears that the Oregon Supreme Court required a higher showing to meet the "good cause" standard set out in the relevant Oregon death penalty statute for transcription of *voir dire* in a capital case. Moreover, even if *Bonner* supported petitioner's argument that the Oregon Supreme Court should have granted counsel's requests under Oregon law, it does not settle the question of whether the Constitution required the Oregon Supreme Court to do so under these circumstances, and, given Groom acted within *Bonner*'s contours, it does not show that he acted ineffectively. Finally, I reject petitioner's suggestion that Groom's efforts to secure the transcript were objectively unreasonable because he did not follow up on the Oregon Supreme Court's denials with a motion for that court to reconsider its previous denials as was done in *Acremant*. First, the assertion involves examination of a different claim than the one before the court faulting Groom with failing to raise the high court's denials as an assignment of error on direct appeal. And second, I conclude that in filing a second motion for the transcript with an enhanced affidavit in support Groom did ask the Oregon Supreme Court to revisit its earlier denial and there is no reason to believe that filing formal motions for reconsideration would have yielded a different result. For these reasons, I deny this subclaim.

I. **Tenth Claim For Relief - Petitioner was Denied his Constitutional Right to Trial Before a Fair, Impartial, and Representative Jury at Re-sentencing**

   1. Claim 10(A) - Petitioner's rights under the Eighth and Fourteenth Amendments were violated when a prosecution witness testified at his re-sentencing that Petitioner was housed on death row, thereby impermissibly reducing the jury's sense of responsibility for his sentence

According to petitioner, when a jail guard revealed through his testimony that petitioner had previously been sentenced to death in this case, it reduced the re-sentencing jury's feeling of responsibility for sentencing him to death again. Petitioner argues that the facts in his case are distinguishable from those set out in *Romano v. Oklahoma*, 512 U.S. 1 (1994), wherein the high court determined that introduction of another death sentence from a separate case did not result in a death sentence imposed in violation of the Eighth and Fourteenth Amendments, because: (1) *Romano* involved admission of evidence that the defendant had been sentenced to death in a separate case, in contrast to petitioner's circumstances where the evidence involved a death sentence in the same case; and (2) in *Romano*, the Supreme Court found it critical that the jury was properly instructed, but petitioner's jury was given no preliminary instructions and never instructed on "their serious task" or the fact that they were the "sole decision makers for the penalty phase in the case." Finally, petitioner maintains that the comment "so infused the trial with unfairness" that it violated his right to due process. Amended Petition [314], p. 106 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 639, 643 (1974)). According to petitioner, admission of evidence that he was previously sentenced to death constituted a non-statutory aggravating factor and unconstitutionally influenced the jury's decision.

Respondent argues that I have already concluded that the guard's comment was neither inaccurate nor related to the jury's role in the sentencing process and it did not affirmatively mislead the jurors regarding their roles at the re-sentencing. In addition, respondent argues that the trial court properly instructed the jury and that any argument that the comment made the jury more, not less, inclined to impose a death sentence is based on speculation.

I adequately addressed the merits of petitioner's arguments in my prior Opinion and Order [120], pp. 10-13. Petitioner has not persuaded me to reach a different conclusion here. Accordingly, on *de novo* review, I deny this subclaim.

2. Claim 10(B) - The selection of Petitioner's jury through a "death-qualification" process violated Petitioner's right to a fair and impartial jury that constituted a representative cross-section of the community

According to petitioner, given the heightened importance of the representative cross-section requirement in capital cases, coupled with data showing: (1) that conservative Caucasian individuals make up the highest percentage of individuals in favor of the death penalty; (2) almost 60% of African-Americans are against the death penalty; and (3) over 60% of self-described liberals are against the death penalty, the automatic removal of any prospective juror who was not a member of the pro-death penalty group deprived petitioner of his right to a jury drawn from a representative cross-section of the community. These arguments notwithstanding, petitioner apparently concedes, by reference to his earlier briefing, that *Lockhart v. McCree*, 476 U.S. 162, 176-77 (1986) controls the resolution of subclaims 10(B)-10(D). *See* Reply [196], pp. 296 & 299 ("There are times when a prior decision of the Supreme Court is in error, and must continue to be challenged. This is one of those times."; "And, where this Court may not reach this issue, in light of *Lockhart* . . . .").

Citing *Lockhart* and *Buchanan v. Kentucky*, 483 U.S. 402 (1987), respondent contends that this issue involves a settled legal question. Recognizing that it would violate a capital defendant's right to exclude all jurors for cause who expressed conscientious objections to capital punishment, respondent insists that a prospective juror may be excused for cause if his or her views would prevent or substantially impair the juror's ability to carry out his or her sworn duties in accordance with the court's instructions. Response [321], p. 93 (citing *Witherspoon v. Illinois*, 391 U.S. 510,

519 (1968); *Wainwright v. Witt*, 496 U.S. 412, 416 (1985)).[21]  Respondent maintains that even accepting as true petitioner's demographic data, so long as a juror is not excluded based solely on his or her views on the death penalty, the fair-cross-section requirement is satisfied.  Here, respondent insists that no juror was excused based solely on his or her views on the death penalty.

Respondent's arguments are well taken.  Accordingly, on *de novo* review, I deny this subclaim.

3.  <u>Claims 10(c) & 10(D) - The use of a judicially created death-qualification mechanism violated petitioner's constitutionally protected right to equal protection and its use to remove jurors whose beliefs and views against imposing the death penalty was a product of their sincerely held religious beliefs violated the First Amendment</u>

Petitioner argues that at the time of his re-sentencing, not only had the State of Oregon not adopted legislation authorizing "death qualification" of capital juries, it constitutionally prohibited utilization of religion as a basis for jury selection.  He maintains that the federal and state constitutions prohibited the trial court's questioning of jurors about their religious beliefs and its excusal of jurors who opposed the death penalty based on those beliefs.  Moreover, he argues that because only defendants facing the death penalty had their jury selection proceedings subject to religious screening, his jury selection violated his right to the equal protection of Oregon's laws and constitutional guarantees.

Similarly, petitioner argues that because potential jurors have a right, not just the opportunity, to serve as jurors, "each prospective juror who was removed during the death qualification,

---

[21]   The *Witherspoon/Witt* standard was reaffirmed in *Uttecht v. Brown*, 551 U.S. 1, 17 (2007).  There the Supreme Court held that to balance the criminal defendant's and the State's interests, "a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible."  *Id*. at 9 (citing *Witt*, 469 U.S. at 424).

collectively and individually, was improperly deprived of this right in violation of the equal protection and due process clauses of the Fourteenth Amendment." He further argues that because all citizens have the right to weigh in on the question of what constitutes "evolving standards of decency" under the Eighth Amendment, the right to serve as a juror, especially in a capital case, is a constitutionally fundamental one subject to strict scrutiny. Having established that there is a fundamental right at stake, petitioner argues that death qualification in Oregon cannot survive review because there is no rational basis for excluding jurors with anti-death-penalty beliefs from the guilt phase of a capital case. In addition, petitioner argues that given Oregon law dictates that the penalty-phase jury is to make a "moral and normative" decision, it is irrational to exclude prospective jurors from serving in the penalty phase because of their moral beliefs.

Respondent contends that there is no equal protection issue here because the trial court excused jurors who indicated an inability to set their personal views in opposition to the death penalty, religious or otherwise, aside and follow the law. He insists that the record shows that religious affiliation played no role in that determination. Moreover, respondent insists that: (1) ORS § 10.030(1) is a jury-eligibility statute and provides only the "opportunity for jury service"; (2) the statute does not, as a federal constitutional matter, entitle a potential juror to serve as a capital juror regardless of how biased he or she may be, either for or against the death penalty; (3) petitioner does not cite authority supporting his arguments that either the First or Fourteenth Amendments require this; and (4) in this case, no juror was excluded because of his or her religious affiliation.

Respondent's arguments are well taken. Death qualification of jurors in capital cases in accordance with *Witherspoon/Witt* is a settled question of law. I conclude that death qualification necessarily contemplates the constitutionality of excusing jurors from service who are unable or

unwilling to set aside their personal opposition to the death penalty, religious or otherwise, to follow the law. This is true even when: (1) questioning jurors about these views, religious or otherwise, is unique to death penalty cases; (2) some prospective jurors are barred from participating in the "moral and normative" decisions as to whether death is an appropriate sentence in particular cases; and (3) state constitutional and statutory provisions bar individuals from being rendered incompetent as jurors based on their opinions on matters of religion and provide that opportunities for jury service shall not be denied or limited on the basis of religious belief.[22] Accordingly, on *de novo* review, I deny these subclaims.

### J.  Eleventh Claim For Relief - The State Violated Petitioner's Constitutional Rights When It Attempted to Prove the "Future Dangerousness" Sentencing Element

 1.  Claim 11(A) - Predictions of future dangerousness are based on a medically and scientifically unreliable, flawed and discredited methodology and therefore cannot be constitutionally used to impose the death penalty

Or. Rev. Stat. § 163.150(1)(b)(B) requires a jury to unanimously find by a standard of beyond a reasonable doubt that it is more probable than not that a defendant will commit future acts of violence that render him a danger to society in order to be eligible for the death penalty. However, petitioner argues that researchers and mental health professionals have concluded that dangerousness cannot be predicted, particularly when the individual is going to be retained in a custodial setting. He maintains that recent research confirms that future dangerousness predictions are wrong as much as 95% of the time and "is informed and believes" that a review in Oregon would reveal that future dangerousness determinations in the state are flawed at a rate comparable to the above noted studies.

_____

[22] *See* Or. Const. Art. I § 6; Or. Rev. Stat. § 10.030(1).

Amended Petition [314], p. 114-15 (citing articles). Citing *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976), petitioner argues that given predictions of future dangerousness are wrong more often than not, admission of evidence, rejected as unreliable by professionals in the field, cannot justify putting someone to death. Consequently, he contends that sentencing him to death based on an objectively unreliable determination of future dangerousness constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Respondent maintains that petitioner cannot prevail on this claim because the Supreme Court explicitly approved a jury's consideration of future dangerousness during the penalty phases of capital trials in *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994), *California v. Ramos*, 463 U.S. 992, 1003 n.17 (1983) and *Barefoot v. Estelle*, 463 U.S. 880, 896-97 (1983) and there is no Supreme Court precedent holding that future dangerousness determinations are inherently unreliable.

The Supreme Court has long settled the legitimacy of future dangerousness as an appropriate sentencing factor in capital cases. *See Simmons*, 512 U.S. at 162-63; *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *Barefoot*; and *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976). Petitioner asserts that new research undermines the validity of these decisions and insists that the data shows, and a study done in Oregon would similarly reveal, that there is no constitutionally reliable way to predict future dangerousness. I, however, am bound by the Supreme Court's precedent established in *Barefoot*, *Jurek* and other related decisions. Accordingly, on *de novo* review, I deny both the facial and as-applied challenges to Oregon's death penalty scheme as set out in this subclaim.

2. Claim 11(c) - State impermissibly based its future dangerousness case on uncharged, unadjudicated allegations of prior bad conduct

Petitioner argues that application of future dangerousness in Oregon is fundamentally and constitutionally flawed because Oregon's system: (1) does not require the prosecutor to prove beyond a reasonable doubt the truth of each prior bad statement or act that supports an assertion of future dangerousness; (2) allows in evidence of a defendant's future dangerousness through historical facts in the form of hearsay and often double or triple hearsay; and (3) allows in evidence of future dangerousness in the form of statements or bad acts that the defendant allegedly said or committed years ago, thereby denying the defendant the opportunity for cross-examination, either due to the passage of time or the nature of the evidence. He maintains that Oregon's use of future dangerousness runs afoul of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) and *Blakely v. Washington*, 542 U.S. 296, 303 (2004)(requiring that each fact that increases the statutory maximum be proven to a jury beyond a reasonable doubt); *Ring*, 536 U.S. at 597(applying *Apprendi* applies in capital sentencing trials); and *Crawford v. Washington*, 541 U.S. 36 (2004)(holding that cross-examination is the only constitutionally acceptable method of ensuring reliability of a testimonial statement).

Petitioner insists that he had a constitutional right to the presumption of innocence on the State's allegations of prior bad statements and acts. Moreover, he argues that his right to confront the evidence against him and to present a defense to allegations of future dangerousness was violated due to: lack of notice, including the lack of an indictment; the age of the allegations, dating back to petitioner's youth; and the joinder of so many charges and allegations in one trial. In addition, he argues that he was denied his right to a jury trial because the jury was not instructed that it had to find him guilty beyond a reasonable doubt of any of the unadjudicated allegations of prior bad statements and acts before deciding to use this evidence as a basis for imposing a death sentence.

Finally, the jury was informed that it only had to find it more probable than not that petitioner would commit some further misconduct, thereby lowering the State's burden of proof.

Respondent maintains that there is no constitutional prohibition barring a jury from considering a defendant's prior unadjudicated conduct during a capital sentencing proceeding. To the contrary, respondent maintains that it is well settled that courts may consider uncharged conduct, including evidence of alleged crimes, when sentencing defendants, including in capital cases. Response to First Amended Petition [321], pp. 103-04 (citing *Nichols v. United States*, 511 U.S. 738, 747 (1994); *Eaton v. Angelone*, 139 F.3d 990, 998 (4th Cir. 1998); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005); *McDowell v. Calderon*, 107 F.3d 1351, 1366 (9th Cir. 1997), *vacated in part on other grounds*, 130 F.3d 833 (9th Cir. 1997); *Hatch v. State of Oklahoma*, 58 F.3d 1447, 1465 (10th Cir. 1995); *Devier v. Zant*, 3 F.3d 1445, 1464-65 (11th Cir. 1993)).[23]

A federal habeas court does not review whether evidence was introduced in violation of state law. *Estelle*, 502 U.S. at 67-68. Rather, it reviews state evidentiary rulings only to determine if they violate the petitioner's due process rights. To that end, I am persuaded by the Tenth Circuit's examination of this issue:

> The Supreme Court [ ] has [n]ever held that admitting evidence at sentencing that tends to prove the defendant engaged in other unadjudicated criminal conduct infringes on the defendant's presumption of innocence pertaining to the other unadjudicated conduct. Instead, the Supreme Court [ ] ha[s] repeatedly held that the district court may admit evidence of such unadjudicated conduct in the penalty phase of a capital trial without violating the defendant's constitutional rights. *See Williams v. New York*, 337 U.S. 241, 244, 252, 69 S.Ct. 1921, 128 L.Ed.2d 745 (1949)(upholding the trial judge's consideration in imposing the death sentence of

---

[23] Respondent also notes that in *Williams II*, the Oregon Supreme Court relied on *Dowling v. United States*, 493 U.S. 342, 343-44 (1990) to conclude that Or. Rev. Stat. § 163.150(1), the statute governing evidence that may be considered in the penalty phase, is to be "interpreted broadly, to include even unadjudicated bad acts." 322 Or. 620, 632-33 (1996).

> evidence the defendant had committed burglaries for which he had not been convicted); *Nichols v. United States*, 511 U.S. 738, 747, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994)(citing *Williams* with approval, in a non-capital case, for the proposition that the Court has upheld the constitutionality of considering unadjudicated conduct at sentencing).

*U.S. v. Lujan*, 603 F.3d 850, 856 (10th Cir. 2010). The Supreme Court has stressed that a capital jury should receive "as much information as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204 (1976); *see also United States v. Jacques*, 684 F.3d 324, 327 (2d Cir. 2012)("Generally, more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors in the penalty phase of a capital case.")(internal quotations omitted).

Moreover, in *Barefoot*, the Court allowed testimony on future dangerousness because it found that: (1) consistent with its findings in *Jurek*, a lay jury is capable of answering the question on future dangerousness; (2) the fact finder can determine the weight to give the evidence; and (3) it was not persuaded that testimony on future dangerousness was almost entirely unreliable or that the fact finder and the adversary system would not be competent to uncover, recognize and take due account of its shortcomings. *Barefoot*, 463 U.S. at 899. Balancing the danger of undue prejudice, a defendant has wide latitude in the penalty phase of a capital case to contest evidence and put on his own evidence showing he does not pose a future danger. The Supreme Court's consistent approval of jury consideration of the question of future dangerousness suggests that the burden to prove this factor can indeed be satisfied, despite reliability concerns inherent in future dangerousness evidence.

Petitioner suggests that Oregon's "unique" use of future dangerousness improperly blurs the distinction between eligibility and selection for the death penalty. He argues that future dangerousness in Oregon is an eligibility factor, and thus, an "element" of an Oregon capital offense

requiring that any evidence introduced to prove this element be subject to the same reliability rules as any other element of the underlying crime, including that the "fact" of future dangerousness be proven beyond a reasonable doubt.

Respondent maintains that in Oregon, eligibility for a death sentence is preliminarily determined in the guilt phase pursuant to Or. Rev. Stat. § 163.095 which defines the various categories of aggravated murder. Sur-Response [335], p. 179-80 (citing *State v. Compton*, 333 Or. 274 (2002)(The jury narrows the class of defendants eligible for the death penalty by finding a defendant guilty of aggravated murder); *State v. Farrar*, 309 Or. 132, 185 (1990)(The statutory provisions identify a discrete class of criminal conduct and genuinely narrow the class of person eligible for the death penalty in accordance with the Eighth Amendment)). Once this threshold eligibility determination is made, a jury may *select* a sentence of death by unanimously answering yes to the four statutory questions,[24] including the one related to future dangerousness. Respondent argues that the Oregon Supreme Court does not view future dangerousness as an eligibility factor, but rather as a forward looking question asking whether the death penalty is an appropriate punishment. *See State v. Guzek*, 310 Or. 299, 305 (1990)(concept of future dangerousness is sufficient to guide the jury's discretion and prevent arbitrary and capricious imposition of the death penalty).

---

[24] **First Question**: Was the conduct of the defendant that caused the victim's death committed deliberately and with the reasonable expectation that the death of victim would result? **Second Question**: Is there a probability - meaning is more likely than not - that the defendant would commit criminal acts of violence that would constitute a threat to society? **Third Question**: Was the conduct of defendant in killing the victim unreasonable in respect to the provocation, if any, by the victim? **Fourth Question**: Should the defendant receive a death sentence? *See* Or. Rev. Stat. § 163.150(1)(b)(A-D).

I conclude that the future dangerousness question serves both to narrow the class of persons who may receive a death sentence and to guide the jury's discretion in determining whether death is the appropriate punishment. I reject petitioner's argument that future dangerousness is an element of the underlying crime requiring the prosecutor to prove any specific allegations of prior bad conduct and the "fact" of future dangerousness itself by a standard of beyond a reasonable doubt. Accordingly, on *de novo* review, I deny this subclaim.

3.     <u>Claim 11(D) - The jury instructions did not define future dangerousness and the level of behavior that is accurately categorized as such</u>

For the reasons set forth in Claim 14(A) below, I deny this subclaim.

4.     <u>Claim 11(E) - Petitioner is actually innocent of being a future danger to society and therefore does not qualify for a capital sentence under Oregon law</u>

Petitioner argues that the passage of time has discredited the State's trial expert, Dr. Cochran's, future dangerousness prediction. He asserts that he has not committed any criminal acts of violence since he was incarcerated in 1988. In addition, he maintains that given his current health status he would not commit such acts if housed in a less restrictive setting. Petitioner also contends that he does not qualify for a death sentence under Oregon law because the jury imposed a death sentence based on a future dangerousness presentation that violated numerous constitutional protections. He insists that had these protections been upheld no reasonable juror would have sentenced him to death and at least one juror would have refused to do so. Consequently, he argues that executing him when he is actually innocent of being a future danger, violates the Eighth Amendment's prohibition against cruel and unusual punishment.

As discussed above, I find that future dangerousness plays a role in narrowing the class of defendants subject to a death sentence under Oregon law. Accordingly, I conclude that future

dangerousness, at least in part, constitutes an eligibility factor and potentially gives rise to a question pertaining to petitioner's actual innocence of a death sentence. Unlike the broad expanse of potential mitigating factors allowing a petitioner to present any aspect of his "character or record and any of the circumstances of the offense that [he] proffers as a basis for a sentence less than death," the future dangerousness question works, in part, to narrow the class of persons eligible for the death penalty.

Importantly, however, the showing required for a free standing claim of actual innocence, *i.e.*, a claim irrespective of constitutional error at trial or sentencing, is "extraordinarily high" and must be "truly persuasive." *Herrera v. Collins*, 506 U.S. 390, 417 (1993)(Supreme Court assumed without deciding that in a capital case a truly persuasive demonstration of actual innocence would render the execution of a defendant unconstitutional). To carry this burden petitioner must affirmatively prove he is innocent. *See Carriger v. Stewart*, 132 F.3d 463, 476-77 (9th Cir. 1997).

Alternatively, to show gateway "actual innocence" under the so-called "miscarriage of justice" exception to procedural default, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995)(citations omitted). The evidence must create a colorable claim of actual innocence, *i.e.*, evidence that the petitioner is innocent of the charge for which he is incarcerated, as opposed to legal innocence as a result of legal error. *Id.* at 321. In the capital sentencing context, a petitioner must show by clear and convincing evidence that but for a constitutional error, not one reasonable juror would have found him eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). Critically, in *Sawyer*, the Court determined that a failure to present mitigation evidence cannot constitute grounds for proving actual innocence:

[T]he "actual innocence" requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error.

*Id.* at 347.

Petitioner largely bases his actual innocence claim here on his assertion that evidence he presented to this court in federal habeas, in addition to evidence he maintains he could obtain in discovery, discredits Cochran's future dangerousness assessment of him and proves that the jury's future dangerousness determination was unsubstantiated. In addition, he argues that the second penalty-phase jury never considered evidence: (1) that he suffered from a treatable mental illness; (2) that he had been diagnosed with bipolar disorder and successfully treated with lithium for decades; (3) that he had consistently taken his medication and not posed a danger for more than two decades; (4) that he had maintained decades-long relationships; and (5) that Simonsen was the more culpable actor in the subject crimes.

I having carefully examined the record and considered *all* of the evidence in light of petitioner's arguments. With a focus on trying to predict how the second penalty-phase jury would have evaluated this evidence, I conclude that petitioner cannot meet his high burden of demonstrating by clear and convincing evidence that not one reasonable juror would find beyond a reasonable doubt that it was more probable than not that petitioner would commit future acts of violence that would render him a danger to society.[25] Even excluding Cochran's testimony altogether or viewing it in light of the evidence petitioner presents calling the credibility of Cochran's testimony

---

[25] I examine this claim under *Schlup's* gateway actual innocence exception. The Ninth Circuit has found that the "extraordinarily high" standard set out in *Herrera* is even higher than *Schlup's* miscarriage of justice exception. Accordingly, my conclusion that petitioner cannot satisfy the *Schlup* standard necessarily forecloses any potential relief under *Herrara*.

into question, there remains a substantial pool of other evidence from which a reasonable juror could conclude petitioner posed a future danger under Oregon law. Petitioner's trial counsel attempted to minimize petitioner's significant criminal record and to explain away his long and consistent history of other troubling and violent conduct. However, a reasonable juror hearing the detailed accounts of petitioner's crimes and conduct, even without hearing Cochran's testimony or rejecting it as unreliable, could conclude beyond a reasonable doubt that it was more probable than not that petitioner would commit future acts of violence that would render him a danger to society.

Similarly, per *Sawyer*, petitioner cannot rely on any alleged failure to present additional mitigation evidence, including evidence of a treatable mental illness, childhood abuse or what he characterizes as Simonsen's greater relative culpability, to prevail on this actual innocence claim. While additional mitigating evidence of petitioner's non-violent conduct over a extended period in prison, successful treatment of his mental illness over the past two decades, his compliance in taking his medication, his currently compromised health, and his ability to maintain long-term relationships, arguably undermines Cochran's diagnosis of severe Antisocial Personality Disorder, petitioner cannot show that Cochran's assessment was the only, or even the most important, factor in the jury's decision. In addition to the subject aggravated murder convictions, the jury heard compelling evidence of the violent and persistent threat petitioner posed to people he encountered both out of custody and in institutional settings over an extended number of years.

In light of the incriminating case against petitioner, he has not brought forth evidence that would prevent a reasonable juror considering all of the evidence from returning an affirmative answer to the future dangerousness sentencing question. Accordingly, on *de novo* review, I deny this subclaim.

73 - OPINION AND ORDER

**K.**  **Twelfth Claim For Relief - The Trial Court's Rulings Violated Petitioner's Constitutional Rights**

1.  Claim 12(1) - The trial court failed to ensure that all bench conferences were recorded, thus preserving a complete record in this capital case

For the reasons set forth in Claim 1(A)(2)(e), I deny this subclaim.

2.  Claim 12(2) - The trial court appointed Brasch against petitioner's wishes and refused to remove him even when it became obvious that he was not competent to try the case

Claim 12(3) - The trial court appointed Brasch even though it knew Brasch had a personal conflict with petitioner and an economic conflict with the case. The court refused to remove Brasch when it became apparent that these conflicts were denying petitioner his Sixth Amendment right to counsel

With regard to petitioner's claim alleging that the trial court failed to remove Brasch due to incompetence (Claim 12(2)), I stand by my earlier determination that an independent review of the record supports a conclusion that petitioner's attorneys were prepared for trial and familiar with evidence in the case. *See* Opinion and Order [120], p. 25. Whatever the merits of any of petitioner's specific claims alleging ineffectiveness on Brasch's part, I conclude that the record does not support petitioner's contention that the trial court violated his Sixth Amendment right to counsel when it failed to identify a level of incompetence in Brasch warranting his *sua sponte* removal by the court.

Similarly, with regard to petitioner's alleged conflicts with Brasch (Claim 12(3)), my review of the record reveals that the trial court did not violate petitioner's Sixth Amendment right to counsel when it failed to identify personal and economic conflicts between Brasch and petitioner, either at the time the court appointed Brasch or later during the trial, that warranted Brasch's *sua sponte* removal by the court.

A trial court has no duty to inquire into a conflict of interest between a defendant and his or her attorney unless the conflict is "apparent." *See Wood v. Georgia*, 450 U.S. 261, 272-73, 272 n. 18 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980)(no duty of inquiry unless court knows or reasonably should know conflict of interest exists). A conflict of interest can arise either when an attorney represents multiple defendants whose interests are hostile to one another or when the attorney represents a defendant with interests hostile to the attorney's own interests. *Mannhalt v. Reed*, 847 F.2d 576, 579-80 (9th Cir.), *cert. denied*, 488 U.S. 908 (1988). However, indigent defendants have no right to a "meaningful relationship" with appointed counsel; rather they are entitled to "competent representation." *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)).

At his PCR deposition, petitioner testified: (1) that at their first meeting Brasch told him that he did not like him or his case and that he could not afford to handle these pro bono cases; (2) that co-counsel Trew insisted that they keep Brasch on the team; (3) that Brasch only took the case because he had promised the judge he would do pro bono work; (4) that as a former D.A. Brasch was not happy about taking petitioner's case; (5) that after a certain point they could not be in the same room and Brasch did not want any part of the case, but that he stayed on "kind of out of spite"; and (6) that Trew told him that Brasch threw a fit in chambers about representing petitioner and advised the judge that he did not want to represent petitioner, but that the judge threatened Brasch with contempt if he did not continue in the case. Respondent's Exhibit 155, pp. 18-21 & 113-14.

Trew testified: (1) that he acknowledged Brasch's note that he refused to see petitioner while Trew was out of town; (2) that there were times during the case when Brasch communicated better with petitioner than either Trew or anyone else; (3) that there were times petitioner expressed

admiration for Brasch and he told Trew "numerous times that he wanted Bob to be his attorney, he liked the way he did things"; (4) that other times there were conflicts and petitioner expressed that he did not like Brasch and vice versa; and (5) that when asked, Trew did not concede that it was a fact that Brasch did not want to be on the case.

Brasch's testimony included the following: (1) that he volunteered to represent petitioner as a favor to Judge Barron and that he "knew at any time [he] wanted to [he] could get out of the case"; (2) that his representation of petitioner was not a happy experience but he handled it with zeal; and (3) that his note to Trew about refusing to see petitioner was an inside joke with Trew and not a truthful statement.

Based on the foregoing, I conclude that petitioner cannot demonstrate by clear and convincing evidence that I should not defer to the PCR court's finding that Brasch represented petitioner zealously at trial. Though petitioner insists that such finding is "utterly false" and without evidentiary support, he does not deny respondent's contention that petitioner failed to ever raise conflict concerns to the trial court or to request substitute counsel. Accordingly, petitioner has failed to show that any alleged personal and economic conflict between himself and Brasch should have been so apparent to the trial court that it violated petitioner's constitutional rights when it did not *sua sponte* inquire into such conflicts and remove Brasch from the case.

Accordingly, on *de novo* review, I deny these subclaims.

3.  <u>Claim 12(4) - At the start of the case, the trial court failed to inform the jury that petitioner was presumed innocent. Instead, the court told the jury that petitioner was presumed "not guilty"</u>

For the reasons set forth above in the discussion of Claim 7(A)(1), I deny this subclaim.

4.      Claim 12(5) - At the close of the case, the trial court improperly instructed the jury that they "may" consider that Mr. Simonsen confessed to shooting the victims. The court should have instructed that the jury "shall" consider this fact

The PCR court made the following relevant findings:

88.     The trial court told jurors, "David Simonsen has admitted that he shot Unna Tuxen and Kathrin Reith, and you may consider that as a fact in this case."

89.     Evidence was presented at trial from which the jury could have concluded that petitioner, rather than David Simonsen, shot the victims.

90.     Petitioner presented no evidence or argument to support his claim that counsel could have persuaded the trial court to instruct the jury that they were required to accept as a fact David Simonsen's statement that he shot the victims.

Respondent's Exhibit 168, pp. 12-13.

In addition, that court concluded that petitioner's counsel could not be sure what Simonsen would say if he were called to testify and that counsel were concerned he would testify that petitioner had actually shot the victims. *Id.* at 11. In view of those findings and the record here, respondent maintains that petitioner cannot demonstrate that the trial court's instruction was constitutionally improper. Response [321], p. 113 (citing *Estelle v. McGuire*, 502 U.S. at 72) (holding that jury instructions must be considered in the context of the instructions as a whole and the trial record). Respondent argued to the PCR court that due to the equivocal nature of the evidence, nothing mandated an instruction that Simonsen conclusively shot the victims, *e.g.*, comparing Burt Tirey's testimony that petitioner told him that *he* had dusted a couple of dudes with Cynthia Ingram's account that petitioner told her that he had Simonsen take care of it. The PCR court found that "[t]he mixture of evidence about whether Simonsen or petitioner actually shot the victims allowed the prosecution to argue the 'robot theory' along with other theories for petitioner's culpability."

Petitioner indicates that Ingram testified that she did not know what petitioner was talking about when he made the above statement to her and that she did not find out that the victims had been shot until a week later. Regardless, I am satisfied that I should defer to the PCR court's above findings of fact.

In addition, clearly established federal law holds that in order to merit habeas relief on a claim of state law instructional error, the habeas court must determine whether the improper instruction, by itself, so infected the entire trial that the resulting conviction violates due process. *Estelle*, 502 U.S. at 72. As noted above, when reviewing an instructional challenge, the instruction may not be judged in artificial isolation. Moreover, even if there was a constitutional error, habeas relief is unavailable unless that error has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Here, the record supports a conclusion that the challenged instruction, in effect, advised the jury that Simonsen shot the girls. Both petitioner and the prosecution argued in accordance with that representation at trial.[26] Accordingly, I conclude that petitioner cannot demonstrate that the challenged instruction had substantial and injurious effect or influence on the jury's verdict and I deny this subclaim.

5.     <u>Claim 12(6) - The trial court failed to give petitioner's requested instructions that mere presence at the scene was not sufficient to convict, even on an aid and abet theory, and, that presence at the scene, even with knowledge of commission of the crime, is not enough to make someone an accomplice to a crime. In failing to give these instructions, the trial court deprived petitioner of his right to present a defense</u>

---

[26]     For example, in closing arguments, petitioner's counsel argued: "Now, David Simonsen is the admitted personal, intentional killer of these two girls. His Honor told you so. That's a fact in this case." Transcript Desigation, Part F, Vol. 11, p. 1410. Similarly, the prosecutor stated in closing: "You don't have to act yourself and be responsible for it, because you can do it by either act or merely advice and you are just as responsible, so when we talk about getting blood on your hands, **Simonsen did the dirty work**, but he wasn't the only one." *Id.* at 1443 (emphasis added).

In *Williams I*, the court concluded under Oregon law that "[t]he trial court correctly instructed the jury on what it needed to find affirmatively in order to conclude that defendant had aided and abetted in the crimes." Accordingly, it held that the trial court did not err when it refused to give petitioner's requested instructions. *See Williams I*, 313 Or. at 33-34 (1992)(citing *State v. Nefstad*, 309 Or. 523, 549-50 (1990)(Whether the evidence was sufficient to affirmatively prove that defendant was guilty on an aiding and abetting theory was a matter that could have been argued to the jury, and, thus, no instruction by the trial court on "mere presence" was required.)). I also note that:

> [a] defendant is entitled to have the judge instruct the jury on his theory of the defense, provided that it is supported by law and has some foundation in the evidence. A failure to give such instruction is reversible error; **but it is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory**.

*United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990)(*overruled on other grounds by Dixon v. United States*, 548 U.S. 1 (2006))(emphasis added).

As noted above, the Oregon Supreme Court determined that the trial court adequately instructed the jury on aiding and abetting. In addition, petitioner's counsel repeatedly argued during his closing that for the jury to convict petitioner on an aiding and abetting theory it had to find that he had "blood on his hands" and show that he got into the killing. I also note that petitioner did not address this claim in his briefs. Accordingly, on *de novo* review, I deny this subclaim.

6.     <u>Claim 12(7) - The trial court gave a constitutionally inaccurate reasonable doubt instruction which allowed the jurors to find guilt based on their passions and prejudices</u>

For the reasons set forth in Claim 7, I deny this subclaim.

7.      Claim 12(8) - Despite insufficient evidence, the trial court violated petitioner's constitutional rights when it instructed the jury on the crimes of sexual abuse and attempted sexual abuse

As a preliminary matter, respondent clarifies that the trial court instructed the jury on *attempted* first degree sexual abuse, not first degree sexual abuse. It also instructed the jury on attempted first degree rape, but given the jury did not agree on that underlying crime, the Oregon Supreme Court determined any error in issuing that instruction was harmless. *Id.* at 26. Moreover, in *Williams I*, the Oregon Supreme Court found sufficient evidence under Oregon law to permit a rational juror to conclude that petitioner intentionally engaged in conduct that constituted a substantial step toward the commission of sexual abuse in the first degree. Specifically, it determined that relevant evidence in support of attempted first degree sexual abuse included:

> [] photographs of the victims' bodies. Their hands were bound behind their backs, and they were nude from the waist down with their pants and underpants pulled completely off one leg and down around the other ankle. The victims were lying on their backs and each had been shot in the head. A rational juror could find that the defendant removed the victims' pants or forced them to do so. Leaving the victims naked from the waist down can constitute a "substantial step" toward the commission of sexual abuse. Removing the victims' clothing also advanced the criminal purpose of forcing sexual contact and provided verification of the existence of that purpose.

*Id.* at 27. Respondent argues the Oregon Supreme Court's finding is presumed correct and precludes this court from concluding that the court's decision was contrary to or an unreasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979).

Again, petitioner does not address this claim in his reply briefs. Accordingly, having reviewed the record and in view of the Oregon Supreme Court's above determinations, I conclude that respondent's arguments are well taken. Accordingly, on *de novo* review, I deny this subclaim.

8.      Claim 12(9) - The trial court violated petitioner's right to due process when it refused to allow petitioner to introduce evidence of Simonsen's independence without

allowing the prosecution to bring in the issue about drug transactions between petitioner and Simonsen

Respondent contends that petitioner's counsel made a tactical decision not to offer evidence of Simonsen's independence in response: (1) to the prosecution stating at trial that if petitioner introduced this evidence, he would take the position that it opened the door to drug-related evidence and the control petitioner had over Simonsen in supplying him with drugs; and (2) to the trial court indicating that it *might* allow in this rebuttal drug-related evidence. According to respondent, the Oregon Supreme Court rejected this claim on state law grounds without discussion. Respondent notes that petitioner cites to no authority supporting his contention that the trial court violated his constitutional rights when it issued its preliminary ruling, based on state law, that it would consider the admissibility of evidence at some future point in the trial. Response [321], p. 119 (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)(state court's interpretation of state law binds a federal court sitting in habeas corpus)).

Again, petitioner does not address this claim in his reply briefs. Accordingly, largely for the reasons discussed in Claims 1(D)(3)(a-e),(f) & (g) above, I conclude that respondent's arguments are well taken and on *de novo* review deny this subclaim.

9.    Claim 12(10) - The trial court violated petitioner's constitutional rights when it intimidated Dawna Urich and emphasized the relevance of her testimony to the jury

By way of background, Ms. Urich testified for the State. During direct questioning, petitioner objected on leading and relevancy grounds. The trial court overruled petitioner's objections. Later, out of the presence of the jury, the court stated that it was allowing leading questions because the witness was showing hostility and being evasive. At that time, petitioner's counsel put its view that

the court had "colored" the evidence to emphasize Urich's testimony on the record. On appeal, the

Oregon Supreme Court resolved this claim as follows:

> Defendant contends that the inflection of the trial judge's voice and the way that he looked at the jury made the ruling improper. The trial judge denied that he had emphasized the ruling or looked at the jury in a significant way while making the ruling. Moreover, the trial judge had instructed the jury at the beginning of the trial that it was not to place undue emphasis on, or try to surmise why he made, any ruling about admissibility of evidence. The record does not support defendant's contention that the trial judge unduly emphasized the evidentiary ruling.

> Defendant also argues that the trial judge intimidated the witness into "say[ing] things that she would not otherwise say." The trial judge did tell the witness, outside the presence of the jury, to tell the truth. That apparently was a warranted admonition to this witness, because she admitted at trial that she had lied to the grand jury, and she was claiming at trial that she had not given an earlier recorded statement to a police officer, which the officer said that she had. Nothing in the record indicates that the trial judge acted in an intimidating or overbearing manner.

> The record does not demonstrate that the trial judge erred in the particulars complained of in its treatment of witness Dawna Urich.

*Williams I*, 313 Or. at 32.

Petitioner does not address this claim in his reply briefs and I must presume that the Oregon

Supreme Court's factual findings are correct. Accordingly, on *de novo* review of the federal

constitutional issue, I deny this subclaim.

10.    Claim 12(11) - The trial court violated petitioner's constitutional rights when it failed to admonish the prosecutor from making inflammatory and improper statements in his closing arguments and when it failed to grant a mistrial following the prosecutor's improper, inflammatory and prejudicial closing arguments

Respondent asserts that petitioner does not identify which statements in the prosecutor's

closing arguments were inflammatory, improper or prejudicial. He further argues that this court

must defer to the PCR court's finding that the prosecutor's arguments were not objectionable, were

supported by evidence in the record and were reasonable inferences that could be drawn from the

evidence. *See* Response [321], p. 122 (citing Respondent's Exhibit 168, p. 13). Finally, respondent contends that this subclaim consists of mere conclusory allegations that lack factual support, and, therefore, it does not warrant habeas relief. *Id.* (citing *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970)).

Petitioner does not address this subclaim in his briefs. I have reviewed the prosecutor's guilt-phase closing arguments and conclude that respondent's arguments are well taken. Accordingly, on *de novo* review of the federal constitutional issue, I deny this subclaim.

    11.    <u>Claim 12(12) - The trial court violated petitioner's constitutional rights when it denied his appellate counsel's motion for transcript of the jury voir dire, even when the motion was supplemented with the required detailed affidavit. This error prevented petitioner from determining whether he received a trial before a fair, impartial and representative jury. The destruction of the tape recordings of voir dire ensures petitioner will never have the opportunity to raise claims regarding the jury that determined his guilt of capital murder</u>

This subclaim is without merit as a matter of fact because appellate counsel asked the Oregon Supreme Court, not the trial court, to order transcription of *voir dire*. Petitioner does not address respondent's assertion in his reply. As summarized in Claim 9 above, petitioner's appellate attorney twice moved the Oregon Supreme Court for an order authorizing transcription of *voir dire* in accordance with the relevant state statute. The trial court never resolved any such motion. Accordingly, I deny this subclaim.

**L.**    **<u>Thirteenth Claim For Relief - The Re-sentencing Court's Rulings Violated Petitioner's Constitutional Rights</u>**

    1.    <u>Claim 13(4) - The re-sentencing trial court allowed the introduction of numerous allegations of prior uncharged and unproved conduct by petitioner</u>

Petitioner does not address the merits of this subclaim in his briefs. Accordingly, for the reasons set forth above in Claim 11(c), I deny this subclaim.

2. Claim 13(5) - The re-sentencing trial court allowed the introduction of petitioner's constitutionally protected speech and alleged personal beliefs, introduced to inflame the passions and prejudices of the jury against him

Respondent maintains that this subclaim is procedurally defaulted because petitioner did not fairly present it to the state courts and that it is otherwise without merit. Respondent notes that petitioner does not specify the constitutionally-protected speech or personal beliefs the trial court erroneously allowed in or how the court could have excluded them. He contends that petitioner is not entitled to habeas relief based on conclusory allegations. Response [321], p. 127(citing *Jones*, 66 F.3d at 204-05). Respondent also argues that admission of evidence in death penalty cases that concerns a defendant's otherwise protected speech or personal beliefs does not violate the First Amendment if it is relevant to an issue before the jury, including the issue of any aggravating circumstances. *State v. Moore*, 324 Or. 396, 422-23 (1996)(citing *Dawson v. Delaware*, 503 U.S. 159, 166 (1992)). He maintains that petitioner has not shown that the subject evidence was not probative of his future dangerousness such that the trial court's admission of it violated his rights under *Dawson*.

Petitioner does not address the merits of this subclaim in his briefs and I find that respondent's arguments are well taken. Accordingly, on *de novo* review, I deny this subclaim.

3. Claim 13(6) - The re-sentencing trial court refused to conduct individualized *voir dire* to determine what jurors knew about the case and their views on the death penalty

Petitioner's counsel asked the trial court to conduct individual *voir dire*, but the court declined to do so, electing instead to use a questionnaire. In addition to completing the

questionnaire, potential jurors answered the court's questions and both sides had the opportunity to question the potential jurors individually. Respondent insists there is no controlling Supreme Court precedent requiring a court to conduct individual *voir dire*. He argues that the Court has never addressed whether and upon what showing individual *voir dire* might be constitutionally required, but has instead focused on the wide discretion due trial courts in conducting *voir dire*. Response [321], p. 128 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991); *Davis v. Florida*, 473 U.S. 913, 914-15 (1985)).

In *Mu'Min*, 500 U.S. at 422, the Court explained that state trial courts "retain [ ] great latitude in deciding what questions should be asked on voir dire." On habeas review, therefore, a federal court is limited to determining whether the trial court's failure to undertake a more thorough oral *voir dire* rendered petitioner's trial "fundamentally unfair." *Id.* at 425-26. The Court has never held that individual *voir dire* is required in capital cases. Rather, it must be "adequate ... to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Specifically, due process requires only that the *voir dire* be adequate and that the venire be questioned about whether they "would always impose death following conviction." *Id.* at 733. The manner in which *voir dire* is conducted is committed to the broad discretion of the trial court. *Ristaino v. Ross*, 424 U.S. 589 (1976); *Mu'Min*, 500 U.S. at 424.

Petitioner does not address the merits of this subclaim in his briefs. Moreover, he has not and cannot demonstrate that the trial court's refusal to conduct individual *voir dire* in his case rendered his trial fundamentally unfair. Accordingly, on *de novo* review, I deny this subclaim.

4. Claim 13(7) - The re-sentencing court failed to ensure that jurors were questioned during *voir dire* on their views of mitigation and on aggravating evidence

Petitioner does not address the merits of this subclaim in his briefs. As noted above, the Constitution does not dictate a particular *voir dire* process, but rather demands that the process be "adequate ... to identify unqualified jurors." *Morgan*, 504 U.S. at 729. During *voir dire*: (1) the trial court referenced the juror questionnaire explaining the four sentencing questions; (2) it specifically asked jurors if they agreed with the principles that if a juror reasonably believes a mitigating circumstance exists, he or she can consider it established, and, that there is no burden of proof on the fourth question; and (3) petitioner's counsel questioned individual jurors about their understanding of the concept of mitigation.

While petitioner may have preferred an individualized *voir dire* or a more specific inquiry into possible juror bias toward the death penalty, I am satisfied that the re-sentencing court allowed enough questioning for petitioner's counsel to select an impartial jury. Accordingly, on *de novo* review, I deny this subclaim.

5. <u>Claim 13(8) - The re-sentencing court allowed the prosecutor to introduce general aggravating evidence that was not relevant to any of the three questions for which the prosecution bore the burden of proof. At the time of petitioner's re-sentencing trial the fourth question was reserved for introduction of mitigating evidence</u>

Respondent argues that petitioner fails to identify the evidence the trial court is alleged to have erroneously admitted and to explain why it is irrelevant. Moreover, he argues that petitioner does not indicate whether he objected to admission of the evidence on relevancy grounds and maintains that pursuant to *Estelle*, 502 U.S. at 70, if the evidence is admissible under state law, there is no due process error. Response [321], p. 130. Finally, respondent insists that petitioner is incorrect in his assertion that at the time of petitioner's re-sentencing the Fourth Question was reserved for mitigation evidence. *Id.* (citing *Moore*, 324 Or. at 414 n.13).

I find that petitioner's claim consists of conclusory allegations and that he fails to show that the unspecified "general aggravating evidence" was not probative of his future dangerousness. In assessing potential future dangerousness evidence, the Oregon Supreme Court has held that:

> the jury should have before it all possible relevant information about the individual defendant whose fate it must determine. The relevant question during the sentencing hearing is whether the defendant will be dangerous in the future. ORS 163.150(1)(b)(B). Evidence of all of a defendant's prior conduct, bad and good, is precisely the type of evidence that the jury needs to make this determination.

*State v. Moen*, 309 Or. 45, 73 (1990).

Petitioner does not address the merits of this subclaim in his briefs. Accordingly, I conclude that respondent's arguments are well taken and on *de novo* review deny this subclaim.

6. <u>Claim 13(9) - The re-sentencing trial court ruled that petitioner could not introduce evidence about the parole board's role in determining the sentence for a life sentence or consecutive sentence. This deprived petitioner of his right to introduce all mitigating evidence for the penalty-phase questions. Where petitioner would physically be was an important consideration for whether he would be considered a future danger. In Oregon, the court sets the length of the sentence, but the Parole Board determines the amount of time a person serves in prison. *Hamel v. Johnson*, 998 P.2d 661, 665 (Or. 2001)</u>

Respondent argues that this claim is "spurious" because: (1) it was petitioner's counsel who mentioned the parole board's role in both opening statements and closing arguments--emphasizing that it would be 30 years before petitioner could even be considered for parole; (2) the re-sentencing court sustained petitioner's counsel's objection to the prosecutor's questioning of a former gang mate of petitioner's about whether the parole board could override the minimum portion of a sentence, on the grounds that getting into the workings of the parole board was prejudicial and not relevant; and (3) petitioner does not point to any trial court ruling preventing petitioner from introducing evidence about the parole board's role. In *Williams II*, 302 Or. at 628, petitioner faulted the trial court with

denying his request to argue to the jury that the court could impose two consecutive life sentences if the jury returned life sentence verdicts. In denying this claim, the Oregon Supreme Court noted that the trial court acted within its authority to prevent "jury confusion and speculation" when it reasoned that to allow such argument would have "opened a Pandora's box involving all sorts of evidence and arguments about possibilities of what the trial court might do, what the Parole Board might do, what the Governor might do, what might happen if the defendant escaped, and so forth."

Petitioner does not address the merits of this subclaim in his briefs. Accordingly, I conclude that respondent's arguments are well taken and on *de novo* review deny this subclaim.

> 7. <u>Claim 13(10) - The re-sentencing trial court failed to admonish the prosecutor from making inflammatory and improper statements in closing argument, and failed to grant a mistrial after the prosecution's improper, inflammatory, and prejudicial closing argument</u>
>
>> <u>Among other statements, the prosecutor stated that the evidence presented did not justify a sentence less than death and that it did not rise to the level of justifying a sentence less than death. Defense counsel objected to this statement and the trial court sustained the objection. However, even after the objection was sustained, the prosecutor persisted in stating that the evidence did not justify a sentence less than death. This is a misstatement of law and placed the burden on petitioner to disprove the applicability of a death sentence. The prosecution bore the burden to prove beyond a reasonable doubt that petitioner should receive the death penalty. Defense counsel moved for a mistrial on this basis, but the trial court denied the motion</u>

On his second direct appeal, petitioner alleged the trial court erred when it denied his motion for a mistrial following the prosecutor's "rise to that level" comment during his rebuttal argument. Petitioner argued that the comment suggested that petitioner had a burden of proof on the Fourth Question and implied that there was a presumption that a death sentence should be imposed unless petitioner met his burden of proof for a lesser sentence. The Oregon Supreme Court found that petitioner timely objected to the comment, that the trial court sustained the objection, and that

counsel did not ask the court to strike the comment or to issue a corrective instruction. That court also noted that it was not until after the prosecutor finished his rebuttal argument that counsel advised the trial court that he would have a matter for the court "when we recess." Only then, after the court instructed the jury on the case, did counsel move for a mistrial based on the prosecutor's comment. The Oregon Supreme Court summarily disposed of the claim on procedural grounds as follows:

> To preserve error, a motion for mistrial must be timely. It is timely if it is made when the allegedly objectionable statement was made. [*State v.*] *Walton*, 311 Or. [223], 248, 809 P.2d 81[(1991)]. Defendant's motion here was not timely and, thus, that claim of error was not preserved for review. We decline to consider defendant's argument.

*Williams II*, 322 Or. at 631.

For the reasons discussed at length in its prior Order [120], pp. 5-10, I once again recognize that Oregon's law governing the timeliness of motions for mistrial is an independent and adequate state law sufficient to bar federal habeas review. Petitioner has not persuaded me to reach a different conclusion here in considering whether this subclaim is procedurally defaulted.

Nevertheless, turning to the merits, respondent insists that the prosecutor's argument not only did not state that the petitioner bore the burden of proof on the Fourth Question, it tracked the language of the statute. Moreover, the trial court noted that: (1) it had sustained the objection to the prosecutor's arguments; (2) the jury instructions properly characterized the burden of proof ; and (3) the prosecutor's statement was not inherently improper. Respondent also maintains that the trial court cured any false impressions left by the prosecutor's argument when it specifically instructed the jury that there was no burden of proof on the Fourth Question and when it instructed the jury on the definition of mitigating circumstances. It noted that the defendant need not prove their existence

beyond a reasonable doubt, but rather that if a juror reasonably believes they exist, he or she may consider it as established. Finally, respondent argues that petitioner cites no controlling federal law that would have required the trial court to either grant the motion for mistrial based on the prosecutor's comments or to give a curative instruction under the circumstances.

Petitioner refers to his prior briefing to argue that the Oregon Supreme Court's reliance on the untimeliness rule was unfounded and the prosecutor's remarks so infected the trial with unfairness as to make petitioner's resulting conviction a denial of due process. He maintains that taken together, the phrases "justify a sentence less than death" and "rise to that level" told the jury that petitioner had the burden of proof on the Fourth Question. Citing *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), he argues that even though the trial court later told the jury there was no burden of proof on this question, its failure to give a curative instruction at the time of the mischaracterization irreparably undermined the heightened reliability required in death penalty cases under the Eighth Amendment.

Petitioner's arguments notwithstanding, I am satisfied that even if the prosecutor's comments could be viewed as suggesting that the petitioner bore the burden of proof on the Fourth Question, they did not impair the fundamental fairness of petitioner's trial. The trial court sustained counsel's objection to the "rise to that level" comment, and, following the prosecutor's rebuttal, properly instructed the jury that there was no burden of proof on the Fourth Question. As respondent correctly notes, jurors are generally presumed to follow their instructions. *See, e.g., Richardson v. Marsh*, 481 U.S. 200, 211 (1981). For these same reasons, I conclude that the prosecutor's rebuttal comments were at worst harmless error. *See Brecht*, 507 U.S. at 623. Accordingly, on *de novo* review I deny this subclaim.

**M.** **Fourteenth Claim For Relief - The Re-sentencing Court's Instructions to the Jury Violated Petitioner's Constitutional Rights**

1. Claim 14(A)(1) - The re-sentencing court violated petitioner's constitutional rights when it failed to issue jury instructions that defined "future dangerousness" in a way that guided the jury's consideration of that issue. Specifically, the court never issued preliminary instructions to the jury on the law, the prosecution's burden of proof, on evidence, objections and other typical trial issues and the jury's serious task of determining whether or not to impose a death sentence

   Claim 14(A)(2) - The only instruction given on future dangerousness tracked the statute, but failed to define the concept of "criminal acts of violence that would constitute a continuing threat to society"

   Claim 14(A)(3) - To the extent that the Oregon death penalty statute allows drug use, drug dealing and threats to constitute evidence of "future dangerousness" it fails to provide the constitutionally required narrowing function

With regard to Claim 14(A)(1), I note that petitioner does not address the trial court's failure to issue preliminary instructions in his briefs. Accordingly, for the reasons set forth in my resolution of Claim 3(D)(1) above, I deny this subclaim.

With regard to Claim 14(A)(2) & (3), a jury instruction at the punishment phase of a capital murder trial is appropriate unless "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). On the issue of whether the re-sentencing court in its instructions to the jury was required to define "criminal acts of violence," I am persuaded by the Fifth Circuit's reasoning on this issue. It has consistently rejected similar claims alleging that it is constitutionally necessary for a trial court to define "criminal acts of violence." *See, e.g., Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009)(holding that the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself").

Having reviewed the instructions at issue, I too conclude that taken in context the challenged term has a sufficiently plain meaning. I am satisfied that the jury understood it needed to differentiate between *criminal acts of violence* and *non-violent criminal or bad acts* in determining whether petitioner posed a future danger as defined by the statute. Moreover, petitioner's apparent effort to place the significant drug and threat evidence presented at his trial in the non-violent category notwithstanding, I conclude that this evidence was relevant to the future dangerousness question and a reasonable juror could have concluded that it tended to support a finding that he was likely to commit future criminal acts of violence. Accordingly, on *de novo* review, I deny these subclaims.

2. Claim 14(B)(1) - The instruction on future dangerousness allowed the jury to find this sentencing element under a "more likely than not" standard of proof

Claim 14(B)(2) - The instructions did not require the prosecution to prove beyond a reasonable doubt that petitioner will commit future acts of violence, but rather that it was more probable than not that he would commit future acts of violence

Claim 14(B)(3) - The verdict form asked only whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The verdict form contained no mention of "beyond a reasonable doubt." Therefore, there can be no certainty that jurors found future dangerousness based on the beyond a reasonable doubt standard

For the reasons discussed in Claim 15 below, I deny these subclaims.

3. Claim 14(C) - The jury instructions prevented the jury from considering all mitigating evidence in that: (1) the first instruction specifically prohibited the jury from considering sympathy; and (2) the definition of mitigation was limited only to factors affecting the petitioner's culpability for the crime

Respondent asserts that this claim is groundless because: (1) the trial court instructed the jury to consider any mitigating circumstances received in evidence, including but not limited to various aspects of petitioner's circumstances and emotional state; (2) it instructed jurors that they may

consider any aspect of petitioner's life in their determination on the Fourth Question; and (3) there is no indication that the jury did not follow these instructions and they are presumed to have done so pursuant to *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In addition, as discussed in Claim 13(7) above, the court and counsel discussed mitigation with each juror during *voir dire* and petitioner's counsel asked jurors if they understood that they could vote for life if they found any mitigating circumstances. Finally, respondent notes that petitioner requested essentially the same instructions on mitigation that he now challenges.

Petitioner asserts that in accordance with *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986), mitigating evidence may not be limited to a defendant's behavior relative to the defense, but may include post-offense behavior. He further maintains that the question asking "whether the defendant should receive a death sentence" is likely insufficient to authorize a jury to fully consider mitigating evidence under *Penry I & II, Lockett, Eddings* and *Skipper*.[27] Moreover, he asserts that in addition to being told that he had to prove the existence of sufficient mitigating evidence to justify a sentence less than death, his jury was given multiple and contradicting variations of what it could consider to be mitigating evidence. For example, the jury instructions began with an instruction advising them that bias, sympathy and mercy should not play a role. Next, the court instructed the jury that it could consider age, past criminal history and whether petitioner acted under duress or emotional distress. Finally, other instructions linked mitigation back to factors related to petitioner's culpability for the crime and informed the jury that mitigation must be established to justify a sentence less than death.

---

[27] *Penry v. Lynaugh (Penry I)*, 492 U.S. 302 (1989); *Penry v. Johnson (Penry II)*, 532 U.S. 782 (2001); *Lockett v. Ohio*, 438 U.S. 586 (1978); and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

In *California v. Brown*, 479 U.S. 538 (1987), the Court addressed whether a state-court jury instruction prohibiting a jury from being swayed by "mere sympathy" satisfied the constitutional requirement that juries be permitted to consider all relevant evidence in mitigation of a defendant's death sentence. In *Brown*, the trial court had instructed the jury that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Id.* at 540. The Court found that a reasonable juror would understand the instruction "as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." *Id.* at 542. It held that an "instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution." *Id.* at 543.

Similarly here, taken in the context of the trial court's instructions as a whole, I conclude that a reasonable juror would understand the instructions as prohibiting consideration of mercy and sympathy to the extent that these were wholly unrelated to evidence presented during the penalty-phase trial. Moreover, having reviewed the instructions, I am satisfied that the jury knew it was permitted to consider broad mitigation evidence well beyond factors specifically bearing on petitioner's culpability for the crime. For example, in discussing mitigating circumstances, the court stated:

> [m]itigating circumstances are those circumstances which do not justify or excuse the offense, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability and the appropriate punishment. You may consider any aspect of Defendant's life in your determination on the fourth question and any aspect of the Defendant's life that may be relevant to your determination of the first three questions.

Transcript Designation, Part V, p.2671. Accordingly, I conclude, in accordance with *Brown*, that the challenged instructions were neither so limiting or inconsistent as to violate petitioner's constitutional rights. On *de novo* review I deny this subclaim.

4.    Claim 14(D) - The jury instructions improperly shifted the burden of proof to petitioner to prove that death was not the appropriate sentence

As noted above, the re-sentencing court advised the jury that there was no burden of proof on the Fourth Question. Specifically, the court told the jury: "[you] should answer this question no if you find that there is any aspect of Defendant's character or background or any circumstances of the offense that you believe would justify a sentence less than death." Taken in the context of the jury instructions as a whole, I am satisfied that the jury understood that there was no burden of proof on this question. I also reject petitioner's argument that in light of respondent's position that once the jury has answered "yes" to the first three questions and decided death is appropriate, asking jurors to exercise their discretion to spare a defendant's life by answering the Fourth Question "no" necessarily amounted to the imposition of an unconstitutional burden of proof. The sentencer may not refuse to consider constitutionally relevant mitigating evidence. However, the Court held in *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled on other grounds*, that a "defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." Similarly, in *Delo v. Lashley*, 507 U.S. 272, 275 (1993), the Court noted that "we recently made clear that a State may require the defendant to bear the risk of nonpersuasion as to the existence of mitigating circumstances." Accordingly, on de novo review, I deny this subclaim.

5.    Claim 14(E) - The jury instructions did not include an instruction advising the jury not to overemphasize the offense based on the multiple charges in the indictment.

<u>Here, the circumstances of the offense were artificially inflated due to the number of aggravated murder charges (6) compared with the number of victims (2)</u>

Petitioner argues that the trial court should have instructed the jury not to be influenced by the number of counts charged in the indictment because it was the intention of the Oregon legislature that all these counts merge into a single count of aggravated murder per victim, in this case two counts. *See State of Oregon v. Barrett*, 331 Or. 27 (2000). He also relies on *Stringer v. Black*, 503 U.S. 222, 232 (1992) and *Brown v. Sanders*, 546 U.S. 212, 231-32 (2006) for the proposition that an overemphasis of improper aggravating factors in a capital sentencing may create issues of constitutional unreliability.

Petitioner's challenge to the trial court's jury instructions raises a state law claim that is not cognizable on federal habeas, unless the instructions deprived him of a fundamentally fair trial. *See Estelle*, 502 U.S. at 272-73. At core, he contends that the trial court's failure to *sua sponte* issue a cautionary instruction advising the jury not to overemphasize the offense based on the number of aggravated murder counts charged compromised the constitutional fairness of his sentencing.

My review of the record reveals that during pre-*voir dire* proceedings, the trial court advised the jury pool as follows:

> [Petitioner] has already been found guilty of **two counts of Aggravated Murder** in the deaths of Unna Tuxen and Katherine Reith, two German tourists.
>
> * * *
>
> He is guilty of the **two crimes**. The only thing we're here to determine is the sentence.

Transcript Designation, Part L, pp. 190-91(emphasis added). Moreover, in its instructions to the jury, the court stated, "[t]he Defendant in this case was previously found guilt[y] of Aggravated

Murders of Unna Tuxen and Katherine Reith." Transcript Designation, Part V, p. 2668. Neither the court nor the prosecutor mentioned multiple counts of aggravated murder pertaining to each victim. Instead, it was petitioner's counsel in opening statements and closing arguments that referenced the multiple charges. Even so, the court instructed the jury to answer the questions based only on the evidence and instructions and specifically advised the jury that "[t]he attorneys' statements and arguments are not evidence." *Id*. at 2663.

In addition, I conclude that petitioner's reliance on *Barrett* to support this claim is misplaced. *Barrett* addressed the question of whether a sentencing court may impose multiple life sentences on a defendant for the aggravated murder of one victim when a jury has convicted the defendant on multiple counts of aggravated murder. It held that the sentencing court could impose only one life sentence because under the relevant statute the harm the legislature intended to address was "one separately punishable offense", *i.e.*, the intentional, aggravated killing of another human being. Nevertheless, noting that each of the theories of aggravated murder was one on which the jury had to agree unanimously, it found that the record *should* depict the full extent of a defendant's involvement in the criminal conduct that led to the victim's death. *Barrett*, 331 Or. at 36. Accordingly, I conclude that *Barrett* does not support petitioner's argument that the trial court's failure to *sua sponte* issue a cautionary instruction advising the jury not to overemphasize the offense based on the number of aggravated murder counts charged in the indictment unfairly or artificially inflated the circumstances of the offense.

Finally, a fair review of the record reveals that the court focused the jury's attention on determining the appropriate sentence on two counts of aggravated murder, one for each victim. Accordingly, I conclude that petitioner cannot meet his heavy burden of demonstrating that the re-

sentencing court's failure to independently caution the jury not to overemphasize the offense based on the number of aggravated murder charges in the indictment so infected the trial with unfairness as to violate due process. *See Henderson*, 431 U.S. at 155 ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."). For these reasons, on *de novo* review, I deny this subclaim.

**N.    Fifteenth Claim For Relief - Oregon's 1991 Death-Penalty Scheme is Unconstitutional**

The allegations in this claim involve facial challenges to Oregon's 1991 Death-Penalty Scheme. Respondent waives the defense of procedural default as to these facial challenges and argues I should deny them on the merits.

1.    Claim 15(A)(1) - (4) - Oregon's statute fails to rationally and objectively narrow the class of defendants who are eligible for the death penalty. First, "aggravated murder" under Oregon law is a far broader classification than is allowed in virtually any other state. Second, Questions 1-3 set out in ORS § 163.150(1)(b)(A-C) do not provide adequate narrowing criteria as required under *Furman* and its progeny in that: (1) the mental state of deliberateness set out in (1)(b)(A) is insufficient alone to provide constitutional narrowing; (2) the term "deliberately" is so vague and ambiguous that it fails to provide any real narrowing; and (3)(1)(b)(c), concerning provocation, is vague, ambiguous and amounts to a pre-determined non-issue

Petitioner insists Oregon's scheme differs from the one the Supreme Court approved in *Jurek* in the following ways. First, in defining aggravated murder, the Texas legislature sufficiently narrowed the group of murderers eligible for the death penalty to intentional and knowing murders committed in five discrete situations. Critically, citing *Pulley v. Harris*, 465 U.S. 37, 49-50 (1984), he contends this narrowing occurs before any penalty proceedings commence and before the question of future dangerousness arises. In contrast, he maintains that Oregon's statute reserves the question of eligibility for the penalty phase where the question of future dangerousness is key to both the

determination of eligibility, an element of the crime itself, and selection, a moral determination. Second, the Texas appellate courts interpreted their future dangerousness question as one allowing a defendant to present whatever mitigating circumstances he is able to assist the jury in determining whether he would likely be a continuing threat to society. And third, the Supreme Court confirmed that the jury's death-penalty decision was reviewable on appeal, including on issues such as sufficiency of the evidence.

Petitioner argues that a death-sentenced individual in Oregon has been "struck by lightening" in the *Furman* sense in that he or she is one of a small percentage of convicted murderers in Oregon over the past 30 years to receive the death penalty. He suggests that Oregon's statutes fail to narrow the class of murders at all, leaving high numbers eligible, but few chosen for a death sentence and those for unarticulated and often perplexing reasons. Consequently, he contends Oregon's scheme is even more arbitrary and capricious than schemes struck down in *Furman*. Petitioner seeks an evidentiary hearing to establish: (1) the true size of the pool of murderers eligible for death; (2) the percentage of murders committed in Oregon over the past 25 years that have resulted in an aggravated murder conviction; and (3) the percentage of these in which the State has sought a death sentence. He predicts that the proportion of murder cases that could be charged with aggravated murder is so high and the selection of those where a death is sought so small, as to make the selection as random as being struck by a bolt of lightening. He expects to show that the Oregon scheme is so broad and so confused in its efforts to narrow the eligible class, so misguided in its use of future dangerousness as both a criterion for death eligibility and death selection, and so lacking in procedural safeguards that it fails to provide a meaningful and reliable basis for selecting the relatively few offenders subjected to capital punishment.

Respondent maintains that because petitioner does not offer any empirical support for concluding that a substantial portion of murders committed in Oregon over the past 25 years resulted in an aggravated murder conviction, much less a death sentence, there is no basis for me to conclude that the definition of aggravated murder in Oregon is unconstitutionally broad. He maintains that petitioner's proffered evidence that prosecutors in Washington State pursue death sentences in relatively few murder cases is irrelevant here because Supreme Court jurisprudence does not suggest, much less clearly establish, that such disparity between states creates any Eighth Amendment issues. In addition, he argues that petitioner cannot credibly argue both that Oregon fails to narrow the eligible class and that its scheme is "freakish and wanton" because the percentage of eligible murderers actually sentenced to death is too low. He maintains that Oregon's scheme complies with the Eighth Amendment requirement that a state death-penalty scheme establish objective criteria that, in application, rationally and genuinely narrow the number of murderers subject to the death penalty. He asserts the scheme winnows the class down to the "worst of the worst," first, by narrowly defining the offense of aggravated murder to capture the most serious murders, and then, by requiring the jury in the penalty phase to find three additional aggravating factors unanimously and beyond a reasonable doubt before the jury may consider the defendant for the death penalty.

Regarding the distinction between eligibility and selection factors, respondent again notes that the Oregon Supreme Court has consistently held that Oregon's death-penalty scheme and the Texas scheme discussed in *Jurek* are similar and that it considers the "future dangerousness" question to be a selection factor that informs the jury's answer to the Fourth Question. From a constitutional perspective, respondent insists that taken in the context of Oregon's scheme as a whole, the definition of aggravated murder set out in Or. Rev. Stat. §163.095 is itself sufficient to

constitutionally narrow the class of murderers potentially subject to the death penalty. He further maintains that Questions 1-3 serve to further narrow that class by requiring the jury to unanimously and affirmatively answer those questions before it considers whether to impose death. The fact that the jury may answer the future dangerousness question "yes" only if its members unanimously agree beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," serves to narrow the class of murderers who are potentially subject to a death sentence.

With regard to the relevance of the First Question in narrowing the class of eligible individuals for a death sentence, respondent argues that: (1) the Oregon Supreme Court held in *Wagner* that "deliberately" involves greater culpability than "intentionally" and that the legal distinction is real; and (2) it is possible for an individual to be convicted of aggravated murder in the guilt phase without a finding by the jury that the murder was committed intentionally. *See, e.g., Compton* (murder of a child by reckless abuse). In such a scenario, the First Question could preclude a death sentence, and thereby, narrow the class eligible for a death sentence. Similarly, respondent asserts that the Third Question could have application in some cases. And he maintains that if Oregon's scheme as a whole is adequate under the Eighth Amendment, it is immaterial whether each penalty phase question has application and serves a narrowing function in each and every case.

Petitioner faults respondent for inconsistently arguing in Claim Eleven that the eligible class consists of those found guilty of aggravated murder, but arguing here that it consists of *both* those convicted of aggravated murder and those for whom the jury answered yes to all three penalty-phase questions. He maintains that these contradictory assertions are emblematic of the reasons Oregon's 1991 capital scheme is unconstitutionally vague and ambiguous, incapable of consistent and rational

interpretation, and arbitrary and capricious in selecting individuals to charge with capital offenses and individuals to sentence to death.

## Discussion

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.

*Tuilaepa*, 512 U.S. at 971-73 (citations omitted).

In *Loving v. United States*, 517 U.S. 748 (1996), the Supreme Court further discussed death penalty eligibility as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Id.* at 755. The Court held that the legislature may itself narrow the definition of capital offenses so that a jury finding of "guilty" establishes eligibility or the legislature may define capital offenses more broadly and provide for narrowing by the jury finding aggravating circumstances at the penalty phase. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988).

Here, I am satisfied that, like the Texas scheme it is modeled after and that the Supreme Court approved in *Jurek*, Oregon's scheme adequately narrows the eligible class via its statutory definition of aggravated murder. Regardless of Texas' definition of aggravated murder setting forth "five situations" under which a defendant might be eligible for the death penalty at the time *Jurek* was decided, examination of its current scheme set out at Tex.Penal Code § 19.03 (2011)), reveals Texas and Oregon's schemes are similar both in number and kind of provisions allowing for an aggravated murder charge. One notable difference involves Or. Rev. Stat. §163.095(2)(e) defining aggravated murder as murder "committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." At first blush, this provision appears to be quite broad. However, in addressing the question of whether it was unconstitutionally broad, the Oregon Supreme Court determined that the provision "requires proof that the murder was committed intentionally and for a specific purpose - to conceal the commission of a separate crime or the identity of the crime's perpetrators." *Farrar*, 309 Or. at 185 & 195. Moreover, it specifically held that the provision could not be applied to all or almost all murders and that it genuinely narrowed the class of persons eligible for the death penalty. *Id.* State courts are the ultimate arbiters of state law. Accordingly, this court must defer to the Oregon Supreme Court's narrow interpretation of Or. Rev. Stat. §163.095(2)(e).

In addition, regardless of whether I should predominately categorize the future dangerousness question as an eligibility or a selection factor, I find that overall the penalty-phase questions, including the future dangerousness question, serve to further narrow the eligible class and adequately minimize the risk of wholly arbitrary and capricious action in accordance with *Furman v. Georgia*, 408 U.S. 238 (1972). Accordingly, I conclude that on its face Oregon's death-penalty scheme

provides a constitutionally sufficient mechanism for narrowing the class of persons eligible for the death penalty, and, on *de novo* review, I deny these subclaims.

2.   Claim 15(A)(5)(a) - (d) - Under Oregon's scheme, the future dangerousness question suffers from numerous constitutional infirmities. First, as a sentencing element and/or an eligibility factor, it fails to ensure that the jury will find that a defendant is a future danger based upon proof beyond a reasonable doubt in accordance with *Ring*, *Apprendi* and *Blakely*. Second, Oregon's statutory scheme requires only that the prosecution prove there is a "probability" that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Third, the use of internally inconsistent and contradictory language in the statute and the subsequent jury instructions and verdict form waters down the standard of proof for this sentencing element and renders Oregon's statutory scheme on the future dangerousness issue unconstitutionally vague and ambiguous

Using future dangerousness to narrow the class of individuals susceptible to the death penalty or to establish guilt of a capitally eligible offense violates the Constitution because it instructs the jury to determine whether a defendant is going to commit some crime in the future, but fails to provide the defendant with any of the constitutional protections that should govern a jury's determination of such a charge

Using future dangerousness as the narrowing factor to determine whether a defendant should be sentenced to death is unconstitutional because it ultimately allows a defendant to be executed based on a standard lower than would be allowed for a conviction of any crime, even attempted crimes. This invites the arbitrary and capricious imposition of the death penalty in violation of due process and equal protection

Respondent insists that the statute requires that the jury unanimously find beyond a reasonable doubt that the answer to the Second Question is "yes." He maintains that, unlike factual determinations about past events, predictions about future behavior are necessarily probabilistic, inherently uncertain, and predictive. He notes that the Oregon Supreme Court has rejected petitioner's mathematical view of the word probability, and, that in *State v. Longo*, 341 Or. 580, 604-05 (2006), it explicitly found that the State must prove the probability of future dangerousness, not

any particular criminal act, by a standard of proof beyond a reasonable doubt.[28] Respondent also notes that in approving use of the same future dangerousness prediction in *Jurek*, the Supreme Court held that such exercise is basically no different than tasks performed countless times each day throughout the American system of justice. Critically too, respondent insists that future dangerousness is not, as petitioner asserts, an element of the offense of aggravated murder, but that it only becomes an issue in the penalty phase where it serves as a basis to eliminate the possibility of a death sentence. As such, respondent argues, any difficulty the jury has in predicting probability of future conduct inures only the defendant's benefit because it will preclude a "yes" vote.

Petitioner argues that the Oregon courts have interpreted future dangerousness far more broadly than did the Texas courts in *Jurek*. For example, he asserts that the Oregon Court of Appeals approved instructions that allowed the jury to find a defendant a risk of being a future danger based merely on the possibility that he might threaten a violent act. *See Cunningham v. Thompson*, 62 P.2d 823, 844-45 (Or. Ct. App. 2003). And the Oregon Supreme Court has allowed evidence of membership in a white supremacist gang and Nazi beliefs to prove future dangerousness. *See Moore*, 324 Or. at 422-23; *State v. Fanus*, 79 P.3d 847, 862-64 (2003). Ultimately, petitioner argues that the breadth of Oregon's future dangerousness jurisprudence has left prosecutors with unfettered discretion to argue that an individual is a future danger. As such, he maintains that this question

_____

[28]    Petitioner's criticism aside, the *Longo* court's reference to gambling statistics, showing that it is possible to prove beyond a reasonable doubt that the odds favored the house even if one cannot say that a dealer will turn a certain card, fairly illustrated the court's point that it is possible to prove beyond a reasonable doubt that there is a probability that a defendant will commit future acts of violence that would constitute a continuing threat to society even if one cannot prove that the defendant will commit a particular crime.

applies either to every individual convicted of aggravated murder or to none of them and results in the arbitrary and random imposition of the death penalty in Oregon.

Discussion

As petitioner must acknowledge, the Supreme Court has long settled the legitimacy of future dangerousness as an appropriate aggravating factor in capital cases. *See Simmons v. South Carolina*, 512 U.S. 154, 162 (1994); *Tuilaepa*, 512 U.S. at 979; *Estelle*, 436 U.S. 880; *Jurek*, 428 U.S. at 274-76. Moreover, the Court has repeatedly rejected arguments that future dangerousness evidence is unconstitutionally arbitrary or unreliable.

In addition, persuasive authority bearing on the question of whether language requiring the jury to find it "likely" or to find that there is a "probability" that the defendant would commit future acts of violence that would constitute a continuing threat to society concludes that such language does not relieve the State of its burden to establish future dangerousness beyond a reasonable doubt. *See United States v. Montgomery*, 10 F.Supp.3d 801, 843 (W.D. Tenn. 2014); *United States v. Coonce*, 2014 WL 1018081 at *17 (W.D. Missouri March 14, 2014)(citing *Lagrone v. Cockrell*, 2002 WL 1968246 at *17 (N.D. Tex. Aug. 19, 2002)(use of term "probability" in the future dangerousness aggravating circumstances did not impermissibly soften the burden of proof, and in any event, in the instructions "the jury was informed in a clear manner that the State had to prove the future dangerousness special issue beyond a reasonable doubt").

Petitioner seeks to distinguish Oregon's use of future dangerousness in the penalty phase of death-penalty cases from that of Texas by suggesting that: (1) future dangerousness in Oregon is an eligibility factor, not a selection factor as was discussed in *Jurek*; and (2) in Oregon the state courts allow in broader evidence to support the future dangerousness determination than is allowed under

the Texas scheme, making its use unconstitutionally vague. However, as I concluded above, future dangerousness in Oregon serves both as an eligibility factor, limiting the discretion of the jury to impose a death sentence; and as a selection factor, guiding the jury's discretion in its consideration of the inherently individualized factors surrounding whether the defendant may or may not pose a danger to society in the future. Regardless, I conclude that petitioner cannot show that any differences between the way Oregon and Texas handle this issue is constitutionally significant with regard to the applicable burden of proof.

Moreover, with regard to petitioner's arguments invoking *Apprendi*, *Ring*, and *Alleyne v. United States*, 133 S.Ct. 2151 (2013), I note that elements of the offense of capital murder under Oregon law are set forth in ORS § 163.095. At the time of petitioner's conviction, capital murder was punishable by a sentence of life imprisonment with the possibility of parole or death. The sentencing factors set out in Questions 1-4 do not constitute "essential elements" of the offense of capital murder. Critically too, in Oregon, the *jury* in a capital sentencing must find beyond a reasonable doubt that there is a probability that the petitioner would commit criminal acts of violence that would constitute a continuing threat to society. Similarly, it is the *jury* on the Fourth Question who determines whether there is a reason to spare the defendant's life, after considering all of the evidence, including but not limited to evidence pertaining to: the circumstances of the offense; petitioner's age, character and background; and petitioner's moral culpability. Accordingly, the capital sentences imposed in Oregon are based on jury not judicial findings as was found problematic in *Apprendi*, *Ring*, and *Blakely*. Finally, not only does the Fourth Question not increase the statutory maximum, it provides jurors with an avenue to impose a non-death sentence, a sentence less than the statutory maximum. For these reasons, I conclude that capital-sentencing proceedings in Oregon

do not suffer from the flaws the Court resolved in *Apprendi*, *Ring* and *Alleyne*. *See Allen v. Stephens*, 805 F.3d 617, 628 (5th Cir. 2015)("The jury reached the mitigation issue only because it had already found the existence of such aggravating circumstances, and had already determined that Allen was eligible to receive a death sentence."), *cert. denied*, 136 S.Ct. 2382 (2016). Accordingly, on *de novo* review, I deny these subclaims.[29]

3.  Claim 15(A)(5)(I) - Question 2 is unconstitutionally vague in that it does not contain a viable definition of what it means to be a future danger and fails to limit the types of behavior that the jury can consider to support future dangerousness

Respondent argues that a term need not have a "special definition" to avoid being unconstitutionally vague so long as it gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. He also notes that the Oregon Supreme Court held in *Compton* that the petitioner did not have a valid claim that the statute was unconstitutionally vague because it may be difficult to discern the margins of the scope of the statute's reach when, applying the statute, the person's acts clearly fell within the undeniable reach of the statute. Finally, with respect to factors bearing on the "selection decision," he maintains that all that is required is that the factors not be so vague as to lack "some 'common-sense core of meaning ... that criminal juries should be capable of understanding.'" *Tuilaepa*, 512 U.S. at 973 (quoting *Jurek*, 428 U.S. at 279). To that end, he argues that, as the Oregon Supreme Court held in *Guzek*, *Montez* and *Farrar*, there is no reason to conclude that the jury could not understand Or. Rev. Stat. § 163.150(1)(b).

An aggravating factor is unconstitutionally vague when it does not "'channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make

---

[29]    For the reasons set forth in my resolution of Claim 11(A) and my analysis of Claims 15(A)(1)-(4) above, I also deny Claims 15(A)(5)(e) -(h).

rationally reviewable the process for imposing a sentence of death.'" *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990)(quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)); *see also United States v. Stone*, 2013 WL 6799119 at *3 (E.D.Cal. Dec. 20, 2013)(summarizing the "ample authority" upholding future dangerousness factor and concluding that it is not "'too vague to provide guidance to the sentencer.'")(citations omitted). The *Lewis* court also noted that "[a] State's definitions of its aggravating circumstances-those circumstances that make a criminal defendant 'eligible' for the death penalty-therefore play a significant role in channeling the sentencer's discretion." *Id.* at 774. Relying on *Jurek*, the Oregon Supreme Court in *Wagner I* rejected arguments that Oregon's statute is unconstitutionally vague because future dangerousness is not susceptible to prediction. Furthermore, that court rejected a defendant's claim that the trial court erred in not instructing the jury that "criminal acts of violence," as set out in ORS 163.10(1)(b)(B), referred to a "relatively narrow" range of conduct likely to result in physical injury to persons as follows:

> ORS 163.150(1)(b)(B), which required the jury to consider the likelihood that defendant will commit such acts in the future, did not so limit the jury's inquiry. This court has held that ORS 163.150(1)(b)(B) reflected an intent that information provided to the jury on the question of defendant's prior criminal conduct be "broad in scope." *State v. Moen, supra*, 309 Or. at 72, 786 P.2d 111. Similarly, ORS 163,150(1)(b)(B) (1987) permitted a jury to consider as broad a range of possible future acts of criminal violence, as those words are commonly understood, as it deems relevant in addressing th inquiry required by the statute. *See State v. Wagner*, 305 Or. 115, 152, 752 P.2d 1136 (1988)(*Wagner I*)(statutory term is not indefinite, because it restricts jury to consideration of acts of *criminal* violence).

*State v. Tucker*, 315 Or. 321, 337 (1993).

Here, petitioner's vagueness challenge is based on an assertion that Oregon courts interpret the future dangerousness question far more broadly than what the Supreme Court has deemed permissible. For the reasons discussed above, however, I conclude that Oregon's use of future

dangerousness does not differ significantly from the way Texas uses it. As it is well settled that Texas' use of future dangerousness passes constitutional muster, I conclude Oregon's use cannot be challenged on vagueness grounds. Accordingly, on *de novo* review, I deny this subclaim.[30]

3.     <u>Claim 15(B) - Oregon's statutory death penalty scheme is unconstitutional because the statutes fail to provide rational and objective criteria for selecting individuals who should be subject to a capital charge and instead leave the decision to the discretion of individual prosecutors. This discretion is without oversight or review and leads to the arbitrary imposition of the death penalty in Oregon.</u>

Respondent argues that this claim lacks both factual and legal merit. He maintains that Oregon's scheme substantially narrows the class of murderers who are subject to the death penalty. Specifically, he notes that the statutes exempt certain classes of persons, *e.g.*, juveniles and the insane; limit capital punishment to those convicted by a unanimous verdict of aggravated murder; allow for a death sentence only if a jury unanimously finds beyond a reasonable doubt all three penalty-phase criteria set out at ORS 163.150(1)(b)(A)-(C); and allow for a death sentence only if a jury unanimously finds, based on all available aggravating and mitigating evidence, that the defendant should receive a death sentence. In addition, he notes that petitioner does not allege or support assertions either that the prosecutor's decision to seek the death penalty in his case was based on any improper criteria or that the Coos County District Attorney's personal practice in seeking the death penalty in Coos County was not based on permissible criteria. Finally, he points out that petitioner does not seek a statewide proportionality review comparing his case to other similar cases,

---

[30]     Notably too, petitioner's contention that Oregon's broad interpretation of its future dangerousness question "renders [it] devoid of any meaning and unconstitutionally vague," is belied by his own chart showing instances wherein a death sentence was avoided when the jury answered "no" to the future dangerousness question. *See* Petitioner's Exhibits 344 & 345.

but rather challenges the constitutionality of Oregon's scheme based on its failure to impose or require the adoption of uniform statewide charging practices.

Petitioner argues that respondent's assertion that prosecutorial discretion is guided by very specific standards is belied both by the sheer number of death penalty cases pending in the State and an examination of other cases that have reached the Federal District Court in Oregon such as *Pinnell v. Belleque*, 3: 06-cv-00828-BR and *Cunningham v. Kelly*, 3: 04-cv-00261-SI. According to petitioner, the disparate outcomes for the co-defendants in the Pinnell case: Pinnell (convicted of aggravated murder and sentenced to death) and Cornell (convicted of felony murder conviction and sentenced to life with the possibility of parole), demonstrate that individual prosecutors are allowed to charge virtually any homicide as aggravated murder, that the statute provides no clear guidance to the jury, and that Oregon's scheme precludes legitimate review. He argues further that the prosecutor's refusal to offer the defendant in *Cunningham* a plea bargain following a polygraph exam on the question of sexual assault is an example of prosecutorial discretion resulting in an arbitrary result that cannot be reconciled with the outcomes of other rape-homicide cases even in the same county. Moreover, despite respondent's suggestion that proportionality review is limited to considerations of race and county-by-county analysis, petitioner maintains that *Furman* requires consideration of the entire State's scheme and whether it produces results that are not capricious and are not based on arbitrary decisions of individual prosecutors acting under exceptionally broad statutes.

Discussion

The Supreme Court has repeatedly held that prosecutorial discretion to select among eligible cases those in which the death penalty will actually be sought does not in and of itself offend

principles of equal protection, due process, or constitute cruel and unusual punishment. *Jurek*, 428 U.S. at 274; *Proffitt v. Florida*, 428 U.S. 242, 254 (1976); *Gregg*, 428 U.S. at 199-200. The Ninth Circuit has similarly held. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1465 (9th Cir. 1987).

Petitioner alleges that since the Oregon death-penalty statute fails to properly narrow the number of death eligible offenses and by extension the class of persons eligible for the death penalty, the narrowing function is performed by the individual prosecutor's decision to seek the death penalty in a particular case. As discussed above, however, I reject the premise that Oregon's death penalty scheme fails to perform the constitutionally required narrowing function. Accordingly, my conclusion negates the predicate on which petitioner's claim is based.

Moreover, I find no case in which the Court has held unconstitutional a selection process wherein prosecutors make the decision to seek the death penalty within the bounds of state law. The Supreme Court has opined that "[a]bsent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." *Gregg*, 428 U.S. at 225.

Here, beyond his assertions that the Oregon statutory scheme fails to adequately narrow the eligible class, thereby leaving that function to the prosecutor, petitioner cites *Pinnell* and *Cunningham* to demonstrate that under Oregon's death penalty scheme, prosecutors' decisions to charge a capital crime are arbitrary and capricious. However, without "exceptionally clear proof," I cannot infer that prosecutors generally, or that the prosecutors in petitioner's case particularly, abused their discretion in pursuing the death penalty. *McClesky*, 481 U.S. at 297. Petitioner's references to *Pinnell* and *Cunningham* do not constitute sufficient proof to prevail on this claim.

The prosecutor in *Pinnell* charged both defendants with aggravated murder and sought the death penalty. However unfair their disparate conviction and sentences may appear, the fact that different juries, presiding over the separate trials of these defendants, returned different verdicts in the guilt phases of those trials does not prove that the prosecutor abused his discretion in pursuing the death penalty in their cases, let alone that Oregon's scheme as a whole is unconstitutional with regard to the level of prosecutorial discretion it allows. To the contrary, the fact that the prosecutor secured a death sentence in one of the cases arguably indicates that he adequately assessed the strength of the cases and the likelihood that a jury in that county would return a death sentence. Similarly, in *Cunningham*, given the multitude of factors at issue in a death-penalty case like his, petitioner's reference to the fact that the prosecutor would not have accepted his offer to plead guilty to intentional rather than aggravated murder or for a sentence less than death, even had Cunningham passed a polygraph on the rape issue, does not persuade me that the prosecutor acted arbitrarily in comparison to other rape/murder cases where a non-death penalty plea agreement was reached or that Oregon's scheme as a whole is unconstitutional with regard to the level of prosecutorial discretion it allows.

Finally, respondent's argument that petitioners do have an avenue of review to challenge prosecutors' death penalty charging decisions is well taken. *See, e.g., Farrar*, 309 Or. at 134-42 (Oregon Supreme Court reviews the question whether the district attorney engaged in an unfair selective prosecution in his decision to prosecute defendant for aggravated murder and his refusal to engage in plea negotiations); *State v. McDonnell*, 310 Or. 98 (1990)(Oregon Supreme Court remands case for an evidentiary hearing upon finding that the district attorney improperly delegated decision to enter into plea negotiations to victim's parents); *State v. Hayward*, 327 Or. 397, 403-04

(1998)(Oregon Supreme Court reviews the question whether the Lane County District Attorney's office had a systematic policy for determining when to engage in plea negotiations in capital cases).

Accordingly, on *de novo* review, I deny this subclaim.

4.  Claim 15(C) - Oregon's scheme, including Or. Rev. Stat. § 163.150 (1)(b)(D), is unconstitutional because it fails to provide jurors with "specific and detailed guidance" allowing them to determine whether the defendant deserved to be sentenced to death in accordance with *McClesky*. Specifically, this provision fails to allow jurors to consider all of a defendant's mitigating evidence or to exercise sympathy and mercy. It shifts the burden of proof to the defendant to disprove that death is the appropriate sentence rather than requiring the State to prove that fact. At the very least, the statute is vague and ambiguous because after the jury has answered "yes" on Questions 1-3, it is inherently looking at the defendant for some reason to answer "yes" to Question 4 and not to the State to prove these issues[31]

In addition, the statutory terms are vague and ambiguous on the burden borne by defendant. While Question 4 purports to place no burden on defendant, § 163.150 (1)(c)(B) states that the court is to instruct the jury to answer the question "no" if only a single juror does not want to impose the death penalty. And § 163.150 (2)(a) states that if the jury votes no on any issue in (1)(b) the defendant gets true life unless 10 or more jurors vote for life with the possibility of parole. This vague and ambiguous statute results in a series of vague and ambiguous instructions to the penalty phase jury

Here, neither the statute nor the jury instructions, clearly and unequivocally stated that an individual juror could decide not to impose death based on "compassionate or mitigating factors stemming from the diverse frailties of humankind." *See Woodson*, 428 US at 304. Therefore, because the statutory scheme fails to appropriately guide jurors in determining which defendants should be sentenced to death, the death penalty has not been imposed by jurors in a consistent manner throughout Oregon

Respondent maintains that for the reasons set out in Claims 13(10) and 14(D), nothing in the current statute or in the statute in effect at the time of petitioner's re-sentencing could be construed as imposing any burden on a defendant regarding the Fourth Question. Moreover, § 163.150(1)(a)

---

[31] In his brief [314], p. 160, petitioner states: "[a]fter the jury has answered 'No' to all three prior questions." I assume that this is a typo given that even one "No" answer on the first three questions would preclude a death sentence.

directs the court in the penalty phase to admit any evidence "that the court deems relevant to sentencing including ... mitigating evidence relevant to [the Fourth Question]." Critically too, § 163.150(1)(c) provides:

> (A) The court will instruct the jury to consider, in determining the issues in paragraph (b) of this subsection [which includes Question 4], any mitigating circumstances offered in evidence, including, but not limited to the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

> (B) The court shall instruct the jury to answer [Question 4] "no" if after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense ... one or more of the jurors believe that the defendant should not receive a death sentence.

Respondent relies on the specificity of these instructions coupled with the Oregon Supreme Court's admonishment that jurors are presumed to follow their instructions absent an overwhelming probability that they would be unable to. *State v. Terry*, 333 Or. 163 (2001). He insists that nothing in the context of these instructions or in the process as a whole creates a risk that the jury would not be able to comprehend and correctly apply the instructions given. *See, e.g., State v. Fanus*, 336 Or. 63, 73-74 (2003)(Eighth Amendment does not prohibit the State from introducing a wide range of evidence for the jury's consideration in determining whether to impose a death sentence).

In addition, respondent indicates that "aggravating factors" play two roles under Oregon law: (1) they constitute the elements under Or. Rev. Stat. § 163.095 which elevate the crime of murder to aggravated murder; and (2) they constitute the first three penalty-phase questions for the jury which are factual findings that render the defendant eligible, or not, for a death sentence. In contrast, he maintains that the Fourth Question is an inquiry that "frames a discretionary determination for the jury and, therefore, does not carry a burden of proof." *Fanus*, 336 Or. at 70 (The jury is free to

consider a myriad of factors to determine whether death is appropriate and that its consideration of "aggravating evidence" in answering the Fourth Question, at the discretionary stage of the process, necessarily must be open-ended)(citation omitted).

Discussion

In order to satisfy the Eighth and Fourteenth Amendments, a capital-sentencing scheme must provide the sentencing authority with appropriate standards "that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt*, 428 U.S. at 258. During the eligibility phase the Court has stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary and capricious in its imposition. However, "in the selection phase, [it has] emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Buchanan v. Angelone*, 522 U.S. 269, 275-76 (1998). In that phase, the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. The consistent concern is that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. *Id.* (citations omitted).

For reasons already discussed above, I reject petitioner's contention that Oregon's scheme does not adequately limit the jury's discretion during the eligibility phase of proceedings or that it unconstitutionally limits the jury's ability to consider all of a defendant's relevant mitigating evidence during the selection phase. Moreover, I find petitioner's suggestion that a jury, having answered the first three penalty-phase questions "Yes," is necessarily inclined to look to the defendant to prove that he should not be sentenced to death, thereby placing an unconstitutional burden of proof on that

defendant with regard to the Fourth Question, is based on speculation. As discussed in Claim 14(D)

above, I find that under Oregon's scheme a jury would understand that there is no burden of proof

on the Fourth Question and to the extent Oregon's scheme contemplates that a petitioner bear the risk

of non-persuasion as to the existence of mitigating evidence, such risk is constitutionally acceptable

and does not constitute an impermissible burden of proof. Accordingly, on *de novo* review, I deny

this subclaim.

5.   Claim 15(D) - The statute deprives certain defendants of protections under the Oregon constitution in violation of due process and equal protection. Oregon's constitution rejects concepts of retributive, vindictive justice, or subjecting a defendant to unnecessary rigor. Moreover, it mandates that all sentences be based on reformatory principles and be subject to proportionality analysis. And it mandates that these rights be applied equally to everyone in the state. *See* Or. Const., Art I, §§ 13, 15, 16 & 20. The Supreme Court has stated that one of the primary, if not the primary, purpose of the death penalty is retributive justice. *See Ford v. Wainwright*, 477 U.S. 399, 421 (1986)(plurality). Therefore, the death penalty is precluded in Oregon

The amendment to Oregon's constitution to add Art. I, § 40, purporting to do away with the preclusion of retributive justice and proportionality, did not do away with prohibitions on unnecessary rigor and guarantees of equal protection. The death penalty in Oregon violates equal protection under the Oregon and United States constitutions and deprives death-sentenced defendants of their liberty interests created by Art I, §§ 13, 15, 16 & 20. The only individuals deprived of these constitutional guarantees and liberty interests are individuals actually sentenced to death. Every other individual charged with a crime in Oregon, including other defendants charged with aggravated murder, remain entitled to the benefits set out in Art I, §§ 13, 15, 16 & 20

Petitioner's equal protection and due process claims hinge on his assertion that Oregon treats

its death-sentenced defendants differently and less favorably than all of its other state-convicted

defendants thereby depriving them of equal protection under the Oregon and United States

constitutions and stripping them of certain liberty interests and protections provided under Oregon's

constitution. Specifically, he contends that Oregon's system denies these defendants their right to

be free from unnecessarily rigorous treatment (§13), retributive justice (§15), cruel and unusual punishment and disproportionate punishment (§16), and to their equal entitlement to privileges and immunities under state law (§20).

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985), quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982). However, the Court recognizes that "the penalty of death is qualitatively different from a sentence of imprisonment, however long" and "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is an appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

For its part, the Ninth Circuit has rejected an equal protection challenge to a state rule allowing for different deadlines in capital and non-capital petitions. *See Rhoades v. Henry*, 638 F.3d 1027, 1055 (9th Cir. 2011)(rejecting due process and equal protection challenge to Idaho statute "which imposes a forty-two day time limit for the filing of post-conviction proceedings in capital cases whereas non-capital defendants have five years within which to pursue post-conviction relief."), citing *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001). Moreover, there are procedural protections afforded capital defendants that are not provided to non-capital defendants. *Compare Beck v. Alabama,* 447 U.S. 625, 638 (1980)("[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the State] is constitutionally prohibited from withdrawing that option from the jury in a capital case.") *with Windham v. Merkle*, 163 F.3d

1092, 1106 (9th Cir. 1998)("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question.")

Similarly, the Court has held that under the Due Process Clause:

> [e]very person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. But a person who *has* been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment.

*Chapman v. United States*, 500 U.S. 453, 465 (1991)(internal citations omitted).

Ultimately, petitioner's equal protection and due process claims fail here because defendants in capital cases are not similarly situated to defendants in non-capital cases. As such, Oregon's disparate treatment of these defendants is not based on an arbitrary distinction, but is rationally related to its purpose of allowing the punishment of death in some cases. The State's disparate treatment of them, whether favorable or unfavorable, does not violate equal protection or due process principles. *See Massie v. Hennessey*, 875 F.2d 1386, 1389 (9th Cir. 1989)(In concluding that there was no equal protection violation in providing automatic appeal for murderers sentenced to death but not for murderers sentenced to life imprisonment, the court specifically held that capital and non-capital defendants are not similarly situated). In addition, I conclude that the Oregon Supreme Court's rejection of these due process arguments on the basis: (1) that the disparate treatment is rationally related to the purpose of imposing death under certain narrow circumstances; (2) capitally-sentenced and non-capitally-sentenced defendants are not similarly situated; and (3) capitally-sentenced defendants are not constitutionally entitled to statewide comparative sentence review, is not based on an arbitrary distinction between capital and non-capital defendants.

In *Wagner I*, the Oregon Supreme Court rejected an argument that enactment of Art. I, § 40 deprived defendants convicted of aggravated murder of protections under §§ 15 & 16 and to their constitutional rights under the equal protection clause. Identifying the issue as a federal question, that court determined that given § 40 was neither directed at a suspect class nor did it touch on a fundamental right explicitly or implicitly protected under the federal constitution, it need only be rationally related to its purpose to satisfy review under equal protection. It then determined that §40 was rationally related to its obvious purpose: "to allow punishment of death for certain unlawful homicides and to prevent review of death penalty statutes under sections 15 and 16." 305 Or. at 140-42, *vac'd and rem'd on other grounds*, 492 U.S. 914 (1989). In addition, in *Cunningham*, that court determined that the defendant failed to establish that he was entitled under the Fourteenth Amendment's due process clause to a statewide comparative sentence review. 320 Or. 47, 68 (1994)(citing *Pulley v. Harris*, 465 U.S. 37 (1984)).

Based on the foregoing, and on *de novo* review, I deny these subclaims.

6.    Claim 15(E) - The statutes do not provide for appellate review of the charging decision or the proportionality of the death sentence

Oregon's scheme stands in contrast to the schemes approved by the Supreme Court in that: (1) without appellate review of the charging decision, there is no way to ensure the death penalty will not be imposed in a manner that is arbitrary and capricious; and (2) the trial judge has no authority to review the prosecutor's charging decision or the jury's sentencing determination. A sufficiency of the evidence review during expedited review when requested by the defendant is not enough to ensure the constitutionality of Oregon's death penalty scheme. Moreover, in light of the failure of Oregon's scheme to genuinely narrow the class of individuals eligible for the death penalty, a true proportionality review is necessary. Finally, Oregon's appellate review is constitutionally lacking because its statutory scheme fails to require or provide for the preparation of a complete and adequate trial record in a capital case

Respondent notes that the Oregon Supreme Court has held that a statewide policy regarding charging discretion is not required under Art. I, § 20 of the Oregon Constitution or the Fourteenth Amendment, nor is a statewide proportionality review constitutionally mandated. *See Cunningham*, 320 Or. at 65-68; *McDonnell II*, 313 Or. at 493; *Wagner I*, 305 Or. at 169-71. In addition, he argues that the Oregon Supreme Court has already considered and rejected a claim alleging that the Oregon courts will not provide adequate appellate review to consider all constitutionally permissible challenges. *See Moore*, 324 Or. 396, 430-34; *Wagner I*, 305 Or. at 167-71. He further notes that the Oregon Supreme Court has considered, and in at least one case granted, claims that the district attorney relied on impermissible criteria in his or her decision to pursue death and it routinely reviews claims that the evidence was insufficient to support an aggravated murder conviction. *See, e.g., Link*, 346 Or. at 210-11. Critically too, he contends that nothing in the Oregon statutes or case law precludes the Oregon Supreme Court from considering whether evidence during the penalty phase supported the jury's verdict, or that the defendant, for some valid constitutional reason, should not be subject to death despite the jury's verdict.

Petitioner maintains that judicial review in Oregon is inadequate because it is highly deferential and limited to considerations such as race of the defendant or a county-by-county proportionality analysis. He argues that Texas' scheme, in contrast, limits the class of crimes eligible for the death penalty *at the outset* to ensure proportionality in charging decisions. In addition, he argues that Texas' appellate courts review those convictions for all appropriate constitutional violations including sufficiency of the evidence to prove capital murder and sufficiency of the evidence on future dangerousness allegations. Moreover, while petitioner concedes that *Pulley* does not specifically require proportionality review, he argues that the Eighth Amendment encompasses

narrow proportionality review, e.g., the Court held that sentencing a minor or an intellectually disabled individual to death violates the Eighth Amendment because it concluded that sentence is disproportionate to the crime under society's evolving standards of decency.

As noted above in my resolution of Claim 15(B), the Oregon Supreme Court reviews allegations of improper prosecutorial charging decisions in capital cases. It will also review allegations pertaining to the penalty phase of a capital case. *See e.g, State v. Rogers*, 352 Or. 510, 555 (2012)("defendant had the opportunity, at trial, to press his interpretation of the death penalty statutes and to ask the court to conduct his penalty-phase trial in accord. If defendant had done so, and if the trial court had disagreed, the appellate process would have provided defendant with a means of assuring that his penalty phase trial was lawfully conducted."). In addition, I address adequacy of Oregon's scheme for producing the record in capital cases in Claim 16 below and reject petitioner's argument that Oregon's scheme is unconstitutional in that regard. For these same reasons, I deny petitioner's claim that Oregon's scheme prevents petitioners like him from obtaining an adequate appellate record to seek fair review of their allegations of improper charging decisions by prosecutors or lack of proportionality surrounding their death sentences.

Finally, petitioner cannot show that the Constitution requires a statewide comparative sentence review. Petitioner's arguments notwithstanding, the Court's examination of proportionality between a crime and sentence to reflect society's "evolving standards of decency" under the Eighth Amendment underscores the reasons his suggestion that statewide comparative sentence review is constitutionally mandated lacks merit.[32] *Atkins* and *Roper* reveal the careful analysis taken by the

---

[32]    *See Atkins v. Virginia*, 536 U.S. 304 (2002)(Eighth Amendment prohibits execution of intellectually disabled individuals); *Roper v. Simmons*, 543 U.S. 551 (2005)(Eighth and Fourteenth Amendments forbid imposition of death penalty on an offender who was under the age of 18 at the

Court to identify discreet circumstances in which imposition of the death penalty violates the Eighth Amendment--in both cases abrogating its own precedent. Petitioner's argument that the same Eighth Amendment proportionality analysis adopted by the high court in those ground-breaking cases requires state courts to engage in statewide comparative sentence analysis in death penalty cases is not persuasive. Accordingly, on *de novo* review, I deny this subclaim.

O.     **Sixteenth Claim For Relief - Lack of a Sufficiently Complete Record to Allow Review**

1.     Claim 16(1) - Oregon provides a facially-unconstitutional procedure for obtaining the record of a capital case on appeal

Failure to create and provide petitioner with a complete record of his capital trial proceedings precludes him from asserting any and all potentially meritorious attacks on his conviction in violation of the due process and equal protection guarantees of the Fifth and Fourteenth Amendments. Moreover, absence of a complete record prevents this court from ensuring that this capital conviction and sentence meet the heightened reliability requirements under the Eighth and Fourteenth Amendments

Claim 16(2) - Oregon's procedures leave the decision of which portions of the proceedings, including the transcript of oral proceedings, should be transcribed up to the discretion of the trail lawyer, even in a capital case. *See, e.g.*, Or. R. App. P. 3.05(1)(record of appeal to include as "much of the record of oral proceedings as has been designated in the notice or notices of appeal filed by the parties".)

Claim 16(3) - A system that relies on trial counsel to request and obtain a complete record of the trial fails to protect a petitioner's constitutional rights, if for no other reason than the virtual certainty that a capital defendant will allege trial counsel rendered ineffective assistance on appeal or in post-conviction. Trial counsel has an irreconcilable conflict in having sole discretion to designate the transcript that will be used to litigate his or her own ineffectiveness

Claim 16(4) - Oregon's procedures are in marked contrast to the procedures of virtually every other state in the Ninth Circuit, as every other state requires preparation of a complete transcript

---

time he or she committed the crime).

> **Claim 16(5) - Petitioner alleges that the Oregon courts engage in manipulation of the court record, including intentional removal of documents filed by capitally-charged defendants, at all stages of the court proceedings**

> **Claim 16(6) - As a result of these failures, Oregon fails to provide for the preparation of a constitutionally adequate record of trial, appellate, and PCR proceedings in capital cases**

Respondent insists subclaims (1)-(6) have no merit because petitioner does not allege: (1) that Oregon law during the relevant period did not allow for the preparation and retention of all the necessary parts of the record in a capital case, much less that the law precluded such preparation and retention; (2) that any provision of Oregon law during the relevant period would not have permitted the court to retain certain documents and exhibits upon petitioner's timely and proper request; (3) that *voir dire* was not recorded or that Oregon law during the relevant period would not have permitted transcription of the recording upon sufficient showing of need; and (4) that any provision of Oregon law affirmatively precluded the PCR court from ordering that certain documents and exhibits be retained and that *voir dire* be transcribed upon petitioner's timely and proper request. In sum, he asserts that petitioner's facial challenges boil down to an assertion that for Oregon's scheme to be constitutional during the relevant period, it had to require that *voir dire* and all bench conferences be transcribed automatically and that all documents and exhibits be retained automatically, regardless of whether a party made a timely or proper request. He insists that even if this is the preferable or current practice there is no precedential authority for this position and that neither *Townsend v. Sain*, 372 U.S. 293, 319 (1963) nor *Mayer v. City of Chicago*, 404 U.S. 189 (1971) suggests otherwise. In addition, respondent argues that while *Mayer* provides that every death row inmate is entitled to a record of "sufficient completeness," nothing in that case or the

Constitution mandates that every capital defendant automatically receive the same record in order to protect his or her rights under the equal protection clause.

Citing *Gardner v. Florida*, 430 U.S. 349, 360-61 (1977), petitioner insists that the State bears the burden of producing an adequate record of his state-court capital proceedings so that I may review the fairness, accuracy and constitutionality of those criminal proceedings and appeals. In addition, in the wake of the Oregon legislature's adoption of a rule change automatically providing death-sentenced inmates with the entire transcript of their trials, including jury selection, he relies on *Mayer,* 404 U.S. at 193 to argue that there is no rationality in a system that allows one set of death row inmates to perfect their appeals while another set is provided a lesser record. Petitioner also cites the lack of uniformity in Oregon in transcribing bench and instruction conferences as raising additional equal protection concerns. Finally, petitioner takes issue with what he characterizes as the State's failure to provide a sufficient record to re-sentencing counsel and its "common custom" of maintaining documents in such a way that counsel cannot meaningfully access them because they are hidden in cryptic notes. He further identifies the "Catch-22 problem" wherein appellate counsel, often newly appointed, cannot reasonably be called on to assert in a motion for a free transcript every point that review of the transcript might disclose. Sur-reply [337] (citing *Bonner*, 66 Or. App. at 5).

The Ninth Circuit has held that a petitioner bears the burden of establishing prejudice from the lack of a complete transcript in light of the alleged value of the transcript and the availability of alternatives that would fulfill the same functions. *Madera*, 885 F.2d at 648-49. *See also, United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994)(when the court reporter failed to record all proceedings verbatim, the defendant had to demonstrate that specific prejudice resulted in order to obtain reversal).

At the heart of petitioner's facial challenges is his contention that Oregon's scheme relies on trial counsel to request and obtain an adequate record of the trial proceedings to allow for review of aggravated murder convictions and death sentences. Citing *Mayer* and *Townsend* for the importance of a complete state court record, he suggests that to a pass constitutional muster, Oregon's scheme must provide for *automatic* production of transcripts of *voir dire* and all bench conferences and *automatic* retention by the court of all documents and exhibits. However, *Mayer* indicates that defendants may or may not need a full verbatim record and references their ability to "make out a colorable need for a complete transcript." Coupled with the explicit declaration that "[a] 'record of sufficient completeness' does not translate automatically into a complete verbatim transcript," *Mayer* rejects petitioner's contention that to be facially constitutional Oregon's scheme must require the State to produce every component of the record petitioner complains of here, regardless of any request or showing on petitioner's or his counsel's part. Similarly, while *Townsend* held that "[o]rdinarily [the complete state-court record]--including the transcript of testimony (or if unavailable some adequate substitute, such as a narrative record), the pleadings, court opinions, and other pertinent documents--is indispensable to determining whether the habeas applicant received a full and fair state-court evidentiary hearing resulting in reliable findings," a fair reading of that case does not lead to the conclusion that the State's burden to produce an adequate record of state court capital proceedings encompasses automatic production of every component of the record that petitioner references here, regardless of any request or showing on a petitioner's part, in order to be facially constitutional.

Moreover, with regard to petitioner's equal protection arguments, *Mayer* actually supports the notion that, depending on individual defendant's circumstances, what constitutes a sufficient

record will vary. That case does not stand for the proposition that uniformity in transcription of every aspect of the trial including *voir dire*, bench conferences and instruction conferences is necessary for a scheme to be constitutional on its face.

In addition, though petitioner argues that Oregon's scheme for creating the record on appeal is facially unconstitutional because trial counsel is tasked with making the record transcription decisions, he does not offer any authority for the proposition that a *per se* conflict of interest arises between petitioners in Oregon and their counsel sufficient for this court to determine Oregon's scheme is unconstitutional merely because it differs from those of other Ninth Circuit states and perhaps results in a less comprehensive record. In the absence of such authority, I decline to infer as a matter of law that a conflict of interest with counsel or some failure on counsel's part to perceive his or her own errors will result in a constitutionally insufficient record.

Finally, with regard to petitioner's suggestion that the Oregon courts engage as a matter of course in manipulation of the record at all stages of court proceedings, including intentional removal of documents filed by capitally-charged defendants, I deny this claim as lacking in support. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)("[c]onclusory allegations which are unsupported by a statement of specific facts do not warrant habeas relief"). Based on the foregoing, I conclude that petitioner has not demonstrated that Oregon's scheme for creating the record on appeal in capital cases during the period relevant to his case was constitutionally invalid on its face and I deny subclaims (1)-(6).

    2.    <u>Claim 16(7) - With regard to petitioner's as-applied challenges, he alleges:</u>

        (a) There are virtually no documentary records from the actual trial. The only ones are case registers, briefing, sentences and judgments. None of the documentary evidence introduced at either the trial or second re-sentencing were made part of the

record in this case (some was made part of later court proceedings, but not all).  Without a complete certified record from the trial court, it is impossible to know what occurred at the time of trial

(b)  There were numerous bench conferences during the trial, first sentencing phase and re-sentencing that went unrecorded

(c)  In this case, the appellate court refused petitioner's request to produce a transcript of jury *voir dire* for his guilt-phase trial.  Without it, petitioner cannot evaluate whether his rights to a fair, unbiased and impartial jury were preserved.  It is also impossible to determine whether jurors were properly or improperly excused from service or to know whether failure to conduct individual *voir dire* resulted in jurors being improperly excused or seated

(d)  Even though this death penalty case is still pending, the state destroyed tapes of voir dire and the trial

(e)  Even though this death penalty case is still pending, the exhibits were returned to the District Attorney, who either reused them in the other trial or had no storage or preservation system

(f)  Oregon failed to make available a usable copy of the case record to re-sentencing counsel, thereby preventing materially exculpatory evidence from being discovered and utilized by counsel at petitioner's re-sentencing trial.  The sworn and notarized exoneration of petitioner by his co-defendant was made part of the appellate record after petitioner's first trial and was the subject of litigation before the appeal was decided.  That litigation, however, was hidden in the record under cryptic notes in OJIN and cannot be discovered by reasonable effort.  It is only available if someone already knows it exists.  The failure of Oregon to make available a usable copy of the case record to re-sentencing counsel prevented materially exculpatory evidence from being discovered and utilized by counsel

3.    Claim 16(8) - To the extent petitioner's counsel failed to request a transcript or complete record under Oregon law, such failure does not excuse the State of its independent duty to provide petitioner with an adequate record of this capital case on which to challenge his conviction and sentence

4.    Claim 16(9) - Petitioner never knowingly, intelligently, or voluntarily waived his constitutional rights to a complete record of his capital trial proceedings

I am cognizant of the dilemma petitioner faces in trying to show prejudice in claims 16(7)(a)-

(e), 16(8) and 16(9) without support of the complete transcript.  Nevertheless, I conclude that

petitioner has not met his burden of demonstrating by more than gross speculation that he was prejudiced by any gap in the record.[33] As noted above, even assuming there are omissions in the record, petitioner cannot prevail on these subclaims absent a specific showing of prejudice. He has failed to make that showing.

Petitioner complains of the omission of several categories of the record: documentary records; transcripts from bench and instruction conferences in all of his guilt and penalty-phase trials; a transcript of *voir dire* in his guilt-phase trial; and exhibits. However, he attempts to prove prejudice as a result of these omissions in only a couple of instances. Because he must present something more than gross speculation to show prejudice as discussed above, I will only address those instances. First, petitioner suggests that the court's failure to record and transcribe the chambers conference wherein his request for true life jury instruction was allegedly discussed during petitioner's re-sentencing trial has prejudiced his ability to establish either that the court or counsel violated his constitutional rights in their handling of a potential true life jury instruction. However, for the reasons discussed in Claim 3(D)(4) above, a credible reading of the record supports only an inference that petitioner opted to forego presenting the jury with a true life option--a reasonable, strategic choice. Therefore, he cannot establish that he was prejudiced by any failure to record and transcribe the referenced conference.

Similarly, with regard to the absence of the guilt-phase *voir dire* transcript, petitioner's efforts to prove prejudice based on this missing transcript are grounded in his speculation that a constitutional violation occurred during *voir dire* when the prosecutor discussed and questioned the

---

[33] I will resolve subclaim 16(7)(f) following the next round of briefing addressing exceptions to procedural default.

jurors about the natural and probable consequences instruction. The prosecutor referenced this discussion and questioning in his closing arguments:

> These particular charges all involve situations wherein aiding and abetting applies. **You remember in jury selection when we asked you questions about that.** Aiding and abetting. If the defendant intends to promote or make easier the commission of the crime, either he encourages, he procures, he advises or he assists, either by act or by advice, either in the planning or the actual commission of the crime, he is aiding and abetting and he is just as responsible as the person that pulled the trigger.

> * * *

> [N]ot only are we talking about aiding and abetting in the commission of a particular crime, the defendant would become criminally responsible for any acts or other crimes that were committed that are the natural and probable consequences of any planning, preparation or commission of that intended crime.

Transcript Designation, Part F, Volume VII, pp. 1344-45 (emphasis added).

Petitioner acknowledges that without the transcript there is no way to know what the prosecutor said and how the jurors responded, *i.e.*, there is no way to know, beyond speculation, that his failure to obtain a transcript of guilt-phase *voir dire* prejudiced him. Accordingly, on *de novo* review, I deny these subclaims.[34]

## P.     Eighteenth Claim For Relief - Cruel and Unusual Punishment

Respondent argues that each of the subclaims set out under Claim 18 is either not exhausted or not ripe for review. He contends that while "[p]etitioner did not raise these claims in any of his state-court proceedings, [] he may do so at the time the final death-warrant hearing is held in state

---

[34]     Following the next round of briefing, I will examine whether petitioner's guilt-phase counsel rendered ineffective assistance when he failed to object to the natural and probable consequences instruction given at his trial. *See* Claim 1(E)(6).

court pursuant to Or. Rev. Stat. § 137.463." Petitioner acknowledges that this claim is presently unripe and reserves further discussion to a time when it becomes ripe for consideration.

I agree that this claim is not ripe for review. I deny it without prejudice as premature.


**Q.**  **Nineteenth Claim For Relief - Incompetency**

Petitioner prophylactically alleges that he is not competent to assist counsel in these proceedings or to be executed. He acknowledges that this allegation is not ripe and that federal habeas review is premature. Pursuant to *Martinez-Villareal v. Stewart*, a claim of incompetency for execution "must be raised in a first habeas petition, whereupon it also must be dismissed as premature due to the automatic stay that issues when a petition is first filed." 118 F.3d 628, 634 (9th Cir. 1997), *aff'd*, 523 U.S. 637 (1998). If presented to the district court after the claim is ripe for review, it shall not be treated as a second or successive petition. *See id.* at 643-44. I, therefore, dismiss this claim without prejudice as premature.


**R.**  **Twentieth Claim For Relief - Improper Restrictions Imposed on Re-sentencing Counsel by Trial Court**

Petitioner alleges that the trial court violated his constitutional rights when it prevented his counsel from introducing all mitigation evidence in his second penalty-phase trial. Specifically, he alleges the court forbade counsel from interviewing any guilt-phase witnesses without express advance approval from the court and later limited such investigation to the issue of petitioner's alleged influence and control over Simonsen. Petitioner contends this prevented his counsel from introducing all available and admissible mitigation evidence.


131 - OPINION AND ORDER

Respondent maintains that petitioner mischaracterizes the trial court's ruling. He insists that the court advised counsel that they could not expend funds to reinvestigate the crime in order to impeach the guilt-phase verdict without first making a specific showing that such investigation might lead to admissible mitigation evidence. Response [321] at 204 (citing Exhibit 208).[35] In addition, respondent notes that this court previously found it implausible that Simonsen's repeated and various confessions to the crimes and his sole claim of responsibility for the shooting tended to show *how*, rather than *whether*, petitioner committed the underlying crimes. Moreover, at petitioner's trial counsel's request, the trial court entered an additional order allowing petitioner's investigator to interview such guilt-phase witnesses as may be necessary on the issue of petitioner's alleged influence and control over co-defendant Simonsen. *See* Exhibit 146 at 175. Respondent maintains that, beyond that request, petitioner does not assert that counsel attempted to make any additional showing for further investigation of guilt-phase witnesses that the trial court then denied.

There is a long-established constitutional expectation that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). In *Locket*, 438 U.S. at 586, 604 (1978), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character

---

[35] The referenced court order is not as detailed as respondent represents. In it, the court authorized defense counsel to incur expense for an investigator up to a certain dollar amount with leave to apply for additional funds if needed, and, in a handwritten addition to the order, the court "[o]rdered that no guilt phase witnesses may be [interviewed] without further order of the court." Exhibit 208.

or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The Court, however, has "never held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing." *Abdul-Kabir,* 550 U.S. at 250-51 (citing *Oregon v. Guzek,* 546 U.S. at 523-27); *see also Franklin v. Lynaugh,* 487 U.S. 164, 174 (1988)("residual doubt" as to a defendant's guilt is not a circumstance of the offense).

Petitioner cannot demonstrate that the trial court's orders issued in December 1992 (precluding the defense investigator from contacting or interviewing guilt phase witnesses *without further order of the court*) and in March 1993 (authorizing petitioner's investigator to "interview such guilt phase witnesses as may be necessary on the issue of defendant's alleged influence and control over co-defendant David Simonsen"), violated petitioner's constitutional right to present all mitigation evidence in his re-sentencing proceeding. Wherever the boundary rests between admissible mitigation evidence and inadmissible evidence of "residual doubt" as to guilt, *Guzek* establishes that a court can impose some limitation on what a capital defendant can investigate and introduce in a penalty-phase proceeding. Therefore, I conclude that the trial court's restriction requiring petitioner to obtain further order of the court before interviewing guilt-phase witnesses did not violate his constitutional rights.

In addition, petitioner fails to acknowledge the qualified nature of the court's initial order which contemplated revisiting the question of investigation of guilt-phase witnesses -- something the court actually did when it granted in part defense counsel's request to interview guilt-phase witnesses in March 1993. Accordingly, the record supports the conclusion that the court was open to requests by counsel for further authorization to investigate and interview guilt-phase witnesses. Petitioner does not point to any event during the re-sentencing proceedings wherein counsel sought

authorization or funding from the court to investigate or interview guilt-phase witnesses to uncover admissible mitigation evidence, including information about petitioner's mental illness, childhood trauma or "other evidence of mitigating circumstances that would have militated strongly in favor of a non-death sentence" and the court denied such request. Amended Petition [314], p. 197. Even assuming these witnesses had admissible mitigation evidence that they had not previously testified about, there is no support in the record to show the trial court denied counsel's request to interview these witnesses to uncover this traditional mitigation evidence. To the contrary, the fact that the trial court allowed counsel to explore the issue of petitioner's control over Simonsen leads me to conclude that had counsel made an appropriate showing regarding the more traditional mitigation evidence, the trail court likely would have authorized such investigation. Based on the foregoing, on *de novo* review, I deny this subclaim.


S.   **Twenty-First Claim For Relief - Petitioner was Denied His Constitutional Rights to Present a Defense by the Ineffective Assistance of His Expert**

Petitioner alleges that his expert, Dr. Wise's, failure to discover petitioner's bipolar disorder, despite evidence in the record pointing to that disorder, violated his constitutional right to due process, to the effective assistance of counsel and to a reliable punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments. According to petitioner, he provided Dr. Wise with treatment records indicating that he had been treated with anti-depressant drugs for depression and anti-psychotic drugs for hypomania. Petitioner asserts that those conditions are two aspects of bipolar disorder, a diagnosis readily reached by prison medical staff shortly after his post-conviction trial. In addition, he indicates that he provided Dr. Wise with evidence of crippling mental disorders in

his family. Relying on *Ake v. Oklahoma*, 470 U.S. 68 (1985), petitioner argues that Dr. Wise's failure to consider records, particularly of prior prescriptions, and to discover petitioner's serious and treatable mental disorder denied him the competent expert assistance to which he was constitutionally entitled.

Respondent contends that there is no support for the proposition that a criminal defendant has a constitutional right to the effective assistance of an expert at trial that is independent of his right to effective assistance of counsel in the investigation and use of experts.

In *Ake*, the Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83. However, not only does petitioner fail to cite to any Supreme Court authority holding that *Ake* guarantees a due process right to effective expert assistance, it appears that the Ninth Circuit has considered and rejected this argument. *See Harris v. Vasquez*, 949 F.2d 1497, 1517-18 (9th Cir. 1990)(rejecting petitioner's proposed "constitutional rule that would require federal courts to conduct a 'psychiatric medical malpractice review' in a federal habeas proceeding to determine whether a state prisoner's psychiatrists 'competently' assisted the defense."). Similarly, I am persuaded by Fourth Circuit reasoning that has consistently "rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel." *Pruett v. Thompson*, 996 F.2d 1560, 1573 n.12 (4th Cir. 1993).

Given the Oregon Department of Corrections has been treating petitioner for bipolar disorder for more than two decades, the parties cannot reasonably dispute that he suffers from the disorder.

Nevertheless, when and how the disorder manifested itself such that a competent expert could have and should have diagnosed it remains unclear. Petitioner suggests that the fact that his treatment records showed he had been prescribed anti-depressant and anti-psychotic medications coupled with the fact that prison medical staff made the bipolar disorder diagnosis shortly after his second penalty-phase trial, prove a competent expert examining him in preparation for his re-sentencing trial would have reached that same diagnosis. Respondent, however, insists that petitioner has never proven that he suffered from bipolar disorder at the time of his 1993 trial, much less that any qualified expert would have diagnosed him with the disorder at the time. I note that prison medical staff cared for petitioner during his prior incarcerations and for years prior to his re-sentencing trial. They, like Dr. Wise, did not discover and diagnose petitioner with bipolar disorder.

Ultimately, the record reflects that the State provided petitioner with access to a competent mental health expert. Dr. Wise was an expert qualified by knowledge, skill, experience, training and education to provide the court and jury with helpful or appropriate information. Petitioner has never challenged Dr. Wise's qualifications as a clinical neuropsychologist. Moreover, there is no evidence or allegation that petitioner's access to this assistance was limited by the State or that the funding provided was insufficient. As I previously noted, Dr. Wise examined petitioner over the course of three days and reviewed his past psychological and psychiatric records, medical records, Children's Services records (MacClaren School records and Jackson County Juvenile records), and records from previous incarcerations. *See* Opinion and Order [120] at 38-41.

Therefore, *Harris* forecloses petitioner's claim that Dr. Wise rendered constitutionally ineffective assistance when he failed to recognize and diagnose petitioner as suffering from bipolar disorder. I decline to expand *Ake* to encompass a "battle of experts" and I reject petitioner's suggestion that I should involve myself in determinations of expert competence. *Id.* (citing *Silagy v. Peters*, 905 F.2d 986, 1013 (7th Cir. 1990)). Rather, in accordance with *Harris*, I conclude that no *Ake* due process violation occurred and on *de novo* review deny this subclaim.

## CONCLUSION

For the reasons stated above, I order as follows:

1.     I DENY on the merits Amended Petition [314] Claims 1(A)(1), 1(A)(2)(e)-(g), 1(A)(3), 1(A)(4), 1(B)(1), 1(C)(2)(a)-(d), 1(D)(3)(a)-(g), 1(D)(4), 1(E)(5); Claim 2; Claims 3(A)(1), 3(A)(2), 3(D)(1), 3(D)(4)(a)-(f), 3(D)(5); Claims 4(A), 4(B)(1)(a)-(c), 4(c); Claims 6(A)(1), 6(A)(2); Claims 7(A)(1)-(6), 7(B); Claim 8; Claim 9; Claims 10(A)-(D); Claims 11(A), 11(C)-(E); Claims 12(1)-(12); Claims 13(4)-(10); Claims 14(A)(1)-(3), 14(B)(1)-(3), 14(C)-(E); Claims 15(A)(1)-(5), 15(B)-(E); Claims 16(1)-(6), 16(7)(a)-(e), 16(8) & (9); Claim 20 and Claim 21;

2.     I DENY Claims 18 and 19 without prejudice as premature;

3.     Respondent shall file, within sixty (60) days of the date of this Opinion and Order, a brief addressing the exhaustion, procedural default and any exceptions to procedural default pertaining to Claims 1(A)(2)(a)-(d), 1(A)(5)(a)-(d), 1(B)(2)(a)-(e), 1(C)(1), 1(C)(3)(a)-(d), 1(C)(4), 1(D)(1)(a)-(d), 1(D)(2), 1(E)(1)(a)-(k), 1(E)(2)(a) & (b), 1(E)(3), 1(E)(4), 1(E)(6), 1(F)(1)(a)-(c); Claims 3(A)(3)(a)-(r), 3(B)(1)(a)-(z), 3(C)(1)(a)-(m), 3(D)(2), 3(D)(3)(a)-(c), 3(D)(6); Claim 5; Claims 6(B)-(E); Claim 10(E); Claim 11(B); Claims 13(1)-(3); Claim 16(7)(f); and Claim 17. Petitioner shall file a response within 60 days of the filing of respondent's brief. Respondent shall file a reply within 30 days of the filing of petitioner's response and petitioner shall file a sur-reply, if any, within 30 days of the filing of respondent's reply; and

3.     Due to the subsequent filing of the Amended Petition, I DENY as moot Motion [299]. As noted above, I will resolve the issues of procedural default, exhaustion and exceptions to procedural default pertaining to the remaining Amended Petition claims

as necessary in my examination and resolution of these claims after a final round of briefing from the parties.

IT IS SO ORDERED.

DATED this 9th day of Aug, 2018.

_____
Robert E. Jones
United States District Judge